## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | |
| | Case No. 18-01297 |
| VEROBLUE FARMS USA, INC., ET AL | |
| | Chapter 11 |
| Debtors. | |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (A) AUTHORIZING POSTPETITION FINANCING; (B) GRANTING § 364(c) AND (d) LIENS AND A SUPERPRIORITY ADMINISTRATIVE CLAIM; (C) APPROVING POSTPETITION FINANCING AGREEMENT WITH ALDER AQUA, LTD. AS LENDER; (D) SETTING A FINAL HEARING; AND (E) GRANTING RELATED RELIEF**

VeroBlue Farms USA, Inc. ("**VBF USA**"), VBF Operations, Inc. ("**VBF Ops**"), Iowa's First, Inc. ("**Iowa's First**"), VBF Transportation, Inc. ("**VBF Transport**") and VBF IP, Inc. ("**VBF IP**") (collectively the "**Debtors**"), the debtors and debtors in possession in the above-captioned cases, hereby submit this *Motion of Debtors for Entry of Interim and Final Orders: (A) Authorizing Postpetition Financing; (B) Granting § 364(c) and (d) Liens and a Superpriority Administrative Claim; (C) Approving Postpetition Financing Agreement with Alder Aqua, Ltd. as Lender; (D) Setting a Final Hearing; and (E) Granting Related Relief* (the "**Motion**"). The Motion is made pursuant to sections 105(a), 364, and 507 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-3 of the Local Bankruptcy Rules (the "**Local Rules**"). In further support, the Debtors respectfully state as follows:

## I.     SUMMARY OF RELIEF REQUESTED

1.     The Debtors respectfully request that the Court enter an interim order, substantially in the form of the proposed order attached hereto, granting, *inter alia*, the following relief, on an interim basis (the "**Interim Order**"):

      a.      Approving, on an interim basis, the DIP Financing Agreement (as defined below) and authorizing, but not directing, the Debtors to execute, deliver,

and perform the DIP Financing Agreement and to obtain financing during the Interim Period (as defined below) in the amounts set forth in the Budget;

b.      Authorizing, but not directing, the Debtors to make the payments contemplated by the proposed Budget (as defined below) during the Interim Period;

c.      Granting Alder Aqua, Ltd. ("**Alder**" or "**DIP Lender**") the postpetition liens and security interests, superpriority claims, and other benefits set forth in the Interim Order to secure the extension of credit under the proposed DIP Financing Agreement during the Interim Period; and

d.      Granting the related relief as set forth in the proposed Interim Order.

2.      The Debtors further request that the Court schedule a final hearing (the "**Final Hearing**"), as early as the Court's schedule will permit, to consider granting the relief requested herein on a final basis and entering a final order substantially in the form that will be filed with the Court in advance of the Final Hearing (the "**Final Order**").

3.      Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtors provide the following summary of the essential terms of the DIP Financing Agreement (all capitalized terms used in the summary below and not otherwise defined in this Motion shall have the meanings ascribed to them in the DIP Financing Agreement or the proposed Interim Order, as applicable):

| Maximum borrowing available on a final basis: | $2,000,000. *See* DIP Financing Agreement § 2.1. |
|---|---|
| **Interim borrowing limit:** | Advances for Interim Period to be made in accordance with the Budget. *Id*. § [   ]. Final Order to be entered by [       ]. *Id*. § 4.1(b). |
| **Borrowing conditions:** | Entry of Interim Order in form and substance satisfactory to DIP Lender; relevant loan documents specified in Section 4.1(a) shall have been received by DIP Lender; no material adverse change in respect of the Debtors shall have occurred. *Id*. § 4.1. |
| **Interest rate:** | Prime rate plus 2% per annum. *Id*. § 2.4. |

| | |
|---|---|
| **Fees, costs and charges paid or payable by Debtors or any other person or entity:** | No origination, prepayment, non-usage, or exit fees. Borrower to pay DIP Lender's reasonable attorneys' fees and costs. *Id.* §§ 2.5, 9.5. |
| **Maturity:** | February 1, 2019. *Id.* §§ 1.1 (definition of "Maturity Date") and 2.1. |
| **Events of default:** | Customary Events of Default for a post-petition loan agreement. *See id.* § 7.1. |
| **Remedies in the event of default:** | Customary remedies for a post-petition loan agreement, including, without limitation, cessation of Advances, termination of DIP Financing Agreement, acceleration, exercise of UCC remedies and other remedies under applicable law. *See id.* § 7.2. |
| **Use of funds limitations:** | Funds to be used for ordinary operations and administrative expenses, subject to the Budget. *See id.* § 2.3. |
| **Protections afforded under 11 U.S.C. §§ 363 and 364:** | DIP Lender to receive (i) superpriority claim pursuant to 11 U.S.C. § 364(c)(1); (ii) priming liens pursuant to 11 U.S.C. § 364(d) solely with respect to the Debtors' biological assets, intellectual property and claims and causes of action, subject to the Carve-Out Expenses and any retainer held by Debtors' counsel in the Bankruptcy Case; and (iii) non-priming liens pursuant to 11 U.S.C. §§ 364(c)(2) & (3), subject to the Carve-Out Expenses and any retainer held by Debtors' counsel in the Bankruptcy Case. *Id.* § 2.6. |
| **Carve-Out:** | The DIP Loan shall be subject to the Carve-Out Expenses, including payments of Court fees and U.S. Trustee fees. *See* DIP Financing Agreement § 2.6. |
| **Line item budget for both the Interim and Final Order periods:** | *See* Exhibit A to DIP Financing Agreement. |

4.     Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtors highlight the following additional provisions in the DIP Financing Agreement and proposed Interim Order:

| | |
|---|---|
| **Cross-collateralization:** | None. |
| **Provisions or findings of fact regarding validity, perfection or amount of secured party's lien or debt that bind the estate:** | None in interim order but Debtors agree to validity of pre-petition secured debt and liens, with a challenge period for other parties in interest. |
| **Provisions or finding of fact regarding relative priority of secured party's lien or debt and the lien or debt of a person not party to the stipulation:** | The DIP Liens are senior to all other known liens with respect to the Debtors' inventory, work in process, accounts receivable, intellectual property, claims and causes in action.   DIP Financing Agreement § 2.6.  The Interim Orer does not contain any finding regarding the relative priority of prepetition liens. |
| **506(c) waivers:** | The Interim Order does not contain a 506(c) waiver, but does provide that the entry of an order surcharging any of the Collateral, or the commencement of an adversary proceeding seeking relief under section 506(c) shall constitute an Event of Default. *See* Interim Order ¶ [  ]; DIP Financing Agreement §§ 7.1(h), (m). |
| **Provisions divesting Debtors of discretion in formulating a plan, administering the estate, or limiting access to the court to seek appropriate relief:** | There are limitations on the indebtedness the Debtors may incur, absent DIP Lender's consent. DIP Financing Agreement § 6.1.   There are limitations on postpetition liens that may be asserted against the Collateral, absent DIP Lender's consent. DIP Financing Agreement § 6.2.

The Debtors may not sell their assets outside the ordinary course of their business (DIP Financing Agreement § 6.5); make any fundamental changes to their business operations, (*id*. § 6.4); may not reject executory contracts or unexpired leases without DIP Lender's prior written consent (*id.* § 7.1(r)).

Debtors may not file a plan that affects Lender's claims and liens unless the DIP Lender has consented in writing.  DIP Financing Agreement § 7.1(q). |

|  | Debtors shall not use any of the funds from the DIP Facility to fund any investigation or challenge to the DIP Facility Liens.  DIP Financing Agreement § 2.3<br><br>Debtors shall obtain an order from this Court confirming their plan on or before January 15, 2019.  *See* DIP Financing Agreement § 7.1(s). |
| --- | --- |
| **Releases of liability for creditor's alleged prepetition torts or breaches of contract:** | None. |
| **Waivers of avoidance actions:** | None.  However, avoidance actions and proceeds thereof constitute Collateral securing the DIP Facility Liens.  *See* DIP Financing Agreement § 2.6. |
| **Automatic stay relief:** | The Interim Order does not contain any provisions modifying or waiving the automatic stay.<br><br>Under the DIP Financing Agreement, upon an Event of Default, the DIP Lender may declare the loan then outstanding due and payable.  *See* DIP Financing Agreement § 7.2.  Upon an Event of Default or on or after the Termination Date, the automatic stay shall be lifted without further action on the part of DIP Lender (other than five business days' prior notice to the Debtors and any creditors' committee) to permit DIP Lender to foreclose on its collateral; provided that the Debtors and any creditors' committee shall have such five business days to prevent such lifting of the automatic stay on the sole basis that such Event of Default or Termination Date has not occurred.  *See* DIP Financing Agreement § 7.2.  All other remedies of the DIP Lender may be taken after it obtains relief from the automatic stay.  DIP Financing Agreement § 7.2. |
| **Waivers of procedural requirements for foreclosure mandated under applicable non-bankruptcy law:** | The Interim Order does not contain any such waivers. |
| **Adequate protection provisions that create liens on claims for relief arising under sections** | Avoidance actions and proceeds thereof are included in the Collateral securing the DIP Facility |

| 506(c), 544, 545, 547, 548 and 549 of the Bankruptcy Code: | Liens.  *See* DIP Financing Agreement § 2.6; Interim Order ¶¶ [      ]. |
|---|---|
| **Waivers effective on default or expiration, of the debtor's right to move for a court order pursuant to section 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent:** | None. |
| **Findings of fact on matters extraneous to the approval process:** | None. |

5.       As explained below the provisions identified above are necessary and appropriate under the circumstances and the product of extensive arms' length negotiations.

## II.       OVERVIEW

6.       This Motion seeks authority to borrow up to an aggregate amount of $2,000,000 in postpetition financing (the "**DIP Financing**") pursuant to that certain Debtor-In-Possession Loan Agreement (the "**DIP Financing Agreement**," a copy of which is attached hereto as **Exhibit A**), dated as of September 21, 2018, by and between the Debtors, as borrowers, and DIP Lender, as lender.  The Debtors seeks authority, on an expedited basis, to borrow in accordance with the Budget (as defined below) on an interim basis (the "**Interim DIP Financing**") until such time as the Court enters a final order with respect to this Motion (the "**Interim Period**").  If approved by the Court, the DIP Financing Agreement will grant the DIP Lender (i) a first-priority lien on the Debtors' biological assets, intellectual property and claims and causes of action, (ii) a junior lien on substantially all of the Debtors' remaining assets, and (iii) a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code.

7.       The DIP Financing and the Interim DIP Financing are critical to the Debtors' operations and ability to fund these chapter 11 cases pending confirmation of the Debtors' soon-

to-be filed chapter 11 plan of reorganization, pursuant to which the Debtors propose to preserve their business as a going concern, retain their employees and assets, refinance their major secured debt, restructure their capital structure, and provide distributions to unsecured creditors. Specifically, the Debtors have an immediate need for the Interim DIP Financing to, among other things, (i) fund payroll for the Debtors' employees, (ii) pay rent and utilities, (iii) pay vendors who are critical to the Debtors' ordinary course operations, and (iv) pay administrative expenses, including professionals' fees and United States Trustee fees in accordance with the budget (the "**Budget**") attached to the DIP Financing Agreement. Without immediate access to the Interim DIP Financing, the Debtors' ability to operate, pay its employees, and preserve the value of its business will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates and creditors.

### III.    JURISDICTION AND VENUE

8.     The Court has jurisdiction over the Debtor, its estate, and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a), 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 4001 and 6003.

### IV.    BACKGROUND

**A.    General Background**

9.     On September [21], 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

10.     The Debtors are operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.

7

11.     The Debtors are in the business of aquaculture.  The Debtors raise Barramundi, also known as Asian Sea Bass.  Barramundi is popular in Southeast Asia and Australia and its market is growing in the United States.   The Debtors sell Barramundi through wholesalers to restaurants, mostly on the East Coast of the United States.

