# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | |
| VEROBLUE FARMS USA, INC., *et. al.*, EIN: | Case No. 18-01297 |
| | Chapter 11 |
| Debtors. | |

## DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF VEROBLUE FARMS USA, INC. AND ITS AFFILIATED DEBTORS

Dated:  December 10, 2018

Dan Childers
Elderkin & Pirnie, PLC
316 Second Street SE, Suite 124
P.O. Box 1968
Cedar Rapids, IA  52401
Telephone: (319) 362-2137
Facsimile: (319) 362-1640
Email:  dchilders@elderkinpirnie.com

Joseph A. Peiffer
Ag & Business Legal Strategies
P.O. Box 11425
Cedar Rapids, IA 52410-1425
1350 Boyson Road, Suite A-1
Hiawatha, IA 52233-2211
Telephone: (319) 363-1641
Facsimile: (319) 200-2059
Email:  joe@ablsonline.com

**Attorneys for the Debtors**

17429490

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................... 1

    A.    Overview.......................................................................................................... 1
    B.    Disclaimers and Limitations ........................................................................... 1
    C.    Sources of Information for Disclosure Statement; Financial Reporting................ 2
    D.    Brief Explanation of Chapter 11 ..................................................................... 2
    E.    Definitions....................................................................................................... 2
    F.    Summary of Classification and Treatment of Claims.......................................... 3
    G.    Claims Allowance Process............................................................................... 4
    H.    Parties Entitled to Vote on the Plan ................................................................ 5
    I.    Voting Procedures and Confirmation Hearing ................................................ 5
    J.    Effect of Confirmation of the Plan.................................................................. 5
    K.    Approval of the Disclosure Statement ............................................................ 6

II.    GENERAL INFORMATION ABOUT THE DEBTORS ............................................. 6

    A.    Aquaculture..................................................................................................... 6
    B.    Debtors' Formation and Initial Expansion...................................................... 6
    C.    Further Expansion and Capital Infusion ......................................................... 7
    D.    Production and Marketing Issues ..................................................................... 7

III.   FACTORS AND EVENTS LEADING TO COMMENCEMENT OF THE
    CHAPTER 11 CASE .............................................................................................. 8

IV.    CORPORATE AND CAPITAL STRUCTURE.................................................... 9

V.     SIGNIFICANT EVENTS IN CHAPTER 11 CASES ................................................ 11

    A.    Retention of Professionals and Chief Restructuring Officer ............................. 11
    B.    Debtor in Possession Loan ............................................................................ 11
    C.    Appointment of Creditors Committee and Retention of Counsel....................... 11
    D.    Substantive Consolidation ............................................................................. 11

VI.    DESCRIPTION OF THE PLAN ............................................................................ 11

    A.    Overview of the Plan; New Equity Infusion................................................... 12
    B.    Treatment of Unclassified Claims ................................................................. 12

        1.    Administrative Expense Claims................................................... 13
        2.    DIP Facility Claim ...................................................................... 13
        3.    Professional Fee Claims............................................................... 13
        4.    Priority Tax Claims...................................................................... 13

    C.    Classification and Treatment of Claims and Interests ....................................... 14

        1.    Class 1:  Priority Non-Tax Claims............................................... 14
        2.    Class 2: Broadmoor Secured Claim ............................................ 14
        3.    Classes 3(a)—(c): Secured Tax Claims ...................................... 14
        4.    Class 4: Additional Secured Claim (Card Services)...................... 15

# TABLE OF CONTENTS

(continued)

**Page**

| | | |
|---|---|---|
| | 5. | Class 5: General Unsecured Claims ........................................................ 15 |
| | 6. | Class 6: Intercompany Interests ............................................................ 16 |
| | 7. | Class 7: Interests in VBF USA ............................................................. 16 |
| D. | | Reorganization of the Debtors ...................................................................... 16 |
| E. | | Substantive Consolidation ............................................................................ 18 |
| F. | | Conditions Precedent to Effectiveness of the Plan ...................................... 19 |
| G. | | Feasibility; Financial Projections; Distributions to Creditors ..................... 20 |
| H. | | Cramdown ..................................................................................................... 20 |

**VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ....................................... 20

| | | |
|---|---|---|
| A. | | Assumption or Rejection of Executory Contracts and Unexpired Leases ........... 20 |
| B. | | Rejection Damages Claims ............................................................................ 20 |
| C. | | Assumed Contracts; Cure of Defaults ........................................................... 21 |

**VIII. MISCELLANEOUS PLAN PROVISIONS** ................................................................ 21

| | | |
|---|---|---|
| A. | | Post-Effective Date Fees and Expenses ........................................................ 21 |
| B. | | Post-Effective Date Statutory Fees ............................................................... 22 |
| C. | | Claims Objections and Settlements ............................................................... 22 |
| D. | | Disputed Claims ............................................................................................ 22 |
| E. | | Retention of Jurisdiction ............................................................................... 22 |
| F. | | Other Provisions ........................................................................................... 22 |

**IX. RISK FACTORS** ......................................................................................................... 22

**X. LIQUIDATION ANALYSIS** ...................................................................................... 23

**XI. SOLICITATION OF ACCEPTANCE OF PLAN** ....................................................... 24

## I.    INTRODUCTION

### A.    Overview

VeroBlue Farms USA, Inc. ("**VBF USA**"), VBF Operations, Inc. ("**VBF Ops**"), Iowa's First, Inc. ("**Iowa's First**"), VBF Transport, Inc. ("**VBF Transport**"), and VBF, IP, Inc. ("**VBF IP**") (collectively, the "**Debtors**") hereby submit this disclosure statement (the "**Disclosure Statement**") pursuant to 11 U.S.C. § 1125.

The purpose of this Disclosure Statement is to provide information allowing the holders of Claims and Interests against the Debtors to make an informed vote on the Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and Its Affiliated Debtors (together with any amendments, modifications, or supplements thereto, the "**Plan**"), a copy of which is attached hereto as **Exhibit A**.  This Disclosure Statement describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain alternatives to the Plan, and the manner in which Distributions would be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.  This Disclosure Statement also explains the Debtors' pre-bankruptcy operating and financial history, as well as the events leading up to the commencement of these Chapter 11 Cases.

The Plan provides for a substantial, new capital infusion to revamp the Debtors' business as a going concern and to restructure the Debtors' capital.  Under the Plan, holders of Allowed Secured Claims would retain their Liens on and security interests in the Collateral and receive payments over time equal to the amount of their Allowed Secured Claims.  Holders of Allowed General Unsecured Claims would be paid 10% of their Allowed Claims in cash upon the effective date of the Plan (the "**Effective Date**").  The Plan also provides for a new capital infusion of up to $29,930,000 from Alder Aqua, Ltd. ("**Alder**"), which would become the only remaining shareholder of VBF USA when the Plan becomes effective.  All other Interests would be extinguished.

