**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re: | Chapter 11 |
| VEROBLUE FARMS USA, INC., ET AL., | Case No. 18-01297 |
| Debtors. | |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO APPROVAL OF DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF VEROBLUE FARMS USA, INC. AND ITS AFFILIATED DEBTORS**

The Official Committee of Unsecured Creditors (the "*Committee*") appointed in the above-captioned bankruptcy cases, by its undersigned counsel, hereby submits this objection (the "*Objection*") to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors* (the "*Disclosure Statement*"). In support of its Objection, the Committee states as follows:

**PRELIMINARY STATEMENT**

1. The Disclosure Statement should not be approved for two principal reasons: (i) the proposed *Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors* (Docket No. 191, the "*Plan*") is patently unconfirmable; and (ii) the Disclosure Statement lacks adequate information with respect to several material aspects of the Plan such that creditors will be deprived of the ability to make an informed voting decision with respect to the Plan. The infirmities in the Disclosure Statement and Plan are substantial – if not completely overwhelming – and it is clear to the Committee that proceeding to a confirmation hearing would be a complete waste of estate and the Court's resources.

2. The deficiencies in the Plan and Disclosure Statement are amplified in light of the extensive preliminary investigation undertaken by the Committee of the conduct of the Debtors,

1

its senior secured creditors, officers, directors, and equity holders. The Committee's investigation, which is ongoing, raises concerns by the Committee that claims and causes of action may exist against certain individuals and entities.

3. On December 19, 2018, the Committee served the Debtors with correspondence serving as a Challenge Notice, as that term is defined in paragraph 8(a) of the *Final Order (A) Authorizing Post-Petition Financing, (B) Granting § 364(c) and 364(d) Liens and a Superpriority Administrative Claim, (C) Approving Post Petition Financing Agreement With Alder Aqua, Ltd., and (D) Granting Related Relief* (Docket No. 73, the "*Final DIP Order*").

4. The Challenge Notice sets forth the Committee's Challenge to the validity, priority, extent and enforceability of the secured claims of Broadmoor Financial, L.P. ("*Broadmoor*"), and sets forth evidence provided to the Committee which the Committee believes may support either the recharacterization of Broadmoor's claim to equity or the equitable subordination of such claim to the Debtors' unsecured creditors. In addition, the Challenge Notice put the Debtors on notice of several other potential claims and causes of action identified by the Committee. These potential claims include, but are not limited to, breaches of fiduciary duty against certain of the Debtors' officers and directors (including Dr. Otto Happel, Jens Haarkoetter, Eva Happel Ebstein, and Bjorn Thelander), fraud in the inducement related to the July 2016 equity infusion of the Plan Sponsor and DIP lender, Alder Aqua, Ltd. ("*Alder*") and debt financing of its affiliate, Amstar Group, LLC, and corporate waste related to expenditures incurred in prosecuting an action against the Debtors' Founders (as defined in the Disclosure Statement) in the U.S. District Court for the Northern District of Iowa pending as Case No. 18-03047.

5. On December 27, 2018, the Debtors responded to the Challenge Notice, disputing many of the Committee's allegations, alleging that the demise of the Debtors was attributable to

the Founders, and declining to bring suit against the individuals and entities identified in the Challenge Notice.

6. The vigorous dispute of the Debtors and Alder to the Challenge Notice makes clear to the Committee that at least additional investigation is required with respect to the potential claims and causes of action set forth in the Challenge Notice and further disclosure by Debtors is required. The Committee intends to conduct this investigation through the filing of a Fed. R. Bankr. P. 2004 motion, requesting production of documents and depositions of several key individuals affiliated with the Debtors, Alder, Amstar and Broadmoor, unless substantive evidence and cooperation is received from the Debtors.

7. Irrespective of the Debtors' feelings about the Challenge Notice, the omission of these potential claims from disclosure in the Disclosure Statement, and the Committee's intention to investigate – and if appropriate, prosecute – such claims, is glaring indeed. Moreover, the Disclosure Statement describes a Plan that purports to grant full releases to most of the individuals and entities that are the target of the Committee's investigation; not only are these releases completely improper under the circumstances of this case, but stand to disenfranchise creditors if approved. The Disclosure Statement is therefore "dead on arrival," as it omits critical information necessary for an informed decision on the Plan and supports a Plan that is patently unconfirmable.