12.     The Debtors have significantly scaled back operations in order to effectuate a retrofit of their physical plant and means of raising the fish.   Now, the Debtors' sole operation is in Webster City, Iowa.

**B.     The Debtors' Existing Secured Debt**

13.     The Debtors and Broadmoor Financial L.P. ("**Broadmoor**") (through assignment) are parties to that certain Loan Agreement dated July 7, 2016 and that certain Security Agreement dated July 7, 2016 (collectively and as amended, the "**Broadmoor Loan Documents**").  Pursuant to the Broadmoor Loan Documents, Broadmoor has a first priority lien on substantially all of the assets of the Debtors (the "**Collateral**").  In addition, by agreements dated as of February 16, 2018, Alder commenced making secured advances from time to time as a participant in the Broadmoor lending facility, which advances, in the total amount of $5,025,000, are added to the amount due and owing.  As of the date hereof, pursuant to the Broadmoor Loan Documents, the Debtors are indebted to Broadmoor in the aggregate amount of not less than [$_____], comprised of [$_____] in principal, and [$_____] in accrued interest (the "**Broadmoor Secured Debt**").

**C.     The DIP Lender**

14.     Alder is an equity owner of VBF USA, which, in-turn, directly or indirectly owns 100% of the shares of the other Debtors.  Specifically, Alder owns the majority of VBF USA's Series A Preferred Shares and owns certain of VBF USA's Common Shares as well.  Alder will serve as the Plan Sponsor of the Debtors' soon-to-be filed plan of reorganization, pursuant to

which, among other things, Alder will provide the much needed capital infusion to fund the plan and make payments to unsecured creditors and will become the Debtors' sole shareholder. Accordingly, Alder is a natural party to fund post-petition operations while the Debtors pursue confirmation of their plan.

**D.      The Debtors' Liquidity Issues, Inability to Obtain Alternative Financing, and DIP Financing Negotiations**

15.      As of the Petition Date, the Debtors had $[_____] in available cash—an amount that is barely sufficient to meet the Debtors' bi-weekly payroll obligations coming due on [_____], 2018.  Put simply, the Debtors cannot maintain even scaled back operations absent postpetition financing.  The Debtors firmly believe that it is in the best interests of creditors and the estates for the Debtors to maintain a scaled back level business operations.  Any disruption in the business could jeopardize the Debtors' ability to confirm their plan, which, in turn, would jeopardize distributions to creditors.  The DIP Financing will sustain the Debtors operations while they pursue confirmation of their plan.

16.      The Debtors approached Broadmoor, their existing secured lender, but it was not willing to provide postpetition financing.  In light of the unwillingness of other parties to provide financing on equal or better terms, the Debtors focused on negotiations with DIP Lender, who was a natural provider of financing given it plans to be the sole shareholder in the reorganized Debtors pursuant to their plan.  The DIP Financing Agreement was negotiated through a good faith, arms' length process.  On September 21, 2018, the parties reached an agreement on terms and entered into the DIP Financing Agreement.

## V.   <u>BASIS FOR RELIEF</u>

**A.   Legal Standard**

17.     "It is given that most successful reorganizations require the debtor-in-possession to obtain new financing simultaneously with or soon after the commencement of the Chapter 11 case." *In re Ames Department Stores, Inc.*, 115 B.R. 34, 36 (Bankr. S.D.N.Y. 1990).   Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.   11 U.S.C. § 364(c).

18.     A court may not approve secured or superpriority financing under section 364(c) of the Bankruptcy Code "unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *In re Ames*, 115 B.R. at 37.   A debtor need not seek unsecured financing proposals from every possible lender or lending source before seeking to incur secured postpetition financing, but should make a reasonable effort to seek other sources of less onerous financing. *Id.* at 40; *see also In re Showshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

*19.*     Additionally, Bankruptcy Code section 364(d)(1) provides that a court may authorize a debtor to incur postpetition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise, and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

20.      Assuming the statutory predicates for postpetition financing have been met, courts generally defer to a debtor's business judgment so long as the financing does not contain terms that the leverage the bankruptcy process for the benefit of a third party over the estate and does not unfairly cede control of the reorganization process to a single non-debtor party.  *E.g.*, *In re Ames*, 115 B.R. at 40; *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

**B.      The Debtors Have an Immediate Need for Financing**

21.      As explained above, unless the Debtors are authorized to obtain postpetition financing, the Debtors will not have sufficient available sources of working capital to operate in the ordinary course of business and fund administrative claims incurred in this case.  The Debtors' ability to maintain business relationships with its vendors and customers, to pay its employees, and to otherwise fund its operations, is essential to the Debtors' continued viability and preservation and maintenance of the going concern value of the Debtors pending confirmation of their soon-to-be filed plan of reorganization.

**C.      The DIP Financing Will Benefit the Debtors' Estates**

22.      The proposed DIP Financing will allow the Debtors to proceed with their efforts to successfully reorganize in these chapter 11 cases and, in turn, make distributions to unsecured creditors.  Without adequate financing, the Debtors would almost certainly need to cease operations and liquidate, which would irreparably harm the value that can be realized for the benefit of creditors and the Debtors' estates.

**D.      No Superior Financing Alternative Available**

23.      As explained above, the Debtors sought alternative sources of postpetition financing, including unsecured financing, in the weeks leading up to the Petition Date.  The Debtors' management contacted Broadmoor, the Debtors' prepetition secured lender, as well as

several local and national lending sources known to provide debtor in possession financing. Based on, among other things, the nature of the Debtors' assets, no party expressed interest in providing financing on a secured or unsecured basis. Under the circumstances, the DIP Financing is the best and only option available to the Debtors.

**E.       Broadmoor's Liens are Adequately Protected**

24.       The DIP Facility provides the DIP Lender with priming liens on the "Primary Collateral: as defined in the Loan Agreement, namely inventory, accounts, intellectual property and causes of action, all as defined in the Loan Agreement.  [Broadmoor consents to the limited priming provided herein.]

25.       As adequate protection for the priming of Broadmoor's Secured Debt, Broadmoor shall receive replacement liens to the extent of any diminution in value of their interest in the collateral securing their Broadmoor Secured Debt.  It is well settled that adequate protections may be provided through a "replacement lien" or "other relief" resulting in the indubitable equivalent of the secured party's interest in such property.  *See* 11 U.S.C. § 361.  Moreover, preservation of value also generally constitutes the "adequate protection needed to prime existing liens.  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [*i.e.*, collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (funds from lender given "priming" lien used to improve collateral is transferred into value.  "This value will serve as adequate protection . . . .").  Accordingly, Broadmoor is adequately protected.  Moreover, Broadmoor has consented to the DIP Financing Agreement and the DIP Lender's priming liens.

### F.      Adequacy of Budget

26.      The Debtors have compiled the Budget based on all historical costs of operation, reasonable projections regarding future operations, and the added costs of operating under chapter 11 of the Bankruptcy Code, including professionals' fees.  The Debtors submit that the Budget is adequate based on all available information.

### G.      The DIP Financing Represents a Reasonable Exercise of the Debtors' Business Judgment

27.      After appropriate investigation and analysis and given the exigencies associated with the Debtors' bankruptcy filings, the Debtors' management has concluded that the DIP Financing is the best and only available option in the circumstances of these cases.  Bankruptcy courts routinely defer to the debtor's business judgment with respect to such matters, as "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

28.      Here, the Debtors have exercised sound business judgment in determining that the DIP Financing is appropriate, and the Debtors have satisfied the legal prerequisites to borrow under the DIP Financing Agreement.  The terms of the DIP Financing Agreement are fair and reasonable and in the best interests of the Debtors' estates.  Nor does the DIP Financing unfairly leverage the bankruptcy process in favor of the DIP Lender or cede control of the reorganization to the DIP Lender.

29.      Indeed, the DIP Financing Agreement contains several features that demonstrate its fairness and reasonableness.  The DIP Financing Agreement provides that the liens granted to the DIP Lender will be junior to (i) existing liens on the Debtors' assets, other than the Debtors'

biological assets, intellectual property and claims and causes of action; (ii) the Carve Out; and (iii) any retainer held by Debtors' bankruptcy counsel. Additionally, the DIP Financing does not include any upfront fees or costs or prepayment penalties. These provisions, among others, demonstrate that the DIP Financing is fair, reasonable, and the best option available to the Debtors.

**H.     The DIP Financing Was Negotiated in Good Faith**

30.     The DIP Financing Agreement was negotiated in good faith and at arms' length between the Debtors and the DIP Lender, with all parties represented by counsel. Accordingly, the Debtors believe that any credit extended under the terms of the Interim Order is extended in good faith by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code.

## VI.     SATISFACTION OF RULE 4001(c)(2)

31.     Bankruptcy Rule 4001(c)(2) provides that within the first 14 days after service of a motion for postpetition financing, the court "may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2). As described above, the Debtors will likely have to cease operations and liquidate if the relief requested in this Motion is not granted. Accordingly, entry of the Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates pending entry of the Final Order.

## VII.     PROPOSED FINAL HEARING AND NOTICE PROCEDURES

32.     The Debtors propose that they serve a copy of the Interim Order within three business days of its entry, together with a notice (in conformity with Local Rule 9013-1) of the Final Hearing on the Motion, by overnight mail, facsimile, email, or hand delivery, on the Notice Parties (as defined below) and on any party that files a request for notice pursuant to Rule 2002 of the Bankruptcy Rules.

33.    The Debtors request that the Court set an objection deadline for objections to the Final Order, which deadline will be included in the notice referenced above.

## VIII.   **NOTICE**

34.    Notice of this Motion has been or will immediately be provided by the Debtors, whether by facsimile, email, overnight mail, or hand delivery, to: (i) the United States Trustee for the Northern District of Iowa; (ii) the Debtors' twenty largest non-insider unsecured creditors; (iii) the IRS and the other government entities listed on the Certificate of Service filed concurrently herewith; (iv) each entity known to assert a security interest or lien in assets of the Debtors; (vii) counsel to the DIP Lender; and (viii) all parties requesting notices pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Interim Order; (ii) schedule the Final Hearing and approve the Debtors' proposed notice procedures with respect thereto; (iii) following the Final Hearing, enter a Final Order granting the relief requested herein; and (iv) grant such other relief as the Court deems just and proper.

Dated [_____], 2018.

Respectfully submitted,

AG & BUSINESS LEGAL STRATEGIES, P.C.


/s/ Joseph A. Peiffer_____
Joseph A. Peiffer AT0006160
PO Box 11425
Cedar Rapids, Iowa 52410-1425
Telephone: (319) 363-1641
FAX: (319) 200-2059
E-mail: Joe@ABLSOnline.com

ELDERKIN & PIRNIE, P.L.C.

/s/ Dan Childers
Dan Childers      LI0007535
316 Second Street SE, Suite 124
P.O. Box 1968
Cedar Rapids, IA  52406-1968
Phone:  (319) 362-2137
dchilders@elderkinpirnie.com
Attorneys for the Debtor-In-Possession

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that a copy of this document was served upon, mailed, or delivered to counsel of record, debtor and other parties of interest listed on the attached sheet not served by the Bankruptcy Court's electronic noticing system in compliance with Bankruptcy Rules 7004 and 9014 on the 21st day of September 2018.