The Debtors believe that the Plan is the only viable means for preserving and enhancing the Debtors' value and avoiding a piecemeal liquidation of its assets, which, unlike under the Plan, would likely result in holders of Allowed General Unsecured Claims receiving nothing.  Thus, the Debtors filed the Plan to effectuate the transactions contemplated therein and maximize value for Creditors and parties in interest.

### B.    Disclaimers and Limitations

The information contained in this Disclosure Statement is included to solicit acceptance and obtain Confirmation of the Plan and may not be relied upon for any other purpose.

Creditors should note that amendments of a minor nature may be made to the Plan prior to Confirmation of the Plan.  Amendments of that nature may be approved by the Bankruptcy Court at the Confirmation Hearing without re-solicitation of Creditors.

The descriptions of the Plan contained in this Disclosure Statement are summaries and are qualified in their entirety by reference to the Plan.  Each Creditor is encouraged to analyze the terms of the Plan carefully.

The statements contained in this Disclosure Statement are believed to be accurate as of the date of its filing unless another time is specified in the Disclosure Statement.  Certain of the facts and materials relied upon while preparing the Disclosure Statement may change in the future.  Counsel for the Debtors makes no representation as to the accuracy of the information contained in this Disclosure Statement.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "**SEC**") or any state securities regulator, and neither the SEC nor any state securities regulator has passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

### C.        Sources of Information for Disclosure Statement; Financial Reporting

Substantially all of the factual information in this Disclosure Statement was obtained from the Debtors' management as well as the Debtors' books and records, and the Schedules.

### D.        Brief Explanation of Chapter 11

The commencement of a bankruptcy case creates an estate composed of all the legal and equitable interests of a debtor as of the date it files for bankruptcy protection.  The Debtors filed their petitions for chapter 11 relief on September 21, 2018.  In a chapter 11 case, a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee.  The principal purpose of a chapter 11 case is to permit a debtor to reorganize its business or liquidate its assets.  The Plan proposed by the Debtors would reorganize the Debtors' finances and equity structure, and provide a platform for a new investment that would be used, in part, to pay Creditors.

### E.        Definitions

**Defined Terms In the Plan**.  Capitalized terms not defined in the Disclosure Statement shall have the meanings set forth in the Plan.

**Other Terms**.  Terms used in the Disclosure Statement that are not defined herein or in the Plan have the meaning ascribed to them, if any, in the Bankruptcy Code or the Bankruptcy Rules.

**Headings**.  The headings in the Plan and in this Disclosure Statement are only for convenience of reference and do not limit or otherwise affect the provisions of the Plan.

**Exhibits**.  All exhibits to the Plan and Disclosure Statement are incorporated into and are a part of the Plan and Disclosure Statement as if set forth in full herein.

17429490

**F.** **Summary of Classification and Treatment of Claims**

| Class | Status | Summary of Treatment under Plan | Estimated Distribution |
|---|---|---|---|
| Class 1 – Priority Non-Tax Claim | Impaired | Unless the holder agrees otherwise, each holder of an Allowed Priority Non-Tax Claim would receive, in full satisfaction of such Claim, four, quarterly payments totaling a value equal to the Allowed amount of such Claim as of the Effective Date. | 100% |
| Class 2 – Broadmoor Secured Claim | Impaired | Broadmoor would retain its Lien on the Collateral in an amount equal the Broadmoor Secured Claim, with such Lien attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.<br><br>On the Effective Date, the Reorganized Debtors shall deliver to Broadmoor a promissory note in the principal amount of $11,025,000, with interest accruing annually at three percent, and maturing on the fourth anniversary of the Effective Date. On the first anniversary of the Effective Date, the Reorganized Debtors would pay Broadmoor $6,000,000 in principal. Thereafter, the remaining balance will be amortized in equal, quarterly payments for three years.<br><br>Any portion of the Broadmoor Loan that is undersecured is classified as an Allowed General Unsecured Claim. | 100% |
| Classes 3(a) - (c) – Secured Tax Claims | Impaired | Unless the holder agrees otherwise, each holder of an Allowed Secured Tax Claim against any of the Debtors would, in full satisfaction of such Claim, retain its Lien on the Collateral and receive four, quarterly payments totaling a value equal to the Allowed amount of such Claim as of the Effective Date, plus post-petition interest as required under applicable law. | 100% |

3

| Class | Status | Summary of Treatment under Plan | Estimated Distribution |
|-------|--------|--------------------------------|------------------------|
| Class 4 – Additional Secured Claim (Card Services) | Impaired | Unless Card Services agrees otherwise, in full satisfaction of its Additional Secured Claim, it shall be entitled to offset the amount totaling a value equal to the Allowed amount of such Claim as of the Effective Date, without penalty for early surrender. | 100% |
| Class 5 – General Unsecured Claims | Impaired | Unless the holder agrees otherwise, on or as soon as practicable after the Effective Date or the date a General Unsecured Claim becomes an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction of such Claim, a Distribution equal to 10% of the amount of such Allowed General Unsecured Claim. Notwithstanding the foregoing, by agreement, subject to the terms and conditions in the Plan, **Broadmoor shall not receive a distribution on account of its Allowed General Unsecured Claim.** | 10% |
| Class 6 – Intercompany Interests | Unimpaired | Intercompany Interests shall be cancelled or reinstated, as determined by the Debtors with the consent of Alder. | N/A |
| Class 7 – Interests in VBF USA | Impaired | All Interests in VBF USA shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of such Interests. | 0% |

### G.    Claims Allowance Process

Generally, a Claim may be deemed Allowed (i) if the Claim is listed as not disputed or contingent in any of the Schedules of Assets and Liabilities in any of the Debtors' cases, (ii) if the Plan provides that the Claim should be treated as Allowed, or (iii) if a Proof of Claim asserting the Claim is timely filed with the Bankruptcy Court and no Entity Files a Claims Objection to the Claim.  If a Claims Objection is filed, the Bankruptcy Court may determine whether the Claim should be Allowed under section 502(b) of the Bankruptcy Code.

4

### H.    Parties Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors whose Claims are Unimpaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Classes that receive or retain nothing under the Plan are deemed to reject the Plan and are not entitled to vote. Under the Plan, Classes 4 and 6 are Unimpaired and thus the holders of Interests in such Classes are not entitled to vote. All holders of Claims in Classes 1, 2, 3(a)–(c), and 5 are Impaired and are therefore entitled to vote on the Plan. Holders of Interests in Class 7 are deemed to reject the Plan.

### I.    Voting Procedures and Confirmation Hearing

After approval of the Disclosure Statement by the Bankruptcy Court, the Creditors and Interest holders will have an opportunity to vote on the Plan. Voting shall be by Class, as set forth in the Plan and described later in this Disclosure Statement. A Class shall be considered to have accepted the Plan if the Plan was accepted by Creditors or Interest holders of such Class, as applicable, that hold (i) at least two-thirds in amount of Claims or Interests in the Class that vote, and (ii) more than one-half in number of the Allowed Claims or Allowed Interests of that Class that voted.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan. For your vote to be counted, you must complete and sign your original ballot and return it by _____, 2019, which is the last date set by the Bankruptcy Court to vote on the Plan.