## LEGAL STANDARD

8. Under section 1125(b) of the Bankruptcy Code, a disclosure statement must contain "adequate information" before the debtor may solicit acceptance of a plan of reorganization. 11 U.S.C. § 1125(b). Adequate information is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable

> such a hypothetical investor . . . to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1). This requirement "plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's acceptability." *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.)*, 216 B.R. 175, 180 (E.D. Va. 1997) *aff'd sub nom.*, 163 F.3d 598 (4th Cir. 1998). Whether the disclosure statement contains adequate information is determined on a case-by-case basis. *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989); *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 696 (4th Cir. 1989); *see also In re Walker*, 198 B.R. 476, 479 (Bankr. E.D. Va. 1996) ("Adequate information for purposes of 11 U.S.C. § 1125 is to be determined by the facts and circumstances of each case."). Although "[a] debtor cannot be expected to unerringly predict the future," it is required to "provide information on all factors known to [it] at the time that bear upon the success or failure of the proposals set forth in the plan." *Id*. at 479-80.

9. A disclosure statement should set forth a variety of categories of information including: (1) the circumstances that gave rise to the filing of a chapter 11 petition; (2) a complete description of the available assets and their value; (3) the anticipated future of the debtor, with accompanying financial projections; (4) the source of the information provided in the disclosure statement; (5) the condition and performance of the debtor while in chapter 11; (6) information regarding claims against the estate, including those allowed, disputed and estimated; (7) a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7; (8) the accounting and valuation methods used to produce the financial information in the disclosure statement; (9) information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and officers of the debtor; (10) a

4

summary of the plan of reorganization; (11) an estimate of all administrative expenses, including attorney's fees and accountant's fees; (12) the collectability of any accounts receivable; (13) any financial information, valuation, or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan; (14) information relevant to the risks being taken by the creditors and interest holders; (15) the actual or projected value that can be obtained from avoidable transfers; (16) the existence, likelihood, and possible success of nonbankruptcy litigation; (17) the tax consequences of the plan; and (18) the relationship of the debtor with affiliates. *Dakota Rail*, 104 B.R. at 193; *In re Oxford Homes Inc.*, 204 B.R. 264 (Bankr. D. Me. 1997).

10. Moreover, courts should deny approval of a disclosure statement that is based on and describes a patently unconfirmable plan. *See* 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if . . . [t]he plan complies with the applicable provisions of this title."). The Court should not approve a disclosure statement "where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *In re American Capital Equipment, LLC*, 688 F.3d 145, 154 (3d Cir. 2012); *see also In re M.J.H. Leasing*, 328 B.R. 363, 369 (Bankr. D. Mass. 2005) (observing that it is appropriate to consider an objection related to confirmation at a disclosure statement hearing) (citations omitted); *In re Felicity Associates*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("it has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face") (quotations and citations omitted).

## **OBJECTIONS TO THE DISCLOSURE STATEMENT**

**A.    The Disclosure Statement Does Not Contain "Adequate Information" As Required By Section 1125.**

11.    As set forth above, section 1125 of the Bankruptcy Code requires a disclosure statement to contain "adequate information" regarding a proposed plan to allow creditors to make an informed decision regarding the plan. "Adequate information" is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtors' books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

12.    Here, the Disclosure Statement not only omits to disclose highly relevant facts that are needed for creditors to make an informed decision regarding the Plan, but also contains a host of apparent misstatements and omissions that put the validity of the Disclosure Statement into grave doubt. Among others, the following provisions of the Disclosure Statement lack adequate information:

a. **The Disclosure Statement Provides Inadequate Information Regarding the Investigation, if any, the Debtors Undertook in Connection with Estate Claims and Causes of Action**. As discussed above, the Committee has identified multiple potential estate claims and causes of action against the Debtors' (i) secured lenders; (ii) former and current officers and directors (Happel, Haarkoetter, Ebstein, Thelander, McCowan); and (iii) majority shareholder (Alder) which, if prosecuted, could result in a full recovery by general unsecured creditors. The Committee's initial findings regarding these causes of action are set forth in its Challenge Notice. The Disclosure Statement omits any discussion of the potential value of these causes of action, or the

extent to which they were investigated and evaluated. Indeed, the Committee has no reason to believe that any such investigation was conducted, given that the Debtors appear to be under the complete control of the very individuals and entities who are targets of such claims.