Signed:  /s/ Alecia Harrison

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VEROBLUE FARMS USA, INC., ET AL., | ) | Case No. [      ] |
| | ) | |
| Debtor. | ) | |

**INTERIM ORDER  (A) AUTHORIZING POST-PETITION FINANCING,
(B) GRANTING §  364(c) and 364(d) LIENS AND A SUPERPRIORITY
ADMINISTRATIVE CLAIM, (C) APPROVING POST PETITION FINANCING
AGREEMENT WITH ALDER AQUA, LTD., (D) SETTING A FINAL HEARING, AND
(E) GRANTING RELATED RELIEF**

Upon consideration of the Motion (the "**Motion**")[1] filed by VeroBlue Farms USA, Inc. ("**VBF USA**"), VBF Operations, Inc. ("**VBF Ops**"), Iowa's First, Inc. ("**Iowa's First**"), VBF Transportation, Inc.  ("**VBF Transport**") (collectively the "**Debtors**"), the debtors and debtors in possession in the above-captioned cases, seeking, *inter alia*, (a) authority pursuant to sections 105, 363, and 364(c) and 364(d) of the title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, for the Debtors to obtain post-petition loans, advances and other credit accommodations from Alder Aqua, Ltd. ("**Lender**"), and entry of the Final Order (as defined below), pursuant to which the Lender will be granted, subject to the Carve-Out (as defined below), (i) a superpriority administrative claim pursuant to 11 U.S.C.  § 364(c)(1); (ii) first-priority "priming" liens in the Debtors' biological assets, intellectual property and claims and causes of action pursuant to 11 U.S.C. § 364(d), subject to the Carve-Out and any retainer held by Debtors' attorneys; and (iii) junior security interests in and liens upon substantially all of the Debtors' other assets pursuant to 11 U.S.C. §§ 364(c)(2) and 364(c)(3), junior to the Permitted Liens (as defined below), the Carve-Out, and any retainer held

---

[1]  Capitalized terms not defined in this Interim Order shall have the same meaning as set forth in the Motion.

by Debtors' attorneys; (b) approval of the Debtor-In-Possession Loan Agreement by and between the Lender and the Debtors dated September [    ], 2018 and related documents and instruments (the "**DIP Financing Agreement**"), and (c) modification of the automatic stay solely to the extent necessary to enter into the proposed financing and effectuate the terms thereof (and for other purposes described herein); and the Lender and Debtors having agreed and stipulated as follows, which stipulations this Court hereby approves and adopts:

A.      <u>Filing of Petition</u>.  On September 21, 2018 (the "**Petition Date**"), the Debtors filed their voluntary chapter 11 petitions under the Code.  Pursuant to sections 1107 and 1108 of the Code, the Debtors are authorized to operate their business as debtors in possession.  To date, no official committee of unsecured creditors has been appointed in this case.

B.      <u>Jurisdiction: Core Proceeding</u>.  Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (O).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District.

C.      **NEED FOR FUNDING.  THE DEBTORS HAVE REQUESTED IMMEDIATE ENTRY OF THIS INTERIM ORDER (AS DEFINED BELOW) PURSUANT TO BANKRUPTCY RULE 4001(C)(2).  THE RELIEF SOUGHT IN THE MOTION IS NECESSARY AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES IN ORDER TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO THE DEBTORS' ESTATES WHICH WOULD RESULT IN THE ABSENCE OF THE PROPOSED FINANCING.  THE DEBTORS BELIEVE THAT WITHOUT THE PROPOSED FINANCING, THE DEBTORS WILL NOT HAVE THE FUNDS NECESSARY (A) TO PAY OVERHEAD, PAYROLL, AND OTHER EXPENSES NECESSARY FOR THE**

**CONTINUED OPERATION OF THE DEBTORS' BUSINESS, INCLUDING THE ADMINISTRATIVE COSTS ASSOCIATED WITH THE CASE, (B) TO IMPLEMENT A PLAN PROCESS THAT WILL MAXIMIZE RECOVERY TO CREDITORS, AND (C) TO MANAGE AND PRESERVE THE DEBTORS' ASSETS.   THE DEBTORS HAVE REQUESTED THAT LENDER MAKE LOANS AND ADVANCES TO DEBTORS IN ORDER TO PROVIDE FUNDS TO BE USED BY DEBTORS FOR THEIR GENERAL OPERATING, WORKING CAPITAL AND OTHER BUSINESS PURPOSES IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS.**

D.      Good Cause.   All such loans, advances and other financial accommodations by Lender will benefit the Debtors, their creditors and their estates.   The Lender is willing to make such loans and advances and provide such other credit accommodations pursuant to section 364(c) and (d) of the Bankruptcy Code during the interim period, as more particularly described herein and in the DIP Financing Agreement.   Among other things, entry of this Interim Order will: (i) minimize disruption of the Debtors' business, (ii) preserve and maintain the assets of the Debtors' estates, (iii) increase the likelihood of a successful conclusion of the case through a proposed plan process, and (iv) avoid immediate and irreparable harm to, and is in the best interests of, the Debtors, their creditors and their estates.

E.      Unavailability of Alternative Financing.   Despite diligent efforts, the Debtors have been unable to procure financing other than the proposed financing by the Lender from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.   The interest rate under the DIP Financing Agreement is fair and reasonable given the risks associated with the Debtors' chapter 11 cases.   The DIP Financing Agreement reflects the proper exercise of sound business judgment by the Debtors.

F.    <u>Notice.</u>  The Debtors have provided notice of the terms of the Motion and the relief requested to (i) the United States Trustee, (ii) all creditors known to Debtors who may have liens against the Debtors' assets, (iii) the United States Internal Revenue Service, (iv) the twenty (20) largest unsecured creditors of the Debtors and (v) all other creditors and parties in interest requesting notice under Bankruptcy Rule 2002(i).  The expedited notice pursuant to Bankruptcy Rule 4001(c) to such parties in interest is necessary to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing for permanent financing.

G.    <u>Business Judgment and Good Faith Under Section 364(e).</u>  The terms of the DIP Financing Agreement between the Debtors and Lender and this Interim Order pursuant to which post-petition loans, advances and other credit accommodations may be made or provided to Debtors by Lender have been negotiated in good faith and at arms' length within the meaning of section 364(e) of the Bankruptcy Code, are in the best interests of the Debtors, their creditors and their estates, are fair and equitable under the circumstances, and are enforceable pursuant to their terms.  The relief granted by this Court pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their bankruptcy estates.  The terms of the proposed financing are (i) fair and reasonable; (ii) reflect prudent exercise of business judgment consistent with the Debtors' fiduciary duties; (iii) constitute reasonably equivalent value and fair consideration; and (iv) are essential and appropriate for the continued operation and management of the Debtors' business and the preservation of its assets and properties.  This Interim Order is subject to, and Lender is entitled to the benefits of, the provisions of section 364(e) of the Bankruptcy Code.

H.    <u>Broadmoor Financial, L.P. Pre-Petition Liens.</u>  The Debtors and Broadmoor Financial L.P. ("**Broadmoor**") (through assignment) are parties to that certain Loan Agreement

dated July 7, 2016, as amended by that First Amendment to the Loan Agreement dated June 27,

2017, and as further amended by that Second Amendment to the Loan Agreement dated September

21, 2017, and that certain Security Agreement dated July 7, 2016 (collectively, the "**Broadmoor**

**Loan Documents**").  Pursuant to the Broadmoor Loan Documents, Broadmoor has a first priority

lien on substantially all of the assets of the Debtors (the "**Collateral**").  Pursuant to the Broadmoor

Loan Documents, the Debtors are indebted to Broadmoor in the principal amount of $44,165,400,

plus accrued interest in excess of $4 million (the "**Broadmoor Secured Debt**").

I.      Factual Findings/Legal Conclusions.  Each of the foregoing findings by the Court

will be deemed a finding of fact if and to the full extent that it makes and contains factual findings

and a conclusion of law if and to the full extent that it makes and contains legal conclusions.

THEREFORE, IT IS HEREBY ORDERED THAT:

1.      Authorization to Incur Indebtedness and Enter Into DIP Financing Agreement and

Related Documents.  The Motion is hereby granted and approved in all respects on an interim basis

pending the Final Hearing (as defined below).  This order is referred to herein as the "**Interim**

**Order**".  Pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the Debtors

are hereby authorized and empowered to borrow from the Lender, pursuant to the terms of this

Interim Order and the terms and conditions set forth in the Note ("**DIP Loan Note**") and DIP

Financing Agreement up to $2,000,000.00 in original principal obligations ("**DIP Loan**") on an

interim basis pursuant to, and in the amounts set forth in, the budget attached hereto as **Exhibit A**

(the "**Budget**").  The Debtors are authorized to execute, deliver, perform and comply with the

terms and covenants of the DIP Financing Agreement and related documents and this Interim

Order.  The terms and conditions of the DIP Financing Agreement and related documents are

ratified and approved, and, together with this Interim Order, shall be sufficient and conclusive

evidence of the borrowing arrangements between the Debtors and the Lender and of the terms and conditions of the DIP Financing Agreement and related documents, for all purposes.  To the extent there is any conflict between the DIP Financing Agreement and related documents and this Order, the terms of this Order shall control.

2.      Use of Advances Made Under this Interim Order.  The Debtors are authorized to use proceeds of the loans and advances made, and other credit accommodations provided, by the Lender to the Debtors, for the payment of its actual and necessary post-petition obligations including, without limitation, actual and necessary general operating and working capital expenses incurred in the ordinary course of Debtors' business and in accordance with the terms and conditions of the DIP Financing Agreement and related documents and instrument and the Budget, subject to the permitted 10% variance from the Budget on a line item basis ("**Permitted Variance**").  The Budget may be modified or amended with the written approval of the Lender. In addition, the Debtors are hereby authorized to use the proceeds of the loans and advances made, and other financial accommodations provided by Lender to Debtors, to pay the fees and expenses of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).

3.      Grant of Liens and Superpriority Administrative Claim.

**(a)      Effective immediately upon making any Advance and pursuant to 11 U.S.C. §§ 364(c)(2), 364(c)(3) and 364(d), as security for the full and timely payment and performance of all of the Loans, the Debtors are authorized to assign, pledge and grant to the Lenders, for the benefit of the Lenders, the DIP Facility Liens (defined below).  The DIP Facility Liens shall constitute:  (i) valid, perfected first-priority liens, senior to all creditors of the Debtors' estate, including Broadmoor and its Broadmoor Secured Debt, in the Debtors' biological assets, intellectual property and claims and causes of action, subject only**

22

to the Carve Out and any retainer held by the Debtors' attorneys; and (ii) valid, perfected liens in all other of the Debtors' assets, subject to existing liens, the Carve-Out and any retainer held by the Debtors' attorneys.  The DIP Facility Liens and their priority shall remain in effect until the DIP Loan has been repaid in full.

(b)      The "DIP Facility Liens" shall mean liens and security interests in all of the Debtors' now owned or hereafter acquired right, title and interest in and to all property, of whatever kind or nature and wherever located, which property includes, but is not limited to all accounts, chattel paper, furniture, fixtures, inventory, biological assets, equipment (including all accessions and additions thereto), general intangibles (including payment intangibles, tax refunds, software, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists and licenses), any and all claims and causes of action, including commercial tort claims and causes of action arising under chapter 5 of the Bankruptcy Code or any proceeds thereof ("Avoidance Actions"), documents (including negotiable documents), instruments (including promissory notes), securities, deposit accounts, certificates of deposit, letters of credit, money, goods and inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossession), intellectual property, investment property (including securities and securities entitlements), leases, books and records relating to all of the foregoing property and interests in property, all additions to, substitutions and replacements for, any of the foregoing, and all products and proceeds of any of the foregoing, including all insurance proceeds, all claims against third parties for loss or destruction of or damage to any of the foregoing, and all income from the lease or rental of any of the

**foregoing, and all supporting obligations and the security therefor or for any rights to payment.**

**(c)      All terms in section 3(b) not otherwise defined above have the meanings given to them in the Uniform Commercial Code.**

**(d)      The Lien and security interest in favor of the Lenders shall be a valid and perfected Lien and security interest in the Collateral, with priority as granted by 11 U.S.C. §§ 364(c)(2), 364(c)(3), and 364(d) as to any Advance made between the Petition Date and the end of the period covered by this Interim Order.**

**(e)      Lender shall not be required to file any financing statements, mortgages, certificates of title, notices of DIP Facility Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the DIP Facility Liens and security interest granted by or pursuant to the DIP Loan Agreement, this Interim DIP Order or Final DIP Order, as the case may be, or any other Loan Document; _provided_, Lender shall be permitted to file any financing statements, mortgages, deed(s) of trust, certificates of title, notices of DIP Facility Liens or similar instruments in any jurisdiction or filing office or to take any other action with respect to the DIP Facility Liens or security interest granted by or pursuant to this Loan Agreement.**

**(f)      Except as approved by the Lender in writing, the Lender's DIP Facility Lien, its priority, administrative priority and other rights and remedies granted to the Lender pursuant to the Loan Documents shall not be modified, altered, primed or impaired in any manner by any other financing or extension of credit to the Borrower (pursuant to § 364 of the Bankruptcy Code or otherwise) or by any dismissal or conversion of the Chapter 11 Case or, with respect to the Loan, any modification, amendment or reversal or stay of the Interim**

DIP Order or the Final DIP Order, as the case may be, or by any other act or omission whatsoever.