The Bankruptcy Court has set a hearing on Confirmation of the Plan and to consider objections to Confirmation, if any, for _____, 2019, at the courthouse for the United States Bankruptcy Court for the Northern District of Iowa, 111 7th Ave. SE, 6th Floor, Cedar Rapids, IA. At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code.

### J.    Effect of Confirmation of the Plan

Confirmation of the Plan makes the Plan and its provisions binding on the Debtors, all Creditors, all Interest holders, and all other parties in interest, regardless of whether they accepted or rejected the Plan. Creditors may receive payment on their Claims only in accordance with the Plan. If confirmed, the Effective Date of the Plan is anticipated to be the fourteenth day after the Bankruptcy Court enters the Confirmation Order.

17429490

### K.     Approval of the Disclosure Statement

A decision by the Bankruptcy Court to approve this Disclosure Statement under Bankruptcy Code section 1125 is a finding that the Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor typical of holders of Impaired Claims to make an informed judgment about the Plan and is not a recommendation by the Bankruptcy Court either for or against the Plan.

## II.     GENERAL INFORMATION ABOUT THE DEBTORS

### A.     Aquaculture

The Debtors are in the business of aquaculture, which is the practice of farming fish, crustaceans, mollusks, aquatic plants, algae, and other organisms.  The Debtors raise a type of fish called Barramundi, also known as Australian Sea Bass.  Barramundi is popular in Southeast Asia and Australia but its market is an "infant" one in the United States.  The Debtors sell Barramundi through wholesalers to restaurants and grocery chains, mostly on the east coast of the United States.

There are two primary markets for Barramundi:

- Live Market: fish sold to wholesalers to distribute to retail operations and centered around ethnic Asian populations in large cities in the United States.

- Dead on Ice: fish sold whole, on ice to wholesalers that distribute to both the food service industry and retailers.

### B.     Debtors' Formation and Initial Expansion

The Debtors were founded in 2014 by five individuals with access to capital markets in Canada and the United States: Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea, and Keith Driver (collectively, the "**Founders**").  The Founders saw opportunity in the aquaculture market but did not have prior aquaculture experience.  They initially formed VeroBlue Farms, Inc., a Canada corporation ("**VBF Canada**"), and raised money in Canadian and American equity markets.  VBF Canada is not a debtor in these Chapter 11 Cases.  Originally, VBF Canada was the sole shareholder of VBF USA but, as explained below, is now a minority shareholder.

In February 2015, the Debtors acquired their first aquaculture facility, located in Blairsburg, Iowa, by acquiring the shares of the owner of the facility, Iowa's First (a Debtor in these Chapter 11 Cases).  The facility consists of 80 nursery tanks (*i.e.*, small fish in small tanks) and 18 opposing flow grow out tanks (*i.e.*, large, self-cleaning tanks for market-size fish).

In May 2015, the Debtors acquired a second aquaculture facility, the Buckeye fish farm located in Radcliffe, Iowa.  The Buckeye facility consists of twenty-four opposing flow grow out tanks and was historically more modern than the Blairsburg facility.  The Buckeye facility was originally held out as a model for future facilities.

### C.      Further Expansion and Capital Infusion

After acquiring the Buckeye facility, the Debtors continued to expand and sought additional, outside capital in the summer of 2016.

To finance their growth, the Debtors raised $63,000,000 in debt and equity financing. Specifically, the Debtors raised $34,000,000 in equity capital by selling preferred shares in VBF USA to Alder ($28,000,000) and FishDish, LLC ("**FishDish**") ($6,000,000). As a result, VBF Canada ceased to be the sole shareholder in VBF USA and now holds a minority interest. In addition, Iowa's First and VBF Ops became borrowers under a credit facility in the original principal amount of $29,000,000 from Amstar Group, LLC ("**Amstar**"). Amstar and Alder are indirectly affiliated. The Amstar facility was increased from time to time and presently has approximately $54,000,000 in obligations outstanding. The Amstar loan was guaranteed by the other Debtors and is secured by substantially all assets of the Debtors.

The raising of $63,000,000 of debt and equity was meant to finance a program with local farmers for dispersed growth facilities. However, after it became clear that this program would not move forward, the Debtors sought, in the third quarter of 2016, to consolidate and expand operations at a new 300,000 square foot facility in Webster City, Iowa, known as Urban Farm (the Debtor's current location). The Urban Farm facility was designed to house five separate barns, each holding forty-eight opposing flow grow out tanks. In addition, in August 2016, the Debtors leased an aquaculture facility in New Athens, Illinois. This leased facility consisted of thirty-six opposing flow grow out tanks.

In the third and fourth quarter of 2016, the Debtors commenced the build-out at the Urban Farm facility in accordance with a new design. In January 2017, the Debtors commenced preparation of the tanks in one of the barns at the Urban Farm facility and, in March through August 2017, stocked the tanks with fish. The preparation and stocking process for the other barns continued through 2017. By February 2018, all five barns at the Urban Farm facility were prepared and stocked with fish.

In addition, the Debtors upgraded their Blairsburg and Buckeye facilities in 2017. The Debtors also acquired other real estate, which was sold in 2018, before the Bankruptcy Cases were filed.

In December 2017, Amstar transferred its rights under the secured lending facility to Broadmoor Financial, L.P. ("**Broadmoor**"). Broadmoor has no financial or commercial relationship with Amstar or Alder (except specifically regarding the secured lending facility) or, to the Debtors' knowledge, any other stakeholder of the Debtors.

### D.      Production and Marketing Issues

None of the Founders had significant prior aquaculture experience. The Debtors, under management of the Founders, materially overestimated the ability to grow fish in the tanks using the technology in place. The Debtors originally estimated fish production of approximately one hundred and twenty kilograms per cubic meter. Actual production has been approximately forty kilograms per cubic meter, *i.e.*, one-third of the original projections.

17429490

Costs, however, remained as high as projected initially. The investment in the tanks and remaining physical assets remained the same regardless of production. Utilities, wastewater disposal, and labor costs have not varied materially with actual production. As a result, the Debtors have only been able to generate thirty percent of projected revenue based upon 100% of projected investment and operating costs. The resulting financial stress was substantial and inevitable.

The financial stress was further compounded by the problems the Debtors had while marketing their fish. Initially, it was difficult for the Debtors to locate purchasers for Barramundi. Further, the technology used by the Debtors often resulted in a poor tasting fish. As a result, customers that did purchase the Debtors' Barramundi were often disappointed with the quality and were not interested in becoming repeat customers.

## III.   FACTORS AND EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

### A.   Change in Management Control; Discovery of Issues; Litigation Against Founders

The Founders did not sufficiently disclose the production issues to VBF USA's board of directors or shareholders. Instead, the Founders presented the board of directors with inaccurate and incomplete information regarding the Debtors' production and finances. The issues were ultimately discovered in 2017 when the Debtors' newly hired Director of Post-Production and Sales and Marketing, Norman McCowan, learned of the production problems. Mr. McCowan brought these issues to the attention of board members and shareholders. The employment of each of the Founders was terminated over the course of 2017 and January 2018.