b. **The Debtors' Insufficient Disclosures Regarding Preserved Causes of Action Will Imperil the Debtors' Right to Pursue Such Causes Post-Confirmation**. In addition, other Causes of Action, including non-insider avoidance actions, are not described in the Disclosure Statement with sufficient detail as to provide voting creditors with adequate information concerning the value of those claims and the identity of potential defendants. Indeed, in their liquidation analysis (attached as Exhibit D to the Disclosure Statement), the Debtors value Causes of Action at *zero*.[1] The Debtors' failure to describe such Causes of Action with sufficient specificity could very well result in the Debtors, or a subsequently-appointed trustee, from being estopped from prosecuting those claims in the future. *See, e.g., In re Transit Grp., Inc.*, 332 B.R. 45, 56 (Bankr. M.D. Fla. 2005) (requiring "that some specificity of retained causes of action is needed in a plan of reorganization or disclosure statement to preserve preference actions post-confirmation"). Debtors' recent request to extend time to identify potential avoidance actions filed on December 20, 2018 (Docket No. 205) further bolsters the Committee's concern that not only have the claims not been adequately investigated, but are still largely unknown and thus, inadequately disclosed

---

[1] Notably, this valuation appears to relate only to the Debtors' pending litigation against the Founders; it does not even mention other Causes of Action expressly being preserved under the Plan.

7

by Debtors. This Court's Order (Docket No. 223) extended the Debtors' time to January 7, 2019 to identify these actions; and yet, no such filing has been made.

c. **The Liquidation Analysis is Completely Deficient**. The Debtors' Liquidation Analysis does not contain a comparison of the estimated recoveries to creditors under the Plan and in a chapter 7 liquidation; accordingly, it has no utility to creditors voting on the Plan, and does nothing to establish that the Debtors can satisfy the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

d. **The Disclosure Statement Provides Inadequate Information Regarding the Broad Releases Being Proposed**. The third-party releases proposed by the Debtors are overly broad, and apply to a range of parties, including Alder, its members, partners, officers, directors, employees, advisors, attorneys, professionals, or agents and advisors of any of the foregoing, including Ebstein, Haarkoetter, Ed Kerzner (a director of Amstar), Alan Sutherland, Thelander, and Anders Wester. The Disclosure Statement fails to provide adequate information regarding the proposed releases and the claims that would be released if approved, as well as the Debtors' assessment of the value of such releases. As such, creditors voting on the Plan are not properly informed of the reasonableness and impact of the proposed releases. The Disclosure Statement fails to describe what, if any, consideration is being given for the releases. Furthermore, creditors are not even given the option to "opt-in" to such releases. Consideration and consent are important factors that courts in the Eighth Circuit consider when evaluating the propriety of third party releases in a chapter 11 plan. *In re Archdiocese of Saint Paul & Minneapolis*, 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (requiring the debtor to show, *inter alia*, "a substantial contribution from the

8

non-debtor co-liable parties" and "significant acceptance of the plan by the group of creditors who are being asked to give up their claims against third parties"). No discussion is provided of the claims being released and the consideration being provided. Leaving aside the fact – as discussed below – that these releases render the Plan unconfirmable, it is clear that the Debtors' disclosures concerning such releases are completely inadequate.