(g)   Pursuant to Section 364(c)(1) of the Bankruptcy Code all amounts due under the DIP Loan shall constitute a super priority administrative claim in the Chapter 11 Case and shall constitute an administrative expense claim under Section 507(b) junior only to the Carve Out and any retainer held by the Debtors' attorneys ("DIP Facility Super Priority Claim").

4.   <u>Limitation on Use of DIP Loan Proceeds</u>. Notwithstanding the foregoing, no funds shall be paid or made available, whether from the DIP Facility or the Carve-Out, for any fees, disbursements or expenses of any party, including the Debtors or any official committee in this case (the "**Committee**"), or any professional employed by any party, in connection with (i) the initiation or prosecution of (but excluding any investigation into) any claims, causes of action, adversary proceedings, or other litigation against the Lender (directly or indirectly), including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Facility obligations, the DIP Facility Superpriority Claim, or the DIP Facility Liens; and (ii) after a Default or an Event of Default, asserting any claims or causes of action against the Lender, including, without limitation, claims or actions to hinder or delay the Lender's assertion, enforcement or realization on the Collateral in accordance with the Lender DIP Loan Documents or this Interim Order.

5.   <u>Re-Borrowing</u>.  Advances under the DIP Loan may be advanced, repaid and re-advanced, subject to the terms of the DIP Financing Agreement.

6.   <u>Adequate Protection to Broadmoor and Existing Lienholders</u>.

(a)    As a result of granting the Lender first-priority liens in certain of the Debtors' Collateral that "prime" those of Broadmoor and any other existing lienholder, Broadmoor and any lienholder (to the extent such lienholder has a valid prepetition lien on the Debtors' Collateral that is being "primed" pursuant to this Interim Order) is entitled to and is hereby granted the following adequate protection to secure payment of an amount equal to the diminution in value of such lienholder's interest in such Collateral (the "Adequate Protection") effective upon the Petition Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, or financing statements, or otherwise: postpetition replacement liens against such Collateral (and the proceeds thereof) on which such lienholders hold a valid prepetition lien (the "Adequate  Protection Liens").

(b)    The Adequate Protection Liens granted herein (i) are subordinate only to the Carve-Out, retainers held by Debtors' attorneys and the DIP Facility Liens, (ii) shall attach in the same order of priority that existed under applicable non-bankruptcy law as of the Petition Date, (iii) are automatically perfected, and (iv)  exclude any Avoidance Actions.

7.    <u>Fees and Expenses of the Lender</u>.  The Debtors shall reimburse the Lender for its reasonable costs, fees (including reasonable attorneys' fees), charges, and expenses incurred in connection with the case whether incurred pre-petition or post-petition. In this connection, the Lender shall transmit summary invoices (subject to confidentiality and applicable claims of privilege) to the Debtors, counsel to any Committee and the United States Trustee, each of whom shall have five (5) calendar days from receipt thereof to review and object to such invoices.  At the expiration of such five (5) calendar day period, the Debtors shall promptly pay such invoices, except those costs, fees, charges and/or expenses as to which an objection has been timely made in writing.  In the event of an objection, the parties shall confer with one another and attempt to

reach agreement regarding the payment to be made.  If agreement cannot be reached between the

parties, the matter shall be promptly submitted to the Bankruptcy Court in the form of a written

objection setting forth the precise nature of the objection and the monetary amount at issue.

Thereafter, the Bankruptcy Court will consider and rule on the objection.  Absent a timely written

objection to any summary invoice, none of the Lender's costs, fees, charges or expenses reflected

in the applicable invoice shall be subject to Court approval, and the Lender shall not be required

to file any interim or final fee application(s) with the Court, provided that the Court shall have

jurisdiction to determine any disputes concerning the Lender's summary invoices.

       8.      <u>Automatic Perfection.</u>  With respect to the debt incurred by Debtors under the DIP

Loan Note and DIP Financing Agreement, this Interim Order shall be sufficient and conclusive

evidence of the priority, perfection and validity of all of the security interests in and liens upon the

property of the Debtors' estate granted to the Lender as set forth herein, without the necessity of

filing, recording or serving any financing statements, or other documents which may otherwise be

required under federal or state law in any jurisdiction or the taking of any other action to validate

or perfect the security interests and liens granted to the Lender in this Interim Order and the DIP

Financing Agreement.  If the Lender shall, in its discretion, elect for any reason to file any such

financing statements or other documents with respect to such security interests and liens, the

Debtors are authorized and directed to execute, or cause to be executed, all such financing

statements or other documents upon the Lender's reasonable request and the filing, recording or

service thereof (as the case may be) of such financing statements or similar documents shall be

deemed to have been made at the time of and on the Petition Date.  The Lender may, in its

discretion, file a certified copy of this Interim Order in any filing or recording office in any county

or other jurisdiction in which the Debtors have real or personal property and, in such event, the

subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order.

9.      <u>Further Acts by the Debtors.</u>  The Debtors are hereby authorized to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the above DIP Financing Agreement as the Lender may reasonably require and as evidence of and for the protection of the DIP Facility obligations and the Collateral or which may be otherwise deemed necessary by the Lender to effectuate the terms and conditions of this Interim Order, the DIP Loan Note and the DIP Financing Agreement.

10.      <u>No Control of the Debtors</u>.  In determining to make any extensions of credit under the DIP Financing Agreement, and in negotiating and consummating the transactions authorized by this Interim Order, the Lender shall not be deemed to have been in control of the operation of the Debtors.

11.      <u>Default Notice.</u>  Prior to the exercise of any enforcement or liquidation remedies against the Collateral, the Lender shall be required to give five days written notice to the Debtors, their bankruptcy counsel, the Committee's counsel, if any, and the U.S. Trustee.  Notwithstanding the occurrence of an Event of Default or the Commitment Termination Date, all of the rights, remedies, benefits, and protections provided to the Lender under the Lender DIP Loan Documents and this Interim Order shall survive the Commitment Termination Date.

12.      <u>Access to the Debtors</u>.  Without limiting the rights of access and information afforded the Lender under the Lender DIP Loan Documents, the Debtors shall permit representatives, agents and/or employees of the Lender to have reasonable access to its premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' business) and shall cooperate, consult with, and provide to such

representatives, agents and/or employees all such non-privileged information as they may reasonably request.

13.     <u>Reporting</u>. On a bi-weekly basis, the Debtors shall provide to the Lender the following: (i) a rolling 13 week cash flow statement, (ii) a budget to actual comparison, due each Tuesday for the prior two weeks, and (iii) any other financial information reasonably requested by the Lender to be provided within 3 days of receipt by the Debtors following a written request for same.  Items (i) – (ii) herein shall be certified as true and correct by an officer of the Debtors.

14.     <u>Insurance Policies</u>.  Upon entry of this Interim Order, the Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral.  The Debtors are authorized and directed to take any action necessary to have the Lender added as an additional insured and loss payee on each insurance policy.

15.     <u>No Further Indebtedness Without Lender's Consent.</u>  Debtors shall not seek or incur any further indebtedness, secured or otherwise, under § 364 of the Bankruptcy Code without Lender's consent.

16.     <u>Survival of Provisions.</u>  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered dismissing the case, converting Debtors' Chapter 11 cases to Chapter 7, or any order which may be entered confirming or consummating any Chapter 11 plan, and the terms and provisions of this Interim Order as well as the priorities in payment, liens, and security interests granted pursuant to this Interim Order and the DIP Financing Agreement shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Interim Order until all DIP Facility obligations are indefeasibly satisfied and

discharged; provided, that, all obligations and duties of Lender hereunder, under the DIP Loan Note, the DIP Financing Agreement or otherwise with respect to any future loans and advances shall terminate immediately upon the earlier of any of the following ("**Commitment Termination Date**"):  (a) the February 1, 2019; provided, however, that if Lender has given its express prior written consent to a different date (no such consent will be implied from any other action, inaction or acquiescence by Lender) then that different date shall apply; (b) the date of indefeasible prepayment in full by Debtors of the DIP Loan, (c) the date of the "substantial consummation" (as defined in Bankruptcy Code § 1101), but in any event no later than the effective date of a plan of reorganization confirmed in these Cases, (d) the date of the consummation of the sale of any material portion of the Collateral outside the ordinary course of business pursuant to Bankruptcy Code § 363, (e) the conversion of any of these cases to a case under Chapter 7 of the Bankruptcy Code or the appointment of a Chapter 11 trustee in any of these cases, or (f) Lender's acceleration of the DIP Loan upon the occurrence of an Event of Default thereunder; subject to five days' notice and right to cure as provided in the DIP Loan.

17.    Resolution of Any Conflicting Terms.  To the extent the terms and conditions of the DIP Loan Note or the DIP Financing Agreement are in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

18.    Order Binding on Successors.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Lender, the Debtors, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtors' estates or of any estate in any successor case).  Except as otherwise explicitly set forth in this Interim Order, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order, the DIP Loan Note or the DIP Financing Agreement.

19.      <u>Subsequent Reversal</u>.  If any or all of the provisions of this Interim Order, the DIP

Loan Note or the DIP Financing Agreement are hereafter modified, vacated, amended, or stayed

by subsequent order of this Court or any other court without the consent of the Lender: (i) such

modification, vacatur, amendment, or stay shall not affect the validity of any obligation of the

Debtors to the Lender that is or was incurred prior to the effective date of such modification,

vacatur, amendment, or stay (the "**Effective Date**"), or the DIP Facility Superpriority Claim and

DIP Facility Liens authorized or created by this Interim Order and the Lender DIP Loan

Documents; and (ii) the DIP Facility obligations arising prior to the Effective Date shall be

governed in all respects by the original provisions of this Interim Order and the Lender DIP Loan

Documents, and the validity of any such credit extended or security interest granted pursuant to

this Interim Order and the Lender DIP Loan Documents is and shall be protected by section 364(e)

of the Bankruptcy Code.

20.      <u>Carve-Out</u>.