In November 2017, Mr. McCowan was elevated to the position of President and he currently maintains that role. Currently, the two directors on VBF USA's board are Ed Kerzner and Alan Sutherland, both of whom are Alder designees. Messrs. Kerzner and Sutherland are also the sole directors of the other Debtors as well as the non-filing entities.

The Debtors, under new management, engaged in an extensive, internal investigation to determine the causes of the Debtors' financial distress. Among other actions, the Debtors retained two outside law firms to assist in the investigation. In addition to the acquisition of flawed technology, overly optimistic business plans, production and marketing problems, and failure to timely disclose the problems, the investigation uncovered numerous instances of apparent self-dealing and financial misconduct by the Founders.

On July 31, 2018, VBF USA filed a complaint in the United States District Court for the Northern District of Iowa against each of the Founders, alleging mismanagement of the business and multiple instances of self-dealing as specified in the complaint. The complaint asserts claims for breach of fiduciary duty, fraudulent concealment, fraudulent misrepresentation, constructive fraud, civil conspiracy, aiding and abetting, unjust enrichment, and equitable accounting, and seeks a declaratory judgment. The Founders have denied the allegations and have moved to transfer venue of the litigation to the United States District Court for the Northern District of Texas. The proceedings are pending.

17429490

B.      **Bridge Facility and Retrofit Trials**

As the full extent of the Debtors' production and financial problems became understood, the Debtors were also running out of working capital and were in default of the Broadmoor Loan. To protect its investment and any value that resided with the Debtors, in February 2018, Alder agreed to provide bridge lending to the Debtors. The bridge facility was advanced in connection with a forbearance agreement with Broadmoor. Total lending under the bridge facility, was increased and amended, was $5,025,000 as of the Petition Date. The Alder bridge loan is documented as a participation in the Broadmoor Loan, and therefore, Broadmoor is also the nominal lender of the bridge loan.

With the time and liquidity provided by the forbearance agreement and bridge lending, the Debtors began testing and analyzing new tank configurations and methods of growth. The new technology, if adopted, would require extensive retrofitting of the Debtors' equipment. Testing and analysis are ongoing.

C.      **Restructuring Negotiations**

As the Debtors revised their business plan based upon a retrofit, it became obvious that significant new capital would be required. The Debtors engaged in discussions with Alder regarding restructuring, supported by a substantial infusion of new capital. The Debtors also explored options with third parties, but those discussions did not result in any proposals for further investment or acquisition of the Debtors' assets.

Following their failed efforts to secure additional investors or investments, and to sell their assets, the Debtors commenced these Chapter 11 Cases and proposed the Plan to implement a comprehensive restructuring. In order to fund the costs of the Chapter 11 Cases, Alder and the Debtors entered into an agreement, dated September 21, 2018, for a debtor in possession lending facility in the maximum amount of $2,000,000 (referred to as the "**DIP Facility**").

IV.    **CORPORATE AND CAPITAL STRUCTURE**

VBF USA owns 100% of the equity in VBF Ops. In turn, VBF Ops owns 100% of the equity in each of the remaining Debtors—Iowa's First, VBF Transport, and VBF IP. VBF Ops also owns 100% of the equity in three other entities that are not debtors in these Chapter 11 Cases: Verostream Seafood Marketing, Inc., a Texas corporation; VBF Construction Assets, Inc., an Iowa corporation; and VBF Construction Services, Inc., an Iowa corporation.

A chart showing the corporate structure is below (with Debtor entities shown in red):

17429490



Iowa's First holds title to most the Debtors' physical assets.  Iowa's First owns the assets related to the Blairsburg, Buckeye, and Urban Farm facilities.  Iowa's First leased the facility in New Athens, Illinois.  VBF Transport owns rolling stock used in the transportation of fish.  VBF IP owns intellectual property and patents associated with the business.  VBF USA owns assets related to the headquarters and corporate operation (in addition to 100% of the shares of VBF Ops).  The other entities (including the non-Debtor subsidiaries) hold no material assets.  In total, the Debtors' assets are estimated to be worth approximately $11,025,000, an in-place value.[1]

The Debtors' books and records show that the Debtors are obligated on the secured lending facility, in the aggregate amount of $53,803,271 and are obligated for another $2,831,099 in trade payables and other debt.  Proofs of Claim filed in the Chapter 11 Cases exceed the amount shown in books and records, and, if allowed, would result in total claims of approximately $4 million.

---

[1]  Note that the valuation, based upon the value to the Debtor of the secured lender's collateral acquired, transported and in place, varies from the estimate of what a sale in a chapter 7 bankruptcy case to a third party or parties would fetch for the same assets.  *See,* Section X, *supra*.

17429490

The Debtors are currently reviewing claims and will file objections as appropriate in due course. Accordingly, the Debtors' debt figures should be treated as approximate.

Copies of the Debtors' unaudited balance sheets and income statements for year-end 2017 and year-to-date through July 31, 2018 are attached hereto as Exhibit B.

## V.   SIGNIFICANT EVENTS IN CHAPTER 11 CASES

### A.   Retention of Professionals and Chief Restructuring Officer.

With approval of the Bankruptcy Court, the Debtor retained Joseph A. Peiffer of Ag & Business Legal Strategies and Dan Childers of Elderkin & Pirnie, PLC as general bankruptcy counsel. The Debtor retained Alex Moglia of Moglia Advisors as chief restructuring officer. The Debtors also engaged the law firm of Thompson Coburn as litigation and corporate counsel and Davis Brown Law Firm as litigation and corporate counsel.

### B.   Debtor in Possession Loan.

With approval of the Bankruptcy Court, the Debtors entered into a Debtor in Possession Loan Agreement, as borrowers with Alder Aqua Ltd., as lender. The loan facility is for an amount up to $2 million to fund operations and Chapter 11 expenses.

### C.   Appointment of Creditors Committee and Retention of Counsel.

The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors to represent the interests of unsecured creditors in these cases. The Committee consists of Phillip L. Sheets Ltd., (chair), McDonald Supply / Hajoca Corp., and William John Turk. With approval of the Bankruptcy Court, the Committee has retained as counsel Thomas Fawkes and Jeffrey Goldberg of Goldstein & McClintock LLLP, and Kristina Stanger of Nyemaster Goode.

### D.   Substantive Consolidation.

The Debtors filed a motion to consolidate the assets and liabilities of all the Debtors' estates. No party in interest opposed the motion. On November 28, 2018, the Bankruptcy Court granted the Debtors' motion and entered an order substantively consolidating all estates.

## VI.   DESCRIPTION OF THE PLAN

The entire text of the Plan has been provided with this Disclosure Statement as **Exhibit "A"**. The following is a brief summary of certain provisions of the Plan; however, this summary is not comprehensive. The Plan, and not the Disclosure Statement, is the legally operative document that controls the relationship between the Debtors and its Creditors and Interest holders. Therefore, the Plan should be read carefully and independently of this Disclosure Statement. Creditors and Interest holders are urged to consult with counsel and other professionals to resolve any questions concerning the Plan.