e. **The Disclosure Statement's Description of Risk Factors is Inadequate.** On pages 22-23, the Debtors set forth a handful of risk factors associated with the Plan. These risk factors are noticeably incomplete. The Debtors omit to disclose the substantial risk of non-confirmation of the Plan based, among other things, on the complete lack of evidence in support of feasibility, the Debtors' failure to meet its burden as to the "best interest of creditors" test, and the existence of impermissibly broad third-party releases. The Debtors also fail to disclose the significant risk that the various contingencies to the Alder new value infusion are not satisfied, which would make consummation of the Plan impossible.[2] In addition, the Debtors do not disclose the substantial risk of default on the Broadmoor credit facility, given that they have completely shut down operations and therefore have no short-term (and perhaps even long-term) ability to generate revenue. The Debtors do not address the risks associated with the claims and causes of action asserted by the Committee in the Challenge Notice, and the potential impact such claims may have on the Debtors' ability to confirm the Plan.

---

[2] *See* Disclosure Statement, Exhibit C. At least one of the ten conditions to funding *already* cannot be met; the requirement that the Debtors obtain a final and non-appealable Confirmation Order on or before February 1, 2019.

13.    Absent substantial revisions and additions to the Disclosure Statement to address these glaring omissions, the Disclosure Statement does not meet the standards of section 1125 of the Bankruptcy Code and cannot be approved.

**B.    The Plan is Patently Unconfirmable, and Therefore, the Disclosure Statement Should Not Be Approved.**

### i.    The Third-Party Releases In the Plan Are Wholly Improper.

14.    Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired class either accept the plan or receive under the plan property of a value, as of the effective date of the plan, of not less than the amount the holder would receive if the debtor were liquidated under chapter 7.  To this end, the releases provided under the Plan render the Plan unconfirmable.

15.    Section 8.15 of the Plan contains broad releases by holders of claims and interests in favor of the "Plan Released Parties," which are defined in Section 2.01 to include "each of the Debtors, the Plan Sponsor, and any of their respective members, partners, officers, directors, employees, advisors, attorneys, professionals, or agents and advisors of any of the foregoing, including Eva Ebstein, Jens Haarkoetter, Ed Kerzner, Alan Sutherland, Bjorn Thelander, and Anders Wester."  The Disclosure Statement fails to provide adequate information regarding the claims being released under the Plan, the consideration being paid or provided by each of the Plan Released Parties for their releases, and the necessity of such releases.  Moreover, the Plan does not provide for an "opt-in" option for creditors voting on the Plan, meaning that if a creditor does not vote at all, it will nevertheless be subject to these broad releases.

16.    While the Eighth Circuit Court of Appeals has not expressly ruled on the permissibility of third-party releases in this context, the majority view adopted by judicial circuits is that releases given by non-debtors to other non-debtors in a plan are permissible only in rare

and exceptional circumstances in which certain factors are present. *In re Continental Airlines*, 203 F.3d 203, 212 (3d Cir. 2000) (permissive view of releases does not equate to "unfettered discretion"; releases generally approved only in "extraordinary cases"); *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Circ. 2005) (non-debtor third-party releases proper only in "rare cases"); *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (third-party releases must be based on affirmative consent of releasing party and cannot be non-consensual); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) ("a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances").

17. Iowa Bankruptcy Courts have adopted this "permissive view" of non-debtor third-party releases and have employed a multi-factor analysis to determine whether it will entertain the possibility of such releases. *See, e.g., In re Fansteel Foundry Corp.*, S.D. Iowa Bankr. Case No. 16-01825, Judge Shodeen Confirmation Order dated October 26, 2018 (Docket No. 970, at pages 14-17), citing *Master Mortg.* Factors and the majority view. The *Master Mortg.* court utilized the following factors: (1) whether there is an identity of interest between the debtor and the released parties; (2) whether the released party "has contributed substantial assets to the reorganization"; (3) whether the releases are "essential to the reorganization"; (4) approval of the releases by creditors; <u>and</u> (5) "whether the Plan provides for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction." *Master Mortg.*, 168 B.R. at 937-38. Here, the foregoing factors cannot be satisfied by the Debtors, and accordingly, the existence of third-party releases renders the Plan unconfirmable on its face.