**(a)      The DIP Facility Superpriority Claim, the DIP Facility Liens, the Adequate**

**Protection Liens, and the Collateral shall be subject in all cases to payment of the following**

**expenses (the "Carve-Out"):**

**(i)      unpaid post-petition fees and expenses of the Clerk of the Court**

**and the U.S. Trustee pursuant to 28 U.S.C. § 1930;**

**(ii)      unpaid post-petition fees and expenses of professionals of the**

**Debtors which are retained by an order of the Court pursuant to sections 327, 328,**

**363 or 1103(a) of the Bankruptcy Code and the Lenders' professionals (collectively,**

**the "Professionals"), but only to the extent such fees and expenses are (1) incurred**

**prior to the date the Debtors receive notice from the Lender that the Commitment**

**has been terminated pursuant to this Interim Order, (2) not otherwise disallowed by the Bankruptcy Court, and (3) not otherwise paid from retainers.**

21.     <u>Credit Bidding and Sale Proceeds</u>.  In the event of the sale of any of the Collateral pursuant to section 363 of the Bankruptcy Code or under a plan of reorganization or liquidation, Lender shall have the right (at an auction or otherwise) to credit-bid an amount equal to all or any portion of the DIP Facility obligations.  Upon the closing of the sale of any of the Collateral, for which the Lender is not the winning bidder, the net proceeds (i.e., net of the costs associated with such closing that the Debtors are obligated to pay) of such sale shall be paid to the Lender for immediate application to the DIP Facility obligations up to the full amount outstanding, subject to the Carve-Out.

22.     <u>Subsequent Hearing: Procedure for Objections and Entry of Final Order</u>. The Motion is set for a final hearing before this Court at _____ _.**m.** on [        ] (the "**Final Hearing**"), at which time any party in interest may present any timely filed objections to the entry of a final order approving the DIP Loan Note and DIP Financing Agreement.  The Debtors shall promptly serve a copy of this Interim Order and notice of the Final Hearing as set forth therein, by regular mail, upon (a) the United States Trustee, (b) all creditors known to Debtors who may have or assert liens against the Debtors' assets, (c) the United States Internal Revenue Service, (d) the twenty (20) largest unsecured creditors of the Debtors, and (e) all other creditors and parties in interest requesting notice under Bankruptcy Rule 2002(i).  Objections to the entry of the Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the District of Colorado, no later than [        ], which objections shall be served so that the same are actually received on such date by (i) counsel to Debtors, (ii) counsel to the Lender, (iii) and the Office of the United States Trustee for the Northern District of Iowa.  Any objections by creditors

or other parties in interest to any of the provisions of this Interim Order may be deemed waived unless filed and served in accordance with this paragraph.

23.     <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are hereby overruled.

24.     <u>Order Effective</u>.  This Interim Order shall be effective as of the date of signature by the Court.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

IT IS SO ORDERED.


Dated: _____ __, 2018

                                                    _____
                                                    United States Bankruptcy Judge


**DEBTOR-IN-POSSESSION LOAN AGREEMENT**

This Debtor-In-Possession Loan Agreement (this "Agreement") is dated as of September 21, 2018, by and between VeroBlue Farms USA, Inc., a Nevada corporation ("VBF USA"), VBF Operations Inc., a Texas corporation ("VBF Operations"), Iowa's First, Inc., an Iowa corporation ("Iowa's First"), VBF Transport, a Delaware corporation ("VBF Transport"), and VBF IP, Inc., a Texas corporation ("VBF IP" and collectively, together with VBF USA, VBF Operations, Iowa's First, VBF Transportation, the "Borrower"), as debtors-in-possession under Chapter 11 of the Bankruptcy Code in Case Numbers (18-01297, 18-01298, 18-01301, 18-01299, and 18-01300 respectively) (joint administration requested) of the United States Bankruptcy Court for the Northern District of Iowa (the "Bankruptcy Case"), and Alder Aqua, Ltd., a British Virgin Islands Business Company ("Lender").

## RECITALS

**WHEREAS**, on the Petition Date (as defined herein), Borrower filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code (as defined herein) (the "Petition") in the United States Bankruptcy Court for the Northern District of Iowa.

**WHEREAS**, Borrower has requested that Lender provide credit pursuant to the terms hereof in an aggregate amount not to exceed $2,000,000.

**WHEREAS**, the proceeds of the Loan (as defined herein) will be used (a) to provide working capital for Borrower, and (b) to pay Chapter 11 costs of administration, subject to the terms of this Agreement and Approval Order of the Bankruptcy Court (as defined herein), in accordance with the Budget (as defined herein).

WHEREAS, the budget contemplated herein provides for the Borrower to use cash collections that are or may constitute Cash Collateral as defined herein,

**WHEREAS**, to provide security for and assure the repayment of the Loan (as defined herein), any Cash Collateral used, and the payment of the other Obligations (as defined herein) of Borrower hereunder and under the other Loan Documents (as defined herein), Borrower agrees that Lender shall be entitled to the following, pursuant to this Agreement and the Approval Order (each as more fully described herein):

a.       an allowed administrative expense claim in the Bankruptcy Case for all sums due or to become due under this Agreement and the other Loan Documents, with superpriority (subject only to the Carve-Out Amount (as defined herein) and any retainer held by Borrower's counsel in the Bankruptcy Case) over all administrative expenses specified in the Bankruptcy Code, including without limitation §§ 503(b), 507(b) or 546(c) of the Bankruptcy Code, pursuant to § 364(c)(1) of the Bankruptcy Code;

b.       pursuant to Bankruptcy Code § 364(c)(2), Borrower shall grant to Lender a perfected first-priority Lien (as defined herein) on all present and after-acquired Assets (as defined herein) of Borrower not subject to a Lien on the Petition Date, subject only to the liens securing the Pre-Petition Debt (as defined herein), the Carve-Out Expenses (as defined herein) up to the Carve-Out Amount (as defined herein) and any retainer held by Borrower's professionals in the Bankruptcy Case; and

c.       pursuant to Bankruptcy Code § 364(d), Borrower shall grant to Lender a perfected first-priority Lien on all Priority Collateral (as defined herein) on the Petition Date, which Lien shall be senior to all claims, encumbrances, and interests other than the Carve-Out

Expenses up to the Carve-Out Amount, and any retainer held by Borrower's counsel in the Bankruptcy Case.

Accordingly, the parties hereto hereby agree as follows:

## SECTION 1.
## DEFINITIONS

1.1.    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>Accounts</u>" means all accounts, instruments, documents, chattel paper and general intangibles, whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically assigned to Lender, including, without limitation, all "accounts" as defined in Article 9 of the UCC.

"<u>Affiliate</u>" means any person or entity which, directly or indirectly, is in control of, is controlled by or is under common control with, Borrower.  For purposes of this definition, "control" of Borrower means the power, directly or indirectly, either to (a) vote 5% or more of the securities having ordinary voting power for the election of directors or managers of Borrower, or (b) direct or cause the direction of the management and policies of Borrower whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" means this Debtor-in-Possession Loan Agreement, as amended, supplemented or otherwise modified from time to time.

"<u>Approval Order</u>" means any order or Order of the Bankruptcy Court entered in the Bankruptcy Case in accordance with Bankruptcy Rule 4001(c)(2), granting interim or final approval of the transactions contemplated by this Agreement and the other Loan Documents and granting the Liens and the Superpriority Claim described herein in favor of Lender, in form and substance satisfactory to Lender, for which the time to file an appeal has expired, and no appeal or motion for rehearing has been filed, or if an appeal or motion for rehearing has been filed, but no stay has been entered.

"<u>Assets</u>" means Borrower's right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Texas, or any other court having jurisdiction over the Case from time to time.

"<u>Budget</u>" means the budget of Borrower in substantially the form attached as <u>Exhibit A</u> to this Agreement, any revisions thereto approved by the Bankruptcy Court, and any subsequent Budgets provided by Borrower and approved by Lender pursuant to this Agreement or the Approval Order.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in the State of Texas are required or permitted to close.

"<u>Carve-Out Amount</u>" shall have the meaning assigned to it in the Approval Order, provided that in no event shall the Carve-Out Amount for any period exceed the amount set forth for such period in the Budget.

"Carve-Out Expenses" shall have the meaning assigned to it in the Approval Order.

"Cash Collateral" has the meaning set forth in Bankruptcy Code § 363(a).

"Chattel Paper" means all "chattel paper" as defined in Article 9 of the UCC including, without limitation, "electronic chattel paper" or "tangible chattel paper," as each term is defined in Article 9 of the UCC.

"Closing Date" means the date on which the conditions precedent to the making of the Loan set forth in Section 4.1 have been satisfied or waived by Lender.

"Confirmation Order" means an order of the Bankruptcy Court confirming a Reorganization Plan in the Case.

"Contractual Obligation" means as to Borrower, any provision of any security issued by Borrower or of any agreement, contract, instrument or undertaking to which Borrower is a party or by which it or any of the Assets owned or leased by it is bound.

"Default" means any of the events specified in Section 7 that, but for the giving of any required notice by Lender and/or the passing of time, would be an Event of Default hereunder.

"Equipment" means (a) all "equipment" as defined in Article 9 of the UCC and (ii) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"Event of Default" has the meaning set forth in Section 7.

"General Intangibles" means all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" also as defined in Article 9 of the UCC and all Intellectual Property Rights.

"Goods" means all "goods" as defined in Article 9 of the UCC.

"Governmental Authority" means any Federal, state, county, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether of the United States of America or a foreign country.

"Indebtedness" means at any time (a) all indebtedness for money borrowed from Lender under this Agreement, (b) all indebtedness of Borrower for the deferred purchase price of Assets or services (other than Assets, including Inventory, and services purchased, and trade payables, other expense accruals and deferred compensation items arising, in the ordinary course of business, including negotiated trade terms and Chapter 11 expense accruals), (c) all obligations of Borrower evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (d) all indebtedness of Borrower created or arising under any conditional sale or other title retention agreement with respect to Assets acquired by Borrower (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Assets), (e) and all reimbursement, payment or similar obligations of Borrower, contingent or otherwise, under acceptance, letter of credit or similar facilities.

"Instruments" means all "instruments" as defined in Article 9 of the UCC.

36

"<u>Insurance</u>" means (a) all insurance policies covering any or all of the Collateral (regardless of whether Lender is the loss payee thereof), and (b) any key man life insurance policies.

"<u>Intellectual Property Rights</u>" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"<u>Inventory</u>" means all "inventory" as defined in Article 9 of the UCC.

"<u>Investment</u>" has the meaning set forth in <u>Section 6.6</u>.

"<u>Investment Property</u>" means all "investment property" as defined in Article 9 of the UCC.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Lien</u>" means with respect to any Assets, any mortgage, deed of trust, lien (statutory or other), pledge, charge, hypothecation, assignment, deposit arrangement, security interest, encumbrance or other security agreement or preferential arrangement of any kind or nature in respect of such Assets.  For purposes of this Agreement and the other Loan Documents, Borrower shall be deemed to own, subject to a Lien, any Assets that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such Assets.

"<u>Loan</u>" has the meaning set forth in Section 2.1.

"<u>Loan Documents</u>" means this Agreement and any other instrument or agreement executed and delivered in connection herewith.

"<u>Maximum Loan Amount</u>" means $2,000,000.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the Assets, business, operations or financial condition of Borrower, in each case, other than such effects as result solely from (i) the commencement of the Case, (ii) the existence of pre-petition claims, or (iii) defaults under such pre-petition claims, (b) the validity or enforceability of the Approval Order or any of the Loan Documents, or (c) the rights and remedies of Lender under the Approval Order and the Loan Documents.

"<u>Maturity Date</u>" means February 1, 2019.

"<u>Obligations</u>" means (a) the principal of and interest on the Loans, (b) all other present and future, fixed or contingent, obligations and liabilities (monetary or otherwise) of Borrower to Lender under this Agreement and the other Loan Documents, including, without limitation, all costs and expenses payable pursuant to <u>Section 9.5</u>.

"<u>Order</u>" means an order of the Bankruptcy Court entered in the Bankruptcy Case, including any Approval Order.

"<u>Permitted Liens</u>" means Liens permitted to exist under <u>Section 6.2</u>.

"<u>Petition Date</u>" means September 21, 2018.

"<u>Pre-Petition Secured Debt</u>" means the indebtedness owed by Borrower to its creditors as set forth on Schedule [_____].