A.    **Overview of the Plan; New Equity Infusion**

The Plan is intended to preserve and maximize the Debtors' business and prospects, restructure the Debtors' debt and equity, and provide a return to holders of Allowed General Unsecured Claims.  Under the Plan, holders of Allowed Secured Claims shall retain their Liens on and security interests in the Collateral and receive payments over time equal to the amount of their Allowed Secured Claims.  Holders of Allowed General Unsecured Claims will be paid an amount equal to 10% of such Claims, as described in more detail in Section 5.05 of the Plan.

A lynchpin of the Plan is the new equity investment that Alder intends to provide the Reorganized Debtors on the Effective Date.  In total, Alder intends to invest up to $29,930,000, consisting of:

a.   $2,000,000.00   Chapter 11 Case costs (to be advanced during the Chapter 11 Cases under the DIP Facility; this amount is based on the 13-week cash flow projections, and is intended to cover, among other things, operations and advisor costs during that time);

b.    $350,000.00   Distributions to holders of Allowed General Unsecured Claims (subject to adjustment);

c.   $6,180,000.00   Interest and principal payments to Broadmoor (interest calculated for a twelve-month period); and

d. $21,400,000.00   Capital investment for the Debtors' retrofit; additional working capital.

Alder's willingness to proceed with the equity investment is subject to various conditions concerning the Debtors' operations and their ability to confirm the Plan.  Conditions to Alder contributing this equity investment are listed on **Exhibit C** attached hereto. In exchange for its investments, Alder will own 100% of the equity interests in VBF USA.

During the Chapter 11 Cases, the Debtors and Alder have been and will continue working cooperatively to endeavor to meet the conditions to Alder's equity investment.  This includes Alder's agreement to provide the DIP Facility.

B.    **Treatment of Unclassified Claims**

If the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective, the Debtors or Reorganized Debtors, as applicable, shall make disbursements of Cash and issue equity in the Reorganized Debtors in the following manner:

17429490

### 1.    Administrative Expense Claims

Each holder of an Allowed Administrative Expense Claim (other than a Claim for Professional Fees) shall receive Cash equal to the amount of such Claim by the later of (i) the Effective Date, or as soon thereafter as is reasonably practicable, or (ii) the date that is fourteen days after the Administrative Expense Claim is Allowed.  This Distribution will be in full and final satisfaction of the Administrative Expense Claim.   The holder of an Allowed Administrative Expense Claim may agree to and receive less favorable treatment in full and final satisfaction of such Claim.

Notwithstanding the foregoing, upon the Effective Date, any Allowed Administrative Expense Claim held by Alder, other than a Claim arising under or related to the DIP Facility (the "**DIP Facility Claim**"), shall be fully and finally satisfied by the distribution to Alder of 100% of the equity interest in the Reorganized VBF USA (the "**Plan Sponsor New Equity Interest**").

In order for the Claim to be allowed, any Entity that claims to hold an Administrative Expense Claim (other than a Claim for Professional Fees) will need to file a motion seeking allowance of such Administrative Expense Claim on or before the date that is twenty-eight days after the Effective Date, regardless of whether or not such Entity has previously asserted an Administrative Expense Claim in a Proof of Claim.

### 2.    DIP Facility Claim

On the Effective Date, the DIP Facility Claim shall be deemed to be an Allowed Claim and, at the election of Alder, fully and finally satisfied by the distribution of the Plan Sponsor New Equity Interests.  If Alder does not so elect, the DIP Facility Claim shall be paid in full in Cash on the Effective Date.

### 3.    Professional Fee Claims

All Professionals seeking payment of professional fees or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), (3), (4), or (5) of the Bankruptcy Code ("**Professional Fees**") must file their respective final applications on or before the date that is forty-five days after the Effective Date. Allowed Professional Fees shall be paid in full in Cash by the Reorganized Debtors as soon as practicable after they are approved by the Bankruptcy Court, unless a Professional agrees to different treatment.

### 4.    Priority Tax Claims

Except to the extent a holder of an Allowed Priority Tax Claim agrees to a different treatment, the holder of such Claim shall receive, in full and final satisfaction of such Claim, a Distribution equal to the amount of the Allowed Priority Tax Claim either (i) in Cash on the Effective Date or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

13

### C.     Classification and Treatment of Claims and Interests

#### 1.     Class 1:  Priority Non-Tax Claims

Unless the holder agrees otherwise, commencing on or as soon as practicable after the Effective Date or the date its Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, the holder of such Claim shall receive, in full and final satisfaction of its Allowed Priority Non-Tax Claim, four, quarterly payments totaling the amount of its Allowed Priority Non-Tax Claim as of the Effective Date, plus Post-Petition Interest where required under applicable law.

The Debtors' books and records currently show no Priority Non-Tax Claims.

#### 2.     Class 2: Broadmoor Secured Claim

Restructured Note.  On the Effective Date, the Reorganized Debtors will deliver to Broadmoor a note in the principal amount of $11,025,000, with interest accruing at the rate of three percent per annum.  The Reorganized Debtors will make monthly payments of interest only until the first anniversary of the Effective Date.  On the first anniversary of the Effective Date, a principal payment of $6,000,000 will be due.  Thereafter the remaining balance shall be amortized in equal, quarterly payments for three years, with final maturity on the fourth anniversary of the Effective Date.  The Reorganized Debtors shall have the right to pre-pay the note in whole or in part.

Lien.  Broadmoor shall retain its Liens on the Collateral to secure the principal and interest due and payable pursuant to the note described in the preceding paragraph, with such Liens attaching to the Collateral in the same priority as prior to the Petition Date.  Upon payment of the principal and interest under the note described in the preceding paragraph, Broadmoor shall release its Liens.

Participation.  The sum of $5,025,000, representing the portion of the Broadmoor Loan allocated to the Collateral in which Alder, as participant, holds a first security interest, will be payable on terms to be agreed between Alder and Broadmoor.

Restated Loan Documents.  The Debtors may submit an amended and restated note and security documents regarding the Broadmoor Secured Claim in the Plan Supplement, in a form acceptable to Broadmoor.

Broadmoor's Deficiency Claim.  The portion of Broadmoor's Claim arising from or relating to the Broadmoor Loan that exceeds $11,025,000 (the "**Broadmoor Deficiency Claim**") shall be treated as an Allowed General Unsecured Claim and is classified in Class 5.

#### 3.     Classes 3(a)—(c): Secured Tax Claims

Unless the holder agrees otherwise, commencing on or as soon as practicable after the Effective Date or the date a Secured Tax Claim becomes an Allowed Secured Tax Claim, each holder of an Allowed Secured Tax Claim against any of the Debtors, in full and final satisfaction of such Claim, shall (i) retain its Lien on the Collateral in an amount equal to the value of such Claim, with the Lien attaching to the Collateral in the same relative priority as existed immediately

14

prior to the Petition Date; and (ii) receive four, quarterly payments totaling the amount of its Allowed Secured Tax Claim as of the Effective Date, plus Post-Petition Interest where required under applicable law.