18. The first factor – identity of interest between the debtor and the released parties – looks to whether the debtor will have financial responsibility, such as through an indemnification

or contribution agreement – if a released party were required to satisfy a judgment in a released action. The Debtors have made no disclosures in the Disclosure Statement to suggest that any of the Plan Released Parties are the beneficiary of such an agreement, such that an identity of interest exists.

19. As to the second factor, the only Plan Released Party that could *conceivably* meet it is Alder, based on the new value contribution it is proposing to make in the Plan. However, even a cursory reading of the Plan and Disclosure Statement demonstrates that Alder's commitment is illusory at best. The commitment to fund is tied to so many conditions – at least one of which is impossible to meet (obtaining a final Confirmation Order by February 1, 2019) – that it cannot be said at this time that Alder is definitively contributing anything to the reorganization. *See* Disclosure Statement, Exhibit C (setting forth 10 separate conditions to funding, some of which will not be met for as long as 12 months after the Effective Date). No other Plan Released Party is believed to be contributing substantial assets (or any assets, for that matter) to the Debtors' reorganization.

20. The third factor similarly cannot be met; the only Plan Released Party that could possibly be viewed as essential to the Debtors' reorganization is Alder, and even that is questionable, given the highly contingent nature of Alder's equity investment commitment.

21. The fourth factor cannot be met since the Debtors are not even requesting approval of the third-party releases by their creditors. And even if the Debtors did provide creditors an ability to "opt-in" to the releases, the vote of Broadmoor – whose claim is subject to Challenge by the Committee – should be ignored for purposes of determining creditor approval.

22. Finally, the fifth factor cannot be met, such that all of the third-party releases must fail. The Debtors are offering a distribution of ten percent (10%) to holders of Class 5 General

Unsecured Claims, which falls far short of the high threshold that the Debtors must meet in order to have their releases approved.

23. The releases sought by the Debtors are of particular interest to the Committee, given its identification of potential causes of action against the beneficiaries of such releases. The Committee should not be deprived of the opportunity to continue its investigation of such claims, and to prosecute such claims in the best interests of creditors and other stakeholders should it determine that such prosecution is proper under the circumstances. Given the *de minimis* (and highly speculative) commitment of Alder for the benefit of unsecured creditors, it is of critical importance to unsecured creditors that the claims identified by the Committee be preserved in their entirety.

### ii. The Plan Is Not Feasible.

24. Section 1129(a)(11) of the Bankruptcy Code states that a plan proponent must establish that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." Here, the Debtors come nowhere close to establishing that their highly-contingent plan can meet this standard.

25. As noted above, the Debtors are entirely reliant upon a $29 million equity infusion from Alder, which will provide capital for the partial repayment of the restructured Broadmoor loan, the payment of the (modest) distribution to Class 5 creditors, and for working capital and capital expenditure needs. Alder's obligation to make this infusion, however, is tied to so many contingencies as to call into question the likelihood that it will ever be made. Despite the highly

contingent nature of this infusion, Alder will receive 100% of the equity interests in Reorganized VBF USA on the Effective Date. Plan, § 8.06.[3]

26. Exhibit C to the Disclosure Statement, setting forth the conditions to funding the equity infusion, makes clear that the funding of the equity infusion is by no means assured, and that Alder will not even be required to fund for up to 12 months following the Effective Date. Of course, if Alder does not fund, the Debtors will be forced to liquidate their remaining assets. Under these circumstances, how can the Debtors possibly meet its burden under section 1129(a)(11)? Simply put, they cannot.

### iii. The Plan Is Not in the Best Interests of Creditors

27. Section 1129(a)(7) of the Bankruptcy Code, also known as the "best interests of creditors" test, provides that:

> With respect to each impaired class of claims or interests –
> (A) each holder of a claim or interest of such class –
>     (i) has accepted the plan; or
>     (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . .

11 U.S.C. § 1129(a)(2).

28. Applying the "best interests of creditors test" "requires the Court to 'conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan.'" *In re Affiliated Foods, Inc.*, 248 B.R. 770, 787 (Bankr. W.D. Mo. 2000) (quoting *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997). The court then independently finds whether creditors will receive as much under the proposed plan as they would in the hypothetical chapter 7

---

[3] The Plan makes no mention of the contingent nature of Alder's new value infusion, which is a striking omission.