"Primary Collateral" means all accounts receivable, inventory and work in progress (including fish in all stages of growth or production), intellectual property (including trade secrets or know), all claims or causes of action including but not limited to claims arising under Chapter 5 of the Bankruptcy Code and claims asserted in *VeroBlue Farms USA, Inc. v. Wulf et al*, case number 18 CV 3047, pending in the United States District Court of the Northern District of Iowa, all general intangibles arising on or after the Petition Date, all papers and records related to any of the foregoing, and all Proceeds of the foregoing.

"Prime Rate" means at any time the rate of interest most recently announced by the Wall Street Journal as the prime lending rate.  Each change in the rate of interest shall become effective on the date each Prime Rate change is announced by the Wall Street Journal.

"Proceeds" means (a) all "proceeds" as defined in Article 9 of the UCC, (b) payments or distributions made with respect to any Assets, and (c) whatever is receivable or received when Collateral or proceeds thereof are sold, exchanged, collected or otherwise disposed of whether such disposition is voluntary or involuntary.

"Reorganization Plan" means a plan of reorganization in the Bankruptcy Case.

"Requirements of Law" means as to Borrower, the certificate of incorporation and by-laws or other organizational or governing documents of Borrower, and any law, treaty, rule or regulation or determination of an arbitration or a court or other Governmental Authority, in each case applicable to or binding upon Borrower or any of its Assets or to which Borrower or any of its Assets its subject.

"Subsidiary" means with respect to the Borrower (herein referred to as the "Parent"), any corporation, partnership, limited liability company, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership interests having ordinary voting power for the election of directors or managers is, at the time as of which any determination is being made, owned or controlled by the Parent or one or more subsidiaries of the Parent.

"Superpriority Claim" means an allowed administrative expense claim for all sums due or to become due under this Agreement and the other Loan Documents, with superpriority (subject only to the Carve-Out Amount) over all administrative expenses specified in the Bankruptcy Code, including without limitation §§ 503(b), 507(b) or 546(c) of the Bankruptcy Code, pursuant to § 364(c)(1) of the Bankruptcy Code.

"Supporting Obligation" means a "supporting obligation" as defined in Article 9 of the UCC.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date of indefeasible prepayment in full by Borrower of the Loan, (c) the date of the "substantial consummation" (as defined in Bankruptcy Code § 1101, but in any event no later than the effective date) of a Reorganization Plan confirmed by the Bankruptcy Court pursuant to the Confirmation Order in the Bankruptcy Case, (d) the date of the consummation of the sale of any material portion of the Collateral outside the ordinary course of business pursuant to Bankruptcy Code § 363, (e) the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or the appointment of a Chapter 11 trustee in the Bankruptcy Case, or (f) Lender's acceleration of the Loan upon the occurrence of an Event of Default hereunder.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Iowa or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

1.2.    Terms Generally.  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections shall be deemed references to Sections and subsections of this Agreement unless the context shall otherwise require.

**SECTION 2.**
**AMOUNT AND TERMS OF LOAN**

2.1.    Advances.  Lender agrees, subject to the terms and conditions of this Agreement, to make advances to the Borrower from time to time from the date that all of the conditions set forth in Section 4.1 are satisfied until the Termination Date in an amount not in excess of the Maximum Loan Amount (the "Loan").  The Borrower's obligation to pay the Loan shall be secured by the Assets.  Borrower may request an advance on the Loan in the amounts and on the dates described on Exhibit B hereto, provided, however, that Borrower may request and receive an advance in different amounts and at shorter intervals, at Lender's sole discretion. Advances may be advanced, repaid, and re-advanced.

2.2.    Procedure for Requesting Advances.  The Borrower shall request an advance not later than 11:00 a.m. three Business Days before which such advance is to be made.  Each request that conforms to the terms of this Agreement shall be effective upon receipt by the Lender, shall be in writing or by email, and shall be confirmed in writing by the Borrower if so requested by the Lender.

2.3.    Use of Proceeds.  Borrower agrees that it shall use the proceeds of the Loan pursuant to the Budget solely (i) to provide working capital for Borrower and (ii) to pay Chapter 11 costs of administration. No portion of the Loan shall be used in any way to investigate any claims against Lender or to assert any claims or defenses of any kind or character against Lender whether such claims or defenses arise under the Loan or any other loan or lease or other transaction or occurrence.

2.4.    Interest.  The outstanding principal amount of the Loan shall bear interest at a fixed rate of the Prime Rate plus 2% per annum.  After the occurrence of an Event of Default, the outstanding principal amount of the Loan shall bear interest at a fixed rate of the Prime Rate plus 5% per annum. Interest shall be calculated on the basis of a 360-day year for the actual days elapsed and shall be payable in arrears on the Termination Date.

2.5.    Repayment of Loan.  Borrower hereby unconditionally promises to pay to Lender the principal amount of the Loan, together with all accrued and unpaid interest thereon and Lender's reasonable attorney fees and expenses as provided in Section 9.5 herein on the Termination Date.  The Loan may be prepaid in full or in part at any time without penalty.  At the Lender's option, the Loan may be converted into equity of the reorganized Borrower upon the effective date of Borrower's plan of reorganization.

2.6.    Priority and Lien.  Borrower hereby covenants, represents and warrants that, upon entry of the Approval Order (i) pursuant to Bankruptcy Code § 364(c)(1), the Loan shall at all times constitute an allowed Superpriority Claim in the Bankruptcy Case, (ii) pursuant to Bankruptcy Code § 364(c)(2), shall be secured by a perfected first-priority Lien on all previously unencumbered Assets, and (iii) pursuant to Bankruptcy Code § 364(d), shall be secured by a perfected first-priority Lien on all Priority Collateral, subject only to the Carveout and any retainer held by Borrower's professionals in the Bankruptcy Case.

2.7.    Security Interest.  To secure the Obligations, Borrower hereby grants to Lender a Lien on and security interest in the Assets.

2.8.    Perfection of Security Interest.  Borrower acknowledges that, pursuant to the Approval Order, the Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment.  Notwithstanding the foregoing, Borrower shall authorize and/or execute such financing statements, instruments and notices as may be reasonably requested by Lender.

2.9.    Payment of Obligations.  Upon the Termination Date, Lender shall be entitled to immediate payment of all Obligations without further application to or order of the Bankruptcy Court.

## SECTION 3.
## REPRESENTATIONS

To induce Lender to make Loan hereunder, Borrower hereby represents as follows:

3.1.    Organization and Authority.  VBF USA is a corporation duly organized and validly existing under the laws of the State of Nevada. VBF Operations is a corporation duly organized and validly existing under the laws of the State of Texas. Iowa's First is a corporation duly organized and validly existing under the laws of the State of Iowa. VBF Transportation is a corporation duly organized and validly existing under the laws of the State of Delaware. VBF IP is a corporation duly organized and validly existing under the laws of the State of Texas.  Borrower (a) is in good standing in each jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect, (b) subject to the entry by the Bankruptcy Court of the Approval Order, has the requisite corporate power and authority to effect the transactions contemplated hereby and by the other Loan Documents, and (c) subject to the entry by the Bankruptcy Court of the Approval Order, has all requisite corporate power and authority and the legal right to own, pledge, mortgage and operate its businesses and Assets, to lease the Assets it operates as lessee and to conduct its business as now or currently proposed to be conducted.

3.2.    Due Execution; Binding Obligation.  Upon entry by the Bankruptcy Court of the Approval Order, the execution, delivery and performance by Borrower of the other Loan Documents to which each is a party, this Agreement is, and each of the other Loan Documents to which Borrower is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation, enforceable in accordance with its terms and the Approval Order, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

3.3.    Title to Borrower's Assets.  Borrower owns and has on the date hereof good and marketable title to, or a leasehold interest in, or a right or license to use, the Collateral to the extent necessary for the operation and conduct of its business.

3.4.    Insurance.  All policies of insurance of any kind or nature owned by or issued to Borrower, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect and are of a nature and provide such coverage as in the reasonable opinion of such Borrower, is sufficient and as is customarily carried by companies of the size and character of such Borrower.

3.5.   <u>Licenses, Etc</u>.  Subject to Bankruptcy Code § 365, Borrower has obtained and holds in full force and effect, either directly or through an Affiliate, all franchises, licenses, permits, certificates, authorizations, qualifications, accreditations, easements, rights of way and other rights, consents and approvals which are necessary for the operation of its businesses as presently conducted, except where the failure to so obtain the foregoing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

## SECTION 4.
## CONDITIONS PRECEDENT

4.1.   <u>Conditions to Each Advance of the Loan</u>.  The obligation of Lender to make an advance on the Loan is subject to the satisfaction, immediately prior to or currently with the making of such advance, of the following conditions precedent, unless Lender has previously waived any such condition precedent in writing:

(a)   <u>Loan Documents</u>.  Lender shall have received (i) this Agreement, executed and delivered by a duly authorized officer of Borrower, (ii) the executed Loan Documents conforming to the requirements hereof, (iii) all Schedules identified herein; and (iv) and such other documents, including, without limitation, security agreements, pledge agreements and other related collateral documents, that are customary in such transactions, in form and substance satisfactory to Lender.

(b)   <u>Approval Order</u>.  Lender shall have received a copy of the Approval Order approving this Agreement and the other Loan Documents and granting the Superpriority Claim status and Liens described herein and finding that Lender is extending credit to Borrower in good faith within the meaning of Bankruptcy Code § 364(e), which Approval Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of Borrower in form and substance satisfactory to Lender, (iii) shall be in full force and effect, (iv) shall provide for a deadline of November 21, 2018, for any party-in-interest (other than Borrower) in the Bankruptcy Case to file an adversary proceeding or contested matter challenging the validity or amount of the Pre-Petition Secured Debt or the validity, scope, priority or enforceability of the liens securing the Pre-Petition Secured Debt, or for claims asserting the equitable doctrine of marshalling or any similar claims; (v) shall provide that Lender shall have the right to credit bid with respect to the Loan pursuant to Bankruptcy Code § 363(k) with respect to any purchase of Borrower's assets; (vi) shall provide that Borrower shall incur no Indebtedness pursuant to section 364 of the Bankruptcy Code without Lender's written consent; and (vii) shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect, and, if the Approval Order is the subject of a pending appeal in any respect, none of the making of such Loan, the granting of Liens and Superpriority Claims herein or the performance by Borrower of any of their obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal; <u>provided</u>, that entry of the Approval Order by the Bankruptcy Court on a final basis shall occur on or before [October 11, 2018].

(c)   <u>No Material Adverse Change</u>.  From the Petition Date, since the date of the most recent financial statements delivered to Lender pursuant to <u>Section 5.1</u>, no event, act or condition shall have occurred in respect of the Borrower which, in the reasonable judgment of Lender, has had or would have a Material Adverse Effect.

(d)   <u>No Injunction</u>.  Since the Petition Date, no law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and

no litigation shall be pending or threatened, which in the judgment of Lender would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loan.

(e)     <u>Additional Matter</u>.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement and the other Loan Documents, shall be in form and substance satisfactory to Lender, and Lender shall have received such other documents in respect of any aspect or consequence of the transactions contemplated hereby or thereby as it shall reasonably request.

(f)     <u>Representations</u>.  All representations contained in or pursuant to this Agreement and the other Loan Documents, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each advance under the Loan hereunder with the same effect as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations shall be true and correct in all material respects as of such earlier date).

(g)     <u>Budget</u>.  Borrower's expenditures shall be in compliance with the Budget.

(h)     <u>No Event of Default</u>.  No event of Default has occurred and is continuing.

## SECTION 5.
## AFFIRMATIVE COVENANTS

Unless otherwise agreed in writing by Lender, Borrower shall:

5.1.     <u>Financial Statements, Etc</u>.  Until the Termination Date, deliver to Lender: (i) all financial information reasonably requested by Lender, and (ii) as soon as available, the monthly operating report required to be provided to the United States Trustee. All such financial statements delivered pursuant to this <u>Section 5.1</u> shall be complete and correct in all material respects.