The holders of Allowed Secured Tax Claims and the amount of such Claims are:

| Holder of Claim | Amount | Collateral |
|---|---|---|
| Hamilton County Treasurer (Class 3(a)) | $255,116.00 | Urban Fish Farm: 401 Des Moines Street Webster City IA 50595. *See* Schedule A-3 Attachment to the Schedules. |
| Hamilton County Treasurer (Class 3(b)) | $17,728.00 | Blairsburg Facility: 2567 190th Street Blairsburg IA 50034. *See* Schedule A-1 Attachment to the Schedules. |
| Hardin County Treasurer (Class 3(c)) | $2,830.00 | Buckeye Facility: 12282 200th Street Radcliff IA 50230. *See* Schedule A-2 Attachment to the Schedules. |

### 4.    Class 4: Additional Secured Claim (Card Services)

Card Services holds an Additional Secured Claim in the amount of $85,348.98 secured by an interest in the Certificate of Deposit at UMB Kansas City, Missouri, Cert. No. 21853261020 (the "**UMB COD**").

Unless Card Services agrees otherwise, on the Effective Date, in full and final satisfaction of its Additional Secure Claim, it will be entitled to offset the amount of its Allowed Additional Secured Claim as of the Effective Date, plus Post-Petition Interest where required under applicable law, against the balance of the UMB COD, and the remainder of the UMB COD shall be surrendered to the Debtors without any surrender charges or penalties.

### 5.    Class 5: General Unsecured Claims

Class 5 consists of General Unsecured Claims.  General Unsecured Claims include most trade payables and Claims arising from rejection of leases or contracts.  In addition, Class 5 includes the unsecured deficiency portions of secured debts.  For example, the amount of the Allowed Claim held by Broadmoor in excess of its $11,025,000 Secured Claim is classified in Class 5, as are Claims secured by Liens that are undersecured due to the priority of the Lien, such as certain mechanics' liens.  The aggregate amount of Allowed Claims in Class 5 is estimated to be approximately $46,000,000, subject to adjustment based upon further information and Proofs of Claims if timely filed.

17429490

Under the Plan, unless the holder agrees otherwise, on or as soon as practicable after the Effective Date or the date a General Unsecured Claim becomes an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim against any of the Debtors shall receive, in full and final satisfaction of such Claim, a Distribution equal to 10% of the amount of such Allowed General Unsecured Claim.

By voting to accept the Plan, Broadmoor waives Distribution on account of the Broadmoor Deficiency Claim.

### 6.     Class 6: Intercompany Interests

Intercompany Interests would be cancelled or reinstated, as determined by the Debtors with the consent of Alder.

### 7.     Class 7: Interests in VBF USA

All Interests in VBF USA shall be extinguished as of the Effective Date, and holders thereof shall receive no Distribution on account of such Interests.

### D.     <u>Reorganization of the Debtors</u>

a.     <u>Reorganized Debtors; Vesting of Estate Property; and Causes of Action</u>. The Plan contemplates the reorganization of the Debtors, with each emerging from bankruptcy and continuing to operate its business as a Reorganized Debtor with a restructured balance sheet.  All of the property of the Estate and of the Debtors will vest automatically in the Reorganized Debtors free and clear of any and all Claims, Liens, and Interests, except for those Claims, Liens, and Interests expressly provided for in the Plan pursuant to Bankruptcy Code sections 1141(b) and (c), without the need for any further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Entity.  For the avoidance of doubt, except as expressly set forth in the Plan, all Causes of Action will vest in the Reorganized Debtors upon the Effective Date, and the Reorganized Debtors shall have the authority to prosecute such Causes of Action.

b.     <u>Powers and Duties</u>.  In addition to any other powers described in the Plan, the powers and duties of the Reorganized Debtors consist of the following:

i.     To take control of, preserve, and operate property of the Estate, subject to the terms of the Plan;

ii.     To investigate and prosecute, settle, or abandon all Causes of Action belonging to or assertible by the Estate;

iii.     To review, object to, seek equitable subordination of, or seek any other remedy with respect to Claims filed against the Debtors;

16

iv.     To abandon, discontinue, dismiss, amend, settle, compromise, negotiate, or otherwise resolve all disputes, including all Causes of Action and Claims Objections;

v.     To make Distributions on account of Claims and Interests consistent with the terms of this Plan;

vi.     To retain persons and professionals to assist in carrying out the powers and duties enumerated pursuant to this Plan;

vii.     To enter into contracts as necessary to assist in carrying out the powers and duties enumerated pursuant to this Plan;

viii.     To pay expenses incurred in carrying out the powers and duties enumerated pursuant to this Plan, including professional fees incurred after the Effective Date;

ix.     To open and maintain bank accounts and deposit funds and draw checks and make disbursements in accordance with the Plan;

x.     To effectuate any of the provisions in this Plan;

xi.     To ask the Bankruptcy Court to enter the final decree; and

xii.     To execute all documents appropriate to convey assets of the Estate consistent with the terms of this Plan.

c.     Discharge. Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, of Claims, Interests, and Causes of Action of any nature whatsoever by any Entity, including any interest accrued on any Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the Estate, or any of their assets or properties, regardless of whether any property would have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of any Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Interest has accepted the Plan, effective as of the Effective Date. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan,

17

on the Effective Date, the Confirmation Order shall be a judicial determination of the complete and full discharge of all Claims and Interests by any Entity, subject to the Effective Date occurring. Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all property of the Estate will vest in the Reorganized Debtors, free and clear of all Claims and Interests of any Entity and with the full and complete discharge of any and all Claims, Interests, or Causes of Action of any Entity.

      d.    <u>Debtors' Releases</u>.  The Plan provides that each Debtor and certain of its related parties shall release the other Debtors, the Estate, the Reorganized Debtors, Alder, and certain of their related parties, from any and all Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities (as further described in Section 8.14 of the Plan).  More information regarding the Debtor Releases is available in Section 2.01 of the Plan.

      e.    <u>Releases by Holders of Claims and Interests</u>.  The Plan provides that holders of Claims and Interests and certain of their related parties shall release the Debtors, Alder, and certain of their related parties, from any and all Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities (as further described in Section 8.15 of the Plan).  More information regarding the Plan Released Parties is available in Section 2.01 of the Plan.

      f.    <u>Exculpation</u>.  Under the Plan, the Debtors, Alder, and certain of their related parties shall not have or incur any liability to any holder of a Claim or Interest, or any party acting or asserting a Claim through a holder of a Claim, for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, solicitation of votes, confirmation, or approval of the Plan or any compromises or settlements contained therein, the administration of the Plan or Distributions under the Plan, the Disclosure Statement, and any ancillary documents related thereto or any contract, instrument, release, or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided*, *however*, that the exculpation shall not apply to liability resulting from acts or omissions that are determined by a Final Order to have constituted gross negligence or willful misconduct.

      g.    <u>Litigation</u>.  For clarity, claims and Causes of Action against the Founders are preserved, including without limitation those that are the subject of pending litigation in the United States District Court for the Northern District of Iowa, in the case captioned *VeroBlue Farms USA, Inc. v. Wulf, et al.*, Case No. 3:18-03047.