14

liquidation. *Id.* "The plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan meets the best interests test." *Id.* (citing *In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1167 (5th Cir. 1993).

29.     Here, as noted above, the Debtors' Liquidation Analysis is wholly insufficient to establish, by a preponderance of the evidence, that the proposed treatment of Class 5 creditors under the Plan is equal to or better than their treatment in a hypothetical chapter 7 liquidation. First, the Liquidation Analysis *does not even attempt* to make this comparison; as such, there has been no evidentiary showing whatsoever to support confirmation of the Plan.  Second, neither the Plan nor the Disclosure Statement take into account the value of the claims and causes of action set forth by the Committee in the Challenge Notice; the Committee submits that these claims, if successful, may result in a substantially greater recovery for unsecured creditors, and they must therefore be taken into account.  Absent these disclosures, the Disclosure Statement cannot be approved, and the Plan cannot be confirmed.

### iv. The Plan Improperly Classifies Broadmoor's Deficiency Claim In An Attempt to Avoid a Contested Cramdown Fight.

30.     In a fairly transparent attempt to ensure that Class 5 General Unsecured Creditors vote to accept the Plan, the Debtors classify the $40 million-plus Broadmoor deficiency claim as a Class 5 Claim, despite the fact that Broadmoor has agreed to waive any distributions on account of it.  If this action is sanctioned, the Debtors will have effectively neutralized the one class of creditors that is most likely to reject the Plan.  By securing the acceptance of Class 5, the Debtors can avoid having to seek "cramdown" of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

31.     Section 1122 of the Bankruptcy Code states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims

or interests of such class." Here, Broadmoor's deficiency claim is so different from the claims of other unsecured creditors as to require separate classification of that claim. First, Broadmoor has already elected to forego any distribution under the Plan, and as such, the treatment of its claim is distinct from the proposed treatment of other general unsecured creditors. Second, the Committee has asserted a challenge to the validity, priority, extent and amount of Broadmoor's claims, and absent a negotiated settlement with parties-in-interest, will likely be the subject of a recharacterization and equitable subordination action. And third, the repayment of Broadmoor's secured claim is intertwined with the purported new value infusion of Alder, such that it is a willing participant in the Plan process.

32. Bankruptcy courts have held that separate classification of a deficiency claim from other unsecured claims is appropriate where those claims are "different in kind, species, and character." *In re Elmwood, Inc.*, 182 B.R. 845, 850 (D. Nev. 1995); *In re Johnston*, 21 F.3d 323, 328 (9th Cir. 1994), *as amended* (May 6, 1994) ("separate classifications of unsecured creditors justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors'"). Here, the Committee submits that separate classification of Broadmoor's deficiency claim is necessary to give voice to the approximately $6 million of general unsecured creditors who would otherwise be drowned out by Broadmoor, and the Debtors' failure to do so renders the Plan unconfirmable.

## **CONCLUSION**

33. For the foregoing reasons, the Committee respectfully requests that the Court deny approval of the Disclosure Statement in its entirety. The Committee reserves the right to object to the adequacy of any amended Disclosure Statements, as well as confirmation of the Plan, on any and all available grounds.

16

Dated: January 9, 2019                    Respectfully submitted,

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF VEROBLUE FARMS USA, INC.,** *et al.*

By: *Kristina M. Stanger*

Kristina M. Stanger
Nyemaster Goode PC
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Phone: (515) 283-8009
Fax: (515) 283-9045
E-mail: kmstanger@nyemaster.com

**-** and -

By: *Thomas R. Fawkes*

Thomas R. Fawkes (*pro hac vice*)
Daniel C. Curth
Jeffrey M. Goldberg (*pro hac vice*)
GOLDSTEIN & MCCLINTOCK LLLP
111 West Washington St., Suite 1221
Chicago, IL 60602
Phone: 312.337.7700
Fax: 312.277.2305
E-mail: tomf@goldmclaw.com

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ESF's notice of electronic filing on January 9, 2019.

/s/ *Kristina M. Stanger*