5.2.     <u>Maintenance of Borrower's Collateral; Insurance</u>.  Keep all of Borrower's Collateral in good condition, subject to ordinary wear and tear and damage by casualty or governmental taking or action in lieu thereof, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; maintain all pre-Petition Date insurance policies, which policies shall name Lender as an additional insured and the loss payee for the proceeds of any such policy; and furnish to Lender, upon written request, certificates evidencing such insurance in form and substance acceptable to Lender.

5.3.     <u>Inspection of Books and Records; Discussions</u>.  Keep proper books of records and accounts in which full, true and correct entries in conformity with all Requirements of Law shall be made of all dealings and transactions in relation to their respective businesses and activities; and permit representatives of Lender, upon reasonable advance notice to Borrower, to visit, inspect, examine and make abstracts from any books and records at any reasonable time or times and to discuss the business, operations, Collateral and financial and other condition of Borrower with officers and employees of Borrower and with its accountants.

5.4.     <u>Notices</u>.  Promptly, and in any event within three Business Days after Borrower acquires knowledge thereof, give notice to Lender of: (a) the occurrence of any Default or Event of Default, (b) the occurrence of any default or event of default under any post-Petition Date Contractual Obligation of Borrower, (c) litigation, investigation or proceeding which may exist at any time between Borrower and

any Governmental Authority, which in any case, if not cured or if adversely determined, as the case may be, would reasonably be expected to have a Material Adverse Effect, (d) any post-Petition Date litigation or proceeding affecting Borrower an adverse determination in which could reasonably be expected to have a Material Adverse Effect or in which injunctive or similar relief is sought; and (e) any development or event which has had or would reasonably be expected to have a Material Adverse Effect.

5.5.    Further Assurances.  At the cost and expense of Borrower, execute and file all such further documents and instruments, and perform such other acts, as Lender may reasonably determine are necessary or advisable to maintain the Liens granted to Lender in connection with this Agreement, the other Loan Documents and the Approval Order and to maintain the priority of such Liens purported to be granted pursuant to this Agreement and the Approval Order. Without limiting the generality of the foregoing, Borrower shall assist Lender in the preparation and filing of any UCC financing statements required by Lender.

5.6.    Approval of Agreement.  Use all commercially reasonable efforts to obtain approval from the Bankruptcy Court of this Agreement and entry of the Approval Order.

5.7.    Budget.  Use cash only in accordance with the Budget, provided, however, that Borrower's expenditures may vary from the Budget 10% on a line-item basis.  Borrower shall provide Lender a weekly report showing actual receipts and expenditures and compared to the Budget for the relevant time periods.

5.8.    Taxes.  Borrower shall pay all taxes as the same become due and payable.

## SECTION 6.
## NEGATIVE COVENANTS

Borrower shall not, without the written consent of Lender:

6.1.    Limitation on Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, including any Indebtedness pursuant to section 364 of the Bankruptcy Code, except:

(a)    Indebtedness in favor of Lender under this Agreement and the other Loan Documents; and

(b)    Indebtedness outstanding on the Petition Date.

6.2.    Limitation on Liens.  Create, incur, assume or suffer to exist any Lien upon the Collateral, whether now owned or hereafter acquired, except for

(a)    Liens existing on the Petition Date securing Pre-Petition Secured Debt;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlords' or other similar Liens arising in the ordinary course of business which are not overdue or which are being contested in good faith by appropriate proceedings;

(c)    pledges or deposits in connection with workers' compensation, general liability insurance and/or claims or unemployment insurance;

(d)    Liens imposed by any Governmental Authority for taxes, assessments or charges not yet due or that are being contested in good faith and by appropriate proceedings;

43

(e)      Liens created pursuant to this Agreement and the Approval Order; and

(f)      Any extension, renewal or replacement of any of the foregoing, provided that the Liens permitted by this paragraph shall not extend to or cover any additional Indebtedness or Assets (other than substitution of like Assets).

6.3.      <u>Limitation on Guaranty Obligations</u>.  Assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other person, except (a) the endorsement of negotiable instruments by Borrower for deposit or collection or similar transactions in the ordinary course of business; and (b) guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other persons, in existence on the Petition Date.

6.4.      <u>Prohibition on Fundamental Changes</u>.  Enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind up or dissolve (or suffer any liquidation or dissolution), or make any material change in their present methods of conducting business or create or acquire any new Subsidiary.

6.5.      <u>Limitation on Sale of Assets</u>.  Convey, sell, lease, assign, transfer or otherwise dispose of any Assets or businesses, whether now owned or hereafter acquired, outside of the ordinary course of business.

6.6.      <u>Limitation on Investments, Loan and Advances</u>.  Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of or make any other investment (each, an "<u>Investment</u>"), except:

(a)      Investments in cash equivalents;

(b)      Investments existing on the Petition Date;

(c)      extensions of trade credit and prepaid expenses made in the ordinary course of business; and

(d)      Investments received in connection with the creation and collection of Accounts in the ordinary course of business.

6.7.      <u>Transactions with Affiliates</u>.  Sell or transfer any Assets to, or otherwise engage in any other transactions with, any Affiliate, except that Borrower may engage in any such transaction which is otherwise permitted under this Agreement, is consistent with past practices, or otherwise in the ordinary course of business at prices and on terms and conditions not less favorable than could be obtained in a comparable arm's-length transaction from unrelated third parties.

6.8.      <u>Lines of Business</u>.  Engage to any substantial extent in any line or lines of business activity other than businesses of the same general type as those in which Borrower are engaged on the date of this Agreement or which are related thereto.

6.9.      <u>Chapter 11 Claims; Payment of Pre-Petition Date Claims</u>.  Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is *pari passu* with or senior to the claims of Lender granted pursuant to this Agreement and the Approval Order, or make any payments of pre-Petition Date obligations other than (a) as permitted under the Approval Order, or (b) as otherwise permitted or required under this Agreement.

6.10.   Use of Proceeds.  Use the proceeds of the Loan, the Collateral, or any Cash Collateral to commence or prosecute any investigation, action or objection with respect to the Superpriority Claims or Liens granted to Lender pursuant to this Agreement and the Approval Order or any other claims of any kind against Lender.

**SECTION 7.**
**EVENTS OF DEFAULT**

7.1.   Event of Default.  If one or more of the following events (each an "Event of Default") shall occur and be continuing:

(a)   Borrower shall fail to make any payment of the Loan when due in accordance with the terms thereof or hereof;

(b)   Any representation made or deemed made by Borrower herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement shall prove to have been incorrect in any material respect on or as of the date made or deemed made;

(c)   Borrower shall default in the observance or performance of any covenant or other agreement contained in this Agreement (other than as provided in subsections (a) and (b) of this Section 7.1), and such default shall continue unremedied for a period of five days after Lender provides written notice of such default to Borrower;

(d)   The Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a trustee or other responsible officer under Chapter 11 of the Bankruptcy Code shall be appointed in the Case;

(e)   An order of the Bankruptcy Court shall be entered granting another Superpriority Claim or Lien *pari passu* with or senior to that granted to Lender pursuant to this Agreement and the Approval Order, or an order of a court of competent jurisdiction shall be entered reversing, staying, vacating or rescinding the Approval Order, or amending, supplementing or otherwise modifying either the Approval Order or this Agreement without the consent of Lender;

(f)   An order of the Bankruptcy Court shall be entered under Bankruptcy Code § 1106(b) in the Case appointing an examiner having enlarged powers relating to the operation of the business of Borrower (*i.e.*, powers beyond those set forth under Bankruptcy Code §§ 1106(a)(3) and (4));

(g)   Borrower shall make any payments relating to pre-Petition Date obligations other than (i) as permitted under the Approval Order, (ii) as otherwise permitted under this Agreement, or (iii) as required by an order of the Bankruptcy Court;

(h)   The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against Borrower's assets or an order under Section 506(c) of the Bankruptcy Code awarding recovery of any costs and expenses of the Collateral;

(i)   Borrower or any other party in interest files a motion without the consent of Lender to use Cash Collateral or to approve financing pursuant to Bankruptcy Code § 364 that would grant an additional Lien on any of the Collateral;

45

(j)　　An order is entered over the objection of Lender permitting the use of Cash Collateral or granting an administrative claim in the Bankruptcy Case that is equal or superior to the administrative claim granted to Lender pursuant to the Approval Order;

(k)　　The filing of any pleading by Borrower seeking, or otherwise consenting to, any of the matters set forth in subsections (e), (f), (h), (i), and (j) of this Section 7.1;

(l)　　The entry of the Approval Order on a final basis shall not have occurred on or before October 11, 2018;

(m)　　The commencement of any proceeding seeking, or otherwise consenting to, (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations, or (ii) any relief under Bankruptcy Code § 506(c) with respect to any Collateral;

(n)　　Subject to Bankruptcy Code § 365, Borrower shall fail to obtain, maintain or comply in all material respects with any order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority and such failure could reasonably be expected to have a Material Adverse Effect;

(o)　　This Agreement, the other Loan Documents and the Approval Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Bankruptcy Code § 364 against Borrower, or Borrower shall so allege in any pleading filed in any court, or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on Borrower or Borrower shall so state;

(p)　　Borrower, without the prior consent of Lender, shall (i) determine, whether by vote of its Board of Directors or otherwise, to suspend the operation of its business in the ordinary course or liquidate all or substantially all of its assets, or (ii) file a motion or other application in its Case seeking authority to do any of the foregoing;

(q)　　Borrower files a Reorganization Plan that purports to affect the Lender's claims, to which plan the Lender has not consented in writing;

(r)　　Borrower files a motion to approve a sale of Borrower or any Collateral (other than the sale of Inventory in the ordinary course of business) or to reject a lease or executory contract on terms to which Lender has not given its prior written consent;

(s)　　Borrower shall have failed to obtain an order of the Bankruptcy Court confirming a plan of reorganization on or before January 15, 2019;

(t)　　An order is entered for the sale of Borrower or any Collateral (other than the sale of Inventory in the ordinary course of business) to which the Lender objects;

(u)　　A change in control of Borrower's management without Lender's consent;

(v)　　Termination of Borrower's exclusive right to file and confirm a Reorganization Plan; and

(w)     Borrower fails to give Lender 10 days' written notice of Borrower's intent to file a Reorganization Plan, together with a copy of such plan.

(x)     Borrower breaches any covenant, warranty, or representation contained herein or in any of the other Loan Documents beyond any applicable notice and cure periods.

7.2.     Remedies.  At any time during the continuance of an Event of Default, Lender may take one or more of the following actions, at the same or different times: (i) declare the Loan then outstanding to be forthwith due and payable, whereupon the principal of the Loan together with accrued interest thereon and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; (ii) after obtaining relief from the automatic stay, set off amounts in any accounts of Borrower and apply such amounts to the Obligations; and (iii) after obtaining relief from the automatic stay, exercise any and all remedies under this Agreement, and the other Loan Documents, the Approval Order and applicable law available to Lender.  Upon an Event of Default or on or after the Termination Date, the automatic stay shall be lifted without further action on the part of Lender (other than fifteen business days' prior notice to the Borrower and any creditors' committee) to permit Lender to foreclose on its collateral; provided that the Borrower and any creditors' committee shall have such five business days to prevent such lifting of the automatic stay on the sole basis that such Event of Default or Termination Date has not occurred.

**SECTION 8.**
**ADDITIONAL REMEDIES; APPLICATION OF PROCEEDS**

8.1.     Remedies; Obtaining the Collateral Upon Default.  Upon the occurrence and during the continuance of an Event of Default, and after obtaining relief from the automatic stay, Lender shall have all rights as provided by law and this Agreement to enforce all of its rights and remedies.