**E.**     **<u>Substantive Consolidation</u>**

      For purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under the Plan, the Plan is predicated upon the Bankruptcy Court entering an order providing for the consolidation of the estates of the Debtors into a single estate.  On

November 28, 2018, the Bankruptcy Court entered an order substantively consolidating the Debtors' estates.

Pursuant to such a consolidation order (i) all assets and liabilities of the consolidated Debtors are deemed to be merged solely for purposes of Distributions made under the Plan; (ii) the obligations of each Debtor are deemed to be the obligation of the consolidated Debtors solely for purposes of Distributions under the Plan; (iii) any Claims filed or to be filed in connection with any such obligations are deemed Claims against the consolidated Debtors; (iv) each Claim filed in the Chapter 11 Case of any Debtor is deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors; (v) all transfers, disbursements, and Distributions made by any Debtor under the Plan would be deemed to be made by the consolidated Debtors; and (vi) all guarantees of the Debtors of the obligations of any other Debtors are deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class will be entitled to their share of assets available for Distribution to such Class without regard to which Debtor was originally liable for such Claim.

Notwithstanding the foregoing, such limited consolidation does not affect (i) the legal and corporate structure of the Reorganized Debtors, (ii) any obligations under any contracts or leases entered into during the Chapter 11 Cases or Executory Contracts or unexpired leases assumed pursuant to the Plan, (iii) distributions from any insurance policies or proceeds of such policies, (iv) the revesting of assets in the separate Reorganized Debtors pursuant to Article VIII of the Plan, or (v) guarantees that are required to be maintained post-Effective Date (a) in connection with Executory Contracts or unexpired leases entered into during the Chapter 11 Cases or that had been, or would be, assumed or (b) pursuant to the express terms of the Plan.

**F.      Conditions Precedent to Effectiveness of the Plan**

The Plan cannot become effective unless and until the following conditions are satisfied or waived in accordance with Section 10.02 of the Plan:

a.      A Final Order directing the substantive consolation of the Debtors' estates consistent with Article IX of the Plan shall have been entered;

b.      The Confirmation Order, in form and substance reasonably satisfactory to the Debtors and Alder, shall have been entered and remain in full force and effect;

c.      There is no stay or injunction in effect with respect to the Confirmation Order; and

d.      Fourteen days shall have passed since the Confirmation Order has been entered.

17429490

### G.      Feasibility; Financial Projections; Distributions to Creditors

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor or plan proponent demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the plan calls for liquidation

The Debtors anticipate that their finances and operations will stabilize if they are able to refinance their secured debt, recapitalize their ownership, and implement the planned capital improvements that should substantially increase the Debtors' production.  The Debtors anticipate that the Distributions under the Plan will be funded by the new equity investment from Alder. Alder has access to ample Cash and equity to fully fund the new equity contribution.

### H.      Cramdown

If any class of Claims fails to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to any non-accepting, impaired Class.  The Plan satisfies the "absolute priority rule" insofar as holders of Interests would receive no Distributions unless and until all Allowed unsecured Claims are paid in full.

## VII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption or Rejection of Executory Contracts and Unexpired Leases.

Any Executory Contract or unexpired lease that has not expired by its own terms on or prior to the Effective Date and that (i) the Debtors have not assumed and/or assigned or rejected with the approval of the Bankruptcy Court, (ii) is not identified as Assumed Contract, and (iii) is not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtors, and the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### B.      Rejection Damages Claims.

With respect to Claims arising from the rejection of Executory Contracts or unexpired leases pursuant to Section 7.01 of the Plan, the bar date to file Proofs of Claim in these Chapter 11 Cases will be reopened for a period of twenty-eight days after the Effective Date, and all such Proofs of Claim must be filed with the Bankruptcy Court during that time.  Any such Claim that is Allowed by the Bankruptcy Court will be treated as an Allowed General Unsecured Claim.  Any Claim arising from the rejection of an Executory Contract or unexpired lease pursuant to Section 7.01 of the Plan for which a Proof of Claim is not timely filed will be forever barred from assertion against the Estates, the Debtors, the Reorganized Debtors, their successors and assigns, or their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.

### C.    Assumed Contracts; Cure of Defaults.

Any monetary amounts by which each Executory Contract and unexpired lease to be assumed is in default will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such Assumed Contract may otherwise agree.  The Plan Supplement will include the list of Assumed Contracts to be assumed by the Reorganized Debtors pursuant to the Plan.  The Plan Supplement will identify the Executory Contracts and unexpired leases sought to be assumed, the counterparties thereto, and the proposed cure payments as of the projected Effective Date.  The Debtors reserve the right to remove Executory Contracts or unexpired leases from such list or to modify the cure amounts executed in connection therewith at any time prior to the Confirmation Hearing.

Any objection to (i) the amount of any cure payments for the Assumed Contracts, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, must be filed and served on the Debtors on or before the deadline established by the Bankruptcy Court for filing objections to the Plan.  If an objection is filed, the Debtors will attempt to resolve such objection prior to the Confirmation Hearing.  If the parties are unable to consensually resolve such objection prior to the Confirmation Hearing, such objection and any cure amounts to be paid will be determined at the Confirmation Hearing or as otherwise agreed to by the parties or ordered by the Bankruptcy Court.

If a dispute remains unresolved as of the Effective Date regarding (i) the amount of any cure payments, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made within a reasonable time following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such dispute, the Executory Contract or unexpired lease at issue will be deemed assumed by the Debtors unless otherwise ordered by the Bankruptcy Court.  However, any such "deemed" assumption will not affect any counterparty's rights and/or remedies under section 365 of the Bankruptcy Code or otherwise, which shall be preserved pending final resolution, notwithstanding the "deemed" assumption.

## VIII.    MISCELLANEOUS PLAN PROVISIONS

### A.    Post-Effective Date Fees and Expenses

From and after the Effective Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the reasonable fees and expenses of professional persons incurred after the Effective Date by the Reorganized Debtors will be paid by the Reorganized Debtors, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

17429490

**B.**    **Post-Effective Date Statutory Fees**

All fees payable pursuant to section 1930 of Title 28 of the United States Code that are incurred after the Effective Date will be paid in accordance with applicable law.  The Reorganized Debtors will submit post-confirmation reports in compliance with applicable law.