8.2.     Remedies; Disposition of the Collateral.  Upon the occurrence and during the continuance of an Event of Default, and after obtaining relief from the automatic stay, any Collateral may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the Assets to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as Lender may do so in compliance with any Requirements of Law.

8.3.     Application of Proceeds.  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, any payment by Borrower on account of principal of and interest on the Loan and any Proceeds arising out of any realization (including after foreclosure) upon the Collateral shall be applied as follows: first, to the payment in full of all costs and expenses (including without limitation, reasonable attorney fees and disbursements) paid or incurred by Lender in connection with any such realization upon the Collateral, and second, to the payment in full of the Loan (including any accrued and unpaid interest thereon, and any fees and other Obligations in respect thereto). It is understood that Borrower shall remain liable to the extent of any deficiency between the amount of the Proceeds of the Collateral and the amount of the Obligations.

8.4.     WAIVER OF CLAIMS.  EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT AND THE APPROVAL ORDER, BORROWER HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH LENDER'S TAKING POSSESSION OF, OR LENDER'S DISPOSITION OF ANY OF, THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR

NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES AND ANY SUCH RIGHT WHICH BORROWER WOULD OTHERWISE HAVE UNDER ANY REQUIREMENTS OF LAW.

8.5.   <u>Remedies Cumulative</u>.  Each and every right, power and remedy hereby specifically given to Lender shall be in addition to every other right power and remedy specifically given under this Agreement, the other Loan Documents, the Approval Order or now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Lender. All such rights, powers and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others. No delay or omission of Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein. In the event that Lender shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit Lender may recover reasonable expenses, including attorney fees, and the amounts thereof shall be included in such judgment.

8.6.   <u>Discontinuance of Proceedings</u>.  In case Lender shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to Lender, then and in every such case Borrower, Lender and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the Liens granted under this Agreement and the Approval Order, and all rights, remedies and powers of Lender shall continue as if no such proceeding had been instituted.

## SECTION 9.
## MISCELLANEOUS

9.1.   <u>Amendments; Modifications and Waivers</u>.  Neither this Agreement, any other Loan Document to which Borrower is a party, nor any terms hereof or thereof may be amended, supplemented, modified or waived except in writing and with written approval by Lender.  Any such amendment, supplement, modification or waiver shall apply to and shall be binding upon Borrower and Lender and their permitted successors and assigns. In the case of any waiver, the parties shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

9.2.   <u>Notices</u>.  All notices, requests, demands, consents and other communications required or permitted under this Agreement shall be in writing and shall be considered to have been duly delivered when (i) delivered by hand, (ii) sent by telecopier (with receipt confirmed), provided that a copy is mailed (on the same date) by certified or registered mail, return receipt requested, postage prepaid, or (iii) received by the addressee, if sent by Express Mail, Federal Express or other express delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may from time to time designate as to itself by notice similarly delivered to the other party in accordance herewith).  A notice of change of address shall not be deemed delivered until received by the addressee.

If to Lender, to:

.

Alder Aqua, Ltd.
Attention:  Lorraine Lipschutz
Email: lipschutz@hif.bm

with a copy (which shall not constitute notice) to:

Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202-4432
Attention:   Michael J. Pankow, Esq.
email mpankow@bhfs.com

If to Borrower to:

VeroBlue Farms USA, Inc. et al
401 West Des Moines Street
Webster City, Iowa  50595
Attention: Norman McCowan, President
Email: norman.mccowan@verobluefarms.com

with a copy (which shall not constitute notice) to:

AG & Business Legal Strategies
P.O. Box 11425
Cedar Rapids, Iowa 52410
Attention:  Joseph A. Peiffer, Esq.
Email: joe@ablsonline.com

9.3.     No Waiver.  No failure or delay on the part of Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between Borrower and Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof of the exercise of any other right, power or privilege hereunder or thereunder.

9.4.     Survival of Representations.  All representations and warranties made herein and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and any other Loan Documents.

9.5.     Payment of Expenses and Taxes.  Borrower agrees (a) to pay or reimburse Lender for all its out-of-pocket costs and expenses reasonably incurred in connection with the development, preparation and execution of, any amendment, supplement or modification to, and the enforcement or preservation of any rights under, this Agreement, the other Loan Documents, the Approval Order and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation the reasonable fees and disbursements of counsel to Lender and other professionals engaged by Lender, (b) to pay or reimburse Lender for all its costs and expenses reasonably incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents, the Approval Order and any such other documents following the occurrence and during the continuance of a Default or an Event of Default, including, without limitation, the reasonable fees and disbursements of counsel to Lender and other professionals engaged by Lender, (c) to pay, and indemnify and hold harmless Lender from, any

and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any (other than taxes calculated based on the income of the Lender), which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents, the Approval Order and any such other documents, (d) to pay, and indemnify and hold harmless Lender (and its directors, officers, employees and agents) from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of this Agreement, the other Loan Documents, the Approval Order or the use of the proceeds of the Loan (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided that Borrower shall have no obligation hereunder to Lender with respect to Indemnified Liabilities determined by the final judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of Lender or its directors, officers, employees or agents. The agreements in this Section 9.5 shall survive repayment of the Loan and all other Obligations payable hereunder. The Borrower may seek a determination from the Bankruptcy Court with respect to whether any fees or expenses payable to Lender pursuant to this Section 9.5 are reasonable pursuant to applicable law.

9.6.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Borrower, Lender, and their respective successors and assigns, except that Borrower may not assign or transfer any of their rights or obligations under this Agreement without the prior written consent of Lender.

9.7.    Right of Set-off.  Subject to the giving of the notice as described in Section 5.4, notwithstanding the provisions of Bankruptcy Code § 362 and any other rights and remedies of Lender now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to Borrower, any such notice being hereby expressly waived, to set off any other indebtedness or other obligation at any time held or owing by Lender to or for the credit or the account of Borrower against and on account of the Obligations of Borrower to Lender under this Agreement or under any of the other Loan Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

9.8.    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

9.9.    GOVERNING LAW.  THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF IOWA AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

9.10.    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

(a)    EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS ITSELF AND ITS ASSETS IN ANY LEGAL ACTION OR

PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT.

(b)      EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN CLAUSE (A) ABOVE AND ANY COUNTERCLAIM THEREIN.

9.11.    Effectiveness.  This Agreement shall become effective once (i) Lender and Borrower shall have each signed a counterpart hereof and Borrower shall have delivered the same to Lender and (ii) the Bankruptcy Court shall have entered the Approval Order.

9.12.    Headings Descriptive.  The headings of the several Sections and subsection, of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

9.13.    Marshalling Recapture.  Lender shall be under no obligation to marshal any assets in favor of Borrower or any other party or against or in payment of any or all of the Obligations. To the extent Lender receives any payment by or on behalf of Borrower, which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to Borrower or their estates, trustees, receivers, custodians or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the liabilities of Borrower to Lender as of the date such initial payment, reduction or satisfaction occurred.

9.14.    Severability.  In case any provision in or obligation under this Agreement or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

9.15.    Limitation of Liability.  No claim may be made by Borrower against Lender or any of its Affiliates, lenders, investors, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection herewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

9.16.    Waiver of Claims Related to Pre-Petition Secured Debt.  In consideration for the Loan, Borrower hereby waives, releases and forever discharges any claims it may have with respect to the Pre-Petition Secured Debt.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

**LENDER:**

**ALDER AQUA, LTD.**

By: _____
Name: _____
Title: _____

**BORROWER:**

**VEROBLUE FARMS USA, INC.**

By: _____
Name: _____
Title: _____

**VBF OPERATIONS INC.**

By: _____
Name: _____
Title: _____

**IOWA FIRST, INC.**

By: _____
Name: _____
Title: _____

**VBF TRANSPORTATION, INC**

By: _____
Name: _____
Title: _____

**VBF IP, INC.**

By: _____
Name: _____
Title: _____

## Exhibit A

**Budget**

## Exhibit B

**Draw Schedule**

| <u>DATE</u> | <u>AMOUNT</u> |
|---|---|
| September 27, 2018 | $300,000 |
| October 18, 2018 | $300,000 |
| November 1, 2018 | $400,000 |
| November 22, 2018 | $200,000 |

Copies to:

Roy Baker
c/o Broadmoor Financial, L.P.
8100 E 22nd Street
Building 500
Suite 1000
Wichita, KS 67226

Leland Cook
c/o Cablevey Conveyors
P.O. Box 148
Oskaloosa, IA 52577-0148

Jake Hilton
c/o CEC Electric
34th St. NW
Ft. Dodge, IA 50501

John Hawkins
City of Webster City – Utility Office
P.O. Box 217
Webster City, IA 50595-0217

Paul Ludwig
c/o FM Controls, Inc.
3226 180th Street
Duncombe, IA 50532

Matt Gerkins
c/o Grant Thornton
1717 Main Street
Suite 1800
Dallas, TX 75201

First State Bank/UMB
P.O. Box 419734
Kansas City, MO

Tom Graft
c/o ISG
115 E Hickory Street
Suite 300
Mankato, MN 56001

McDonald Supply

1914 E Lincolnway Avenue
Ames, IA 50010

Midwest Manure Management
11815 130th Street
Swaledale, IA 50477

Bill Harris
c/o Optimal Fish Food, LLC
2324 10th Street
APT 202
Brookings, SD 57006

Orscheln Farm & Home
1800 Overcenter Drive
Moberly, MO 65270

Packard Electric, Inc.
PO BOX 285
HWY 69 S
Belmond, IA 50421

Phillip Sheets
c/o Phillip L. Sheets, LTD.
7632 Jefferson Road
Belleville, IL

Select Propane & Fuel Inc
P.O. Box 125
Red Bud, IL 62278

Jackie Zimmerman
c/o Skretting
712 East 2400 North
Tooele, UT 84074

Kevin Coats
c/o Tropic Star Seafood
3620 Ventura Drive East
Lakeland, FL 33811

Donald Ricketts
c/o Wastewater Technologies, LLC
P.O. Box 737
Monterrey, VA 24465

T. Snoddy
c/o Westfield Insurance
P.O. Box 9001566
Loiusville, KY 40290-1566

Mike Isley
c/o Eldon C Stutsman, Inc.
P.O. Box 250
Hills, IA 52235

Agsource Cooperative Services
PO Box 930230
Verona, WI
53593-0230

Baker McKenzie
Zurich
8034 Zurich
SWITZERLAND

Beltana Transport,
LLC
PO Box 753863
Memphis, TN 38175

Cassels Brock
2100 Scotia Plaza
40 King Street W
Toronto, ON M5H
3C2
CANADA

Christine Huynh
401 Des Moines
Webster City, IA 50595

Curtis Johnson
613 CEDAR ST
Webster City, IA 50595

Davies Collison
Cave Law Pty Ltd
Trust A
1 Nicholas Street
Melbourne, VIC 3000
AUSTRALIA

Alana Heber
c/o Foodmix Marketing Communications
103 West Arthur Street
Elmhurst, IL 60126

Hutcheson Engineering Products Inc.
6405 John J Pershing Dr
Omaha, NE 68112

Rick Dahlson
c/o Jackson Walker LLP
P.O. Box 130989
Dallas, TX 75313-0989

Johnstone Supply Billing Dept.
2701 Ford St
Ames, IA 50010

Katie Olson
1610 Haven Place
Allen, TX 75002

Norman McCowan
401 Des Moines
Webster City, IA 50595

Kyle Roggensack
c/o PWC
P.O. Box 952282
Dallas, TX 75395

Sanchez Welding
3617 Hendrick Dr.
Plano, TX

William Turk
5621 Valhalla Drive
North Richland Hills, TX 76180

Charles Stein
509 Pleasant St
Webster City, IA 50595