**C.**    **Claims Objections and Settlements**

a.    After the Effective Date, Claims Objections may be made, and Claims Objections made previous thereto will be pursued, only by the Reorganized Debtors.  The deadline for the Reorganized Debtors to file Claims Objections will be 180 days after the Effective Date, subject to extension by motion to the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors will, without further order of the Bankruptcy Court, have the right to retain and compensate counsel or other professionals to assist with Claims Objections or any other duties of the Reorganized Debtors under the Plan.

b.    After the Effective Date, the Reorganized Debtors may settle any Disputed Claims where the proposed Allowed Claim is to be less than $25,000 without notice and a hearing and without an order of the Bankruptcy Court.  All other settlements will be subject to notice and a hearing pursuant to section 102(1) of the Bankruptcy Code and Bankruptcy Rule 9019.

**D.**    **Disputed Claims**

If any Claim is a Disputed Claim, then no Distribution provided for in the Plan will be made on account of such Claim unless and until said Disputed Claim becomes an Allowed Claim.  If any Distribution is made while there is an extant Disputed Claim, then the Distribution that would be paid on account of the Disputed Claim will be withheld until the Disputed Claim is Allowed or Disallowed.  If the Claim is Allowed, then the holder of the Allowed Claim will receive its withheld Distribution.  If the Claim is Disallowed, then any Distribution that was withheld with respect to such Claim will be released to the Reorganized Debtors.

**E.**    **Retention of Jurisdiction**

The Plan contains a standard retention of jurisdiction provision.  *See* Plan Art. XI.  The Bankruptcy Court will retain jurisdiction to enforce the terms of the Plan.  *See* Plan Art. XI; Plan Section 8.05.

**F.**    **Other Provisions**

Creditors and other parties in interest are directed to the Plan with respect to all other the provisions that are not specifically discussed in this Disclosure Statement.

**IX.    RISK FACTORS**

As with any plan or other financial transaction, there are risk factors that must be considered.  It should be noted that all risk factors cannot be anticipated, that some events may develop in ways that were not foreseen and that many or all the assumptions that used in connection

with this Disclosure Statement and the Plan may not be realized exactly as assumed. Some or all such variations may be material. While all reasonable efforts have been made to accurately predict future facts, there can be no assurance that subsequent events will bear out the analysis set forth herein. All possible risks cannot, and are not, discussed in this Disclosure Statement. However, the Plan is structured to minimize risks to existing Creditors.

However, certain risks remain, which bear upon Alder's ability to make the proposed equity investment:

- Adverse developments in technology. The Debtors' proposed new technology is not fully proven. If developments adversely affecting the business or prospects, Alder may decline to proceed with the proposed investment.

- Unanticipated Claims. If the Debtors have incorrectly calculated or estimated their Claims, the total investment required may become too high for Alder to proceed with the proposed investment.

- Failure to develop a market. To effectuate the retrofit, the Debtors will be required to suspend marketing and fish production. If the Debtors are unable to capture sufficient market share following such suspension, assuming a technologically successful, timely, and cost-effective retrofit with proper technology, then Alder may decline to proceed with the proposed investment.

## X.  LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must determine (with certain exceptions) that the Plan provides that, for each Impaired Class, each Class member holding an Allowed Claim would recover an amount at least equal to the distribution that such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The trustee appointed in a chapter 7 case would make all his or her own decisions with respect to the liquidation of the Estate, the hiring of professionals, the pursuit of any claims or litigation, and the payment or objection to Claims.

Attached hereto as **Exhibit D** is a liquidation analysis prepared by the Debtors' management showing estimated distributions to Creditors under a chapter 7 liquidation. As set forth in Exhibit D attached hereto, the Debtors believe that Creditors will receive a significantly higher recovery under the Plan than they would in a chapter 7 liquidation. It is unlikely that holders of Allowed General Unsecured Claim would receive any value in a chapter 7 liquidation because substantially all of the Debtors' assets are encumbered by one or more Liens. The total amount of Secured Claims against the Debtors exceeds the estimated liquidation value of the Debtors' assets, and thus no funds would be available for holders of Allowed General Unsecured Claim.

One issue affecting the liquidation analysis merits specific discussion. The proceeds, if any, of claims and causes of action asserted in pending litigation against the Founders could be available for pro rata distribution to general unsecured creditors. Placing a value on the claims for purposes of a hypothetical Chapter 7 liquidation requires sophisticated judgments for several reasons. First, the allegations in the various counts of the lawsuit the Debtors have filed against

23

the Founders are complex and varied. Although the Debtors believe that all the allegations in its suit are meritorious, it is certainly possible that a judgment for some, but not all, of the claims against the Founders will be awarded and that others will be denied. It is not currently possible to make any reasonable estimate of the size of the judgment the Debtors may obtain.  Second, and more importantly, the Debtors cannot make any reasonable calculation, at this point, of the amount that might be collected from any such judgment, regardless of how large it might be.  Little is known about the ability of the Founders to pay any substantial judgment, except that that the Debtor had no directors and officers insurance in place.  Third, it is far from certain that a Chapter 7 trustee would have available the substantial resources required to pursue the litigation.  Indeed, the Debtor believes it unlikely that a Chapter 7 trustee would have the resources necessary to pay counsel, experts and other costs of litigation.  Fourth, the claims and causes of action are collateral for the DIP Loan.  The fact that it is already pledged makes outside funding nearly impossible, and in a Chapter 7 case the collateral may be foreclosed upon.  With no substantial resources in the estate that could be used to fund the litigation, it is quite possible that a chapter 7 trustee would have no choice except to abandon the suit or attempt to settle it for a nominal value.

Moreover, any net recoveries on the litigation, or recoveries for any other unencumbered assets, would first be paid to repay the DIP Loan, administrative and other provisionary expenses, and only then would be paid pro rata to all unsecured creditors in a Chapter 7 case.  Broadmoor's deficiency claim is estimated to constitute approximately 95% of general unsecured claims as it would not be waived in a Chapter 7 liquidation case.  Accordingly, other creditors would receive only a small fraction of net litigation recoveries or realization upon other unencumbered assets. For example, if hypothetically $2 million in unencumbered funds were generated in a Chapter 7 case, and $1 million were applied to priority claims, then only $50,000 would be available to general unsecured creditors other than Broadmoor.

## XI.    SOLICITATION OF ACCEPTANCE OF PLAN

The Debtors hereby solicit acceptance of the Plan and urge its Creditors and Interest holders to vote to accept the Plan.

Dated the date set forth above.

VEROBLUE FARMS USA, INC.
on behalf of itself and its substantively
consolidated debtors


By:  /s/ Norman McCowan
      Norman McCowan
      Chief Executive Officer



ELDERKIN & PIRNIE, PLC

24

17429490

By: /s/ Dan Childers
      Dan Childers
      Attorney for Debtor


AG & BUSINESS LEGAL STRATEGIES


By: /s/ Joseph A. Peiffer
      Joseph A. Peiffer
      Attorney for Debtor

17429490

## <u>EXHIBIT A</u>

**PLAN**

**[FILED SEPARATELY]**

## **EXHIBIT B**

## **FINANCIAL STATEMENTS**

# EXHIBIT C

## CONDITIONS TO ALDER'S EQUITY INVESTMENT

# **EXHIBIT D**

# **LIQUIDATION ANALYSIS**

17429490

2

17429490