**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re: | Chapter 11 |
| VEROBLUE FARMS USA, INC., ET AL., | Case No. 18-01297 |
| Debtors. | |

**FISHDISH LLC'S OBJECTION TO DISCLOSURE STATEMENT AND**
**CONFIRMATION OF DEBTORS' REVISED CHAPTER 11 PLAN**

The FishDish LLC ("FishDish"), by and through their undersigned counsel, hereby files this objection ("Objection") to the Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Veroblue Farms USA, Inc. and its Affiliated Debtors ("DS" or "Disclosure Statement") (Docket No. 365), and opposition to the confirmation of the Amended Joint Chapter 11 Plan of Reorganization of VeroBlue Farms USA, Inc. and its Affiliated Debtors ("Plan") (Docket No. 364),[1] filed in the chapter 11 cases of VeroBlue Farms USA, Inc. and its affiliated debtors (collectively, "Debtors"). In support of its Objection, FishDish respectfully states:

## I. PRELIMINARY STATEMENT

1.      FishDish is an entity holding 6 million preferred shares of VeroBlue Farms, USA, Inc. As such, FishDish is an Interests holder in the Debtors, has a pecuniary interest in the outcome of the Confirmation Hearing and is a party-in-interest as defined under the Bankruptcy Code. FishDish has standing as an Interests holder to appear and be heard on any issue in a chapter 11 proceeding, generally. 11 U.S.C. §1109(b). FishDish also has specific standing, as a party-in-interest, to object to the Plan. 11 U.S.C. § 1128.

2.      The Debtors, Alder Aqua Ltd. ("Alder") and Broadmoor Financial, L.P. ("Broadmoor" and, collectively with the Debtors and Alder, the "Plan Proponents") have been

---

[1]      Terms not otherwise defined herein shall have the meaning ascribed to them in the Plan. The hearing on Plan confirmation is currently set for April 17, 2019 ("Confirmation Hearing").

1

very successful in preventing any inquiry or transparency into the process by the which the Plan was formulated and proposed.  This success plays no small part in the Plan's undoing, as the Plan Proponents cannot carry their burden of proof at the Confirmation Hearing with the meager evidence they have provided to this Court and other parties-in-interest.

3.    Simply put, while the Plan has all the trappings of a "reorganization" plan, it is merely a vehicle for Alder's principals and other "favored" parties to obtain releases, unquestionably designed to prevent minority shareholders from bringing claims for damages caused by the bad acts of various third parties.[2]  Upon closer examination of the Plan, however, one realizes that relatively little money changes hands under it, assuming the Plan ever becomes effective, the probability of which is miniscule given Alder's required conditions to fund.  (*See* DS at Ex. C; *infra* at 19.)  Nevertheless, even assuming that Alder does fund the Plan, most of those funds never change hands or quickly go right back into Alder's pocket.

4.    FishDish objects to Plan confirmation as the Plan Proponents have failed to meet their burdens under 11 U.S.C. § 1129.  To wit:

- § 1129(a)(1):  The Plan fails to comply with the Bankruptcy Code and other applicable law for several critical reasons: first, the proposed third-party releases violate 11 U.S.C. § 524(e); and, second, the Plan does not provide the same treatment to all holders of Interests in the same class under 11 U.S.C. § 1123(a)(4);

- § 1129(a)(3):  The Plan has not been proposed in good faith given the totality of circumstances in this case including the highly contingent nature of Alder's investment in the Reorganized Debtor, the patently impermissible third-party releases being provide to "favored" parties under the Plan, the Debtors' absolute failure to investigate certain Challenge Notice Claims (defined below) against the third parties being broadly released for their misconduct in conjunction with these Debtors, and the Debtors' waste of

---

[2]    *See e.g.*, Defendants Leslie Wulf, Bruce Hall, James Rea, and John (Ted) Rea's Answer and Affirmative Defenses to the Amended Complaint and Third-Party Claims, filed before the U.S. District Court for the Northern District of Texas, Dallas Division dated April 10, 2019, in the case of *VeroBlue Farms USA, Inc., Plaintiff, v. Leslie A. Wulf, Bruce A. Hall, James Rea, John E. Rea and Keith Driver, Defendants and Third-Party Plaintiffs, vs. Eva Ebstein, Jens Haarkoetter, Bjorn Thelander, Anders Webster, Norman McCowan, Dr. Otto Happel, and Aqua Alder LTD, Third-Party Defendants* (Case No. 3:19-cv-00764-L), attached as <u>Exhibit A</u> to this Objection.

2

significant estate assets – both before and during these Bankruptcy Cases – and other inequitable conduct, among other things;

- § 1129(a)(7):  The Plan is not in the best interests of creditors;

- § 1129(a)(11):  The Plan is not feasible because Alder's contingency requirements for funding cannot be met.  FishDish also anticipates submitting evidence that the Plan Proponents intend to liquidate the Debtors' assets after Plan confirmation, without any such proposal being present in the Plan, as required by this section of the Bankruptcy Code; and

- § 1129(b):  The Debtors cannot cramdown the Plan on FishDish for two reasons: first, the Plan does not treat FishDish's Interests fairly and equitably under § 1129(b)(2)(C); and second, assuming that Alder's Interests were properly classified in its own class of Interests (the "Alder Interests"), the Plan is not "fair and equitable" and "discriminates unfairly" against FishDish and other non-Alder preferred shareholders under *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999), *remanded to* 182 F.3d 922 (7th Cir. 1999) (hereinafter "*203 N. LaSalle*").

5.      On March 13, 2019, the Debtors filed the present Disclosure Statement (with the Creditors' Committee consent).  (Docket No. 365.)  The certificate of service states that the Disclosure Statement was served on March 14, 2019.  (*See id*.)  A mere four days later, on March 18, 2019, this Court reviewed and approved the Disclosure Statement (over the objection of the then-barred Ad Hoc Equity Committee).  On March 20, 2019, this Court entered the order approving the Disclosure Statement ("DS Approval Order").  (Docket No. 389.)

6.      Federal Rule of Bankruptcy Procedure 2002 requires 28 days' notice to parties in interest "for filing objections and the hearing to consider approval of a disclosure statement." Clearly, that notice provision was not met, nor did the Debtors seek relief from the notice provisions or request that the adequacy of the Disclosure Statement be considered at the Confirmation Hearing.  As the notice provisions of the Federal Rules of Bankruptcy Procedure were not met, FishDish submits that this Court should consider its objections to the adequacy of the information contained in the Disclosure Statement at the confirmation hearing.

3

7.      FishDish objects to the Disclosure Statement as not compliant with 11 U.S.C. §

1125, as the Disclosure Statement does not contain adequate information to allow creditors to

make an informed decision to accept or reject it.  To wit:

- the alleged claims set forth in the Challenge Notice and the basis on which the Debtor determined that those claims lacked merit are not disclosed;

- the Disclosure Statement does not provide adequate information as to Plan Proponent and/or third-party entity conflicts of interest that the Third-Party Releasees (defined below) held during their respective tenures as directors or officers of the Debtors, and in what capacity and when they served directors or officers of the Debtors or related parties;

- the Disclosure Statement incorrectly asserts that the shares in the Reorganized Debtor are being provided to Alder in return for its New Equity Investment (defined below).  (DS at 13.)  The Plan also asserts that the new equity is in exchange for a new investment.  (Plan at 23.)  Pursuant to the terms of the Plan, however, Alder receives the equity in the Reorganized Debtor on the Plan Effective, which does not require that the New Equity Investment be made.  (Plan at 31.)  *In short, Alder stands to receive 100% of the Reorganized Debtor's equity with no requirements to fund or make further investment after confirmation.  Equally upsetting, the Third-Party Releasees get their releases without Alder committing one further dollar to the Plan*;

- the Disclosure Statement fails to provide information on a patent reissue application response that was due on December 22, 2018; and

- the Disclosure Statement does not provide adequate information as to the Plan Proponents' true intentions to liquidate after confirmation.

## II. BACKGROUND

8.      The Debtors were in the business of aquaculture, specifically fish farming, and

raised Barramundi (or Asian Sea Bass) for sale through wholesalers to restaurants and grocery

chains.  On September 21, 2018 ("Petition Date"), the Debtors filed for bankruptcy relief under

chapter 11 of the Bankruptcy Code and are debtors-in-possession.

9.      On October 24, 2018, the Office of the United States Trustee appointed the Official

Committee of Unsecured Creditors ("Committee") pursuant to section 1102 of the Bankruptcy

Code to represent the interests of General Unsecured Creditors in these Bankruptcy Cases.

4

**A. The Challenge Notice Claims**

10.     On September 26, 2018 – prior to the formation of the Committee – the Court entered that certain Final Order (A) Authorizing Post-Petition Financing, (B) Granting § 364(c) and 364(d) Liens and a Superpriority Administrative Claim, (C) Approving Post Petition Financing Agreement with Alder Aqua, LTD, (D) setting a Final Hearing, and (E) Granting Related Relief (Docket No. 73, the "DIP Order"), pursuant to which, *inter alia*, the Debtors were authorized to obtain post-petition loans, advances and other credit accommodations from Alder.  In addition, the DIP Order purports to allow Broadmoor's secured claims and grants Broadmoor several forms of adequate protection on such claims.

11.     Paragraph 8(a) of the DIP Order sets forth the procedure for asserting a challenge to the claims and security interests of Broadmoor.  While the DIP Order's Challenge procedures are limited only to the Broadmoor Lien and Broadmoor Secured Claim (as defined therein), out of an abundance of caution, the Committee notified the Debtors of these Challenges *and* the other potential claims and causes of action it discovered through correspondence timely served on the Debtors' counsel in accordance with paragraph 8(a) of the DIP Order and the Extension Order on December 19, 2018 (the "Challenge Notice"), attached to this Objection as <u>Exhibit B</u> and incorporated by reference in its entirety.

12.     The Challenge Notice reflects the Committee's initial investigation findings and suggests that the Debtors' estates hold tens of millions of dollars of claims and causes of action against a variety of entities and individuals.  It challenges the validity, priority, extent and enforceability of Broadmoor's secured claim, and provided evidence supporting either the complete recharacterization of Broadmoor's claim below current shareholders or the equitable subordination of such claim to the Debtors' unsecured creditors and non-insider equity holders.  In

addition, the Challenge Notice puts the Debtors on notice of a host of other claims and causes of

action identified by the Committee (collectively, the "Challenge Notice Claims").  The most

relevant Challenge Notice Claims released under the Plan include:

- *Amstar's Note Sale to Broadmoor and Alder's Participation Agreement with Broadmoor.*
  Amstar Group, LLC's ("Amstar") sale of its secured claims to Broadmoor in December
  2017 may not have been arm's length or legitimate.  Alder and Amstar have common
  ownership.  Per the Disclosure Statement, in February of 2018, the Debtors ran out of
  working capital and defaulted on the Broadmoor Loan.  Alder agreed to provide a bridge
  loan of just $5.025 million in connection with a forbearance agreement with Broadmoor
  and took a participation interest in the Broadmoor loan.  (DS at 9.)  Neither Alder nor
  Broadmoor have produced this participation agreement or any other evidence that supports
  an arm's length transaction.  No parties outside of Alder or Broadmoor know whether Alder
  has any level of control (or to what extent) over Broadmoor's decision making or the terms
  on  the  underlying  transaction,  let  alone  whether  money  actually  changed  hands.
  Broadmoor also took the Amstar note subject to any claims of misconduct from the original
  noteholder Amstar, whose principals and related parties control Alder and the Debtors.  For
  the  reasons  set  forth  in  the  Challenge  Notice,  claims  to  either  recharacterize  and/or
  equitably subordinate the Broadmoor secured claim exist.[3]  This Court has barred any
  discovery into these claims.  (Docket No. 421.)

- *Breaches of Fiduciary Duty, Fraud in the Inducement and Corporate Waste*.  The Debtors'
  estates hold claims and causes of action for breach of fiduciary duty and aiding and abetting
  breach  of  fiduciary  duty  against  several  current  and  former  officers,  directors  and
  shareholders of the Debtors, as discussed in more detail on pages 9-14 of the Challenge
  Notice.  The Court has barred any discovery into these claims.  (Docket No. 421.)

13.    The Debtors did not undertake *any* independent investigation of the estates'

Challenge Notice Claims at any time prior to or following the filing of these Bankruptcy Cases.

Rather than investigate and potentially prosecute these claims, the Debtors attempt to "bury" them

under the Plan, which, if confirmed, will grant broad releases to most of the targeted parties who

---

[3]      Any party-in-interest may raise an objection to the validity and extent of any other creditors' claim.  The Plan
Proponents may not unilaterally transact those rights away.  *AI Int'l Holdings (BVI) Ltd v. MUFG Union Bank, N.A.
(In re Weinstein Co. Holdings)*, 595, B.R. 455, 463 (Bankr. D. Del. 2018). Concurrent with this Objection, FishDish
has filed a separate objection to the Broadmoor Claim, which was never allowed under the plain language of the DIP
Order.  The timely submission of the Challenge Notice prevented the automatic triggering of Broadmoor's claim and
lien allowance.  (DIP Ord. at ¶ 8.)  A more detailed argument with citations to the DIP Order may be found at the Ad
Hoc Equity Committee's Reply in Support of the Standing Motion. (Docket No. 380 at 5-6.) All arguments from said
reply are incorporated herein by reference.

simultaneously held positions of authority for, or are otherwise related to, the Debtors, Alder and third-party Amstar.[4]

### B.  Alder Ownership and Corporate Governance

12.     Alder holds a majority of preferred equity shares in the Debtors ("Alder Preferred Shares").  (Docket No. 1 at 11-12.)  The Alder Preferred Shares are of the same priority as those held by FishDish, and both Alder and FishDish are classified as Class 7 Interest holders under the Plan. (*Id.*, Plan at 14.)

13.     Alder also lent the Debtors $2 million in a debtor in possession credit facility.  (DS at 11.)

14.     There are currently two members on the VBF USA's Board of Directors ("Board"), Ed Kerzner and Alan Sutherland.  Both are Alder designees – who also sit as the sole directors of other Debtor entities.  (DS at 8.)  It is unknown if the Debtors' Board currently has a quorum or authority to bind the Debtors to any course of action.  This Court previously barred discovery into this issue. (Docket No. 421.)

15.     In short, Alder controls the Board and the operations of the Debtor.  Alder holds an undisclosed interest in Broadmoor's senior debt.  Nothing is known about the transaction whereby Broadmoor acquired this debt, except for the fact that Broadmoor concluded the transaction in days without undertaking any due diligence.  It is unknown what persons or entities comprise Broadmoor and whether Alder, in fact, has control or veto power over Broadmoor decision-making by virtue of the undisclosed participation interest agreement.  This Court previously barred discovery into that issue. (Docket No. 421.)

---

[4]     FishDish is aware the Committee has withdrawn the Challenge Notice.  The Committee cannot, however, withdraw the claims and causes of action detailed in the Challenge Notice.

4770331/1/18753.000

### III. THE PLAN

16.     On December 10, 2018, the Debtors filed their original plan of reorganization. Later, on March 13, 2019, the Debtors filed the current Plan, which purports to "reorganize the Debtors' finances and equity structure an provide a platform that would be used, in part, to pay Creditors." (DS at 2.)

17.     Under the Plan, priority and tax claims would receive distributions at 100% of their value. Broadmoor retains its lien on all Collateral and be delivered a promissory note in the principal amount of just over $11 million. Alder states that the Alder Participation Interest (defined below) will be repaid "on terms to be agreed upon by" by Alder and Broadmoor, Alder but does not disclose those terms. (Plan at 11.)  This Court previously barred discovery into that question. (Docket No. 421.)

18.     Although Alder's obligation to fund is highly contingent and may never occur, as discussed *infra*, the Plan basically provides that Alder (i) repays itself $2 million advanced by Alder under the DIP Facility, (ii) pays $350,000 (subject to adjustment) to General Unsecured Creditors (both, presumably on the Effective Date, even though the Plan does not expressly obligate Alder to provide such funding on the Effective Date or otherwise), and (iii) $6.18 million to Broadmoor on the one-year anniversary of the Effective Date, with $5.025 million of such funds reverting to Alder to satisfy some sort of "participation agreement" ("Alder Participation Interest") that has never been provided to FishDish or any other party-in-interest including, without limitation, Debtors' counsel and the Office of the United States Trustee.

19.     $21.4 million of additional Alder cash is earmarked for post-confirmation capital investments in the Debtors – but Alder is under absolutely no obligation to make such investments under the Plan unless the conditions set forth in Exhibit C of the Disclosure Statement are met.

8

Yet those conditions are impossible to satisfy.  As such, under even the most favorable interpretation of the Plan and its economics, Alder is only obligated to spend $1.53 million in hard cash to fund the Plan – hardly the $29.93 million promoted by the Debtors and Alder in the Disclosure Statement.  Nevertheless, Alder receives 100% of the Reorganized Debtor's equity on the Effective Date and the Third-Party Releases are released from those pending claims against them plus any forthcoming claims from other aggrieved parties.  (Plan at 22, 23.)  The Plan goes effective 14 days after entry of the confirmation order, **with or without any funding**.  (Plan at 31.)

20.     The Plan purports to pay General Unsecured Creditors a twenty-five percent (25%) cash distribution and any recoveries from certain Causes of Action.  All Interests (*i.e.*, equity shares) in the Debtors are extinguished under the Plan.  (DS at 3-4.)

21.     If the Broadmoor Claim is recharacterized or equitably subordinated to the level of preferred shareholder – either on account of acts attributed to Amstar or in conjunction with the Note transaction with Broadmoor – then any recovery on the Challenge Notice Claims exceeding General Unsecured Claims (approximately $3 to 4 million) would directly benefit FishDish as a preferred shareholder.  As minority shareholders have asserted since the beginning of their participation in these Bankruptcy Cases, the Challenge Notice Claims have merit and the potential recovery on them is far beyond any threshold to FishDish's participation as a preferred shareholder.

**A.  Plan Releases**

22.     The Plan provides for releases of certain identified third parties:  Eva Ebstein, Jens Haarkoetter, Ed Kerzner, Alan Sutherland, Bjorn Thelander, Anders Wester and Norman McCowan. (Plan at 4, 6 (for the definitions of "Debtor Releasees" and "Plan Released Parties").)

9

The Plan also provides that the Plan Proponents and their members, officers, agents and professionals, including Eva Ebstein, Jens Haarkoetter, Ed Kerzner, Alan Sutherland, Bjorn Thelander, Anders Wester are "Exculpated Parties." (Plan at 5.) Ebstein, Haarkoetter, Thelander and Wester were former members of the Debtors' board. (DS at 19.) Kerzner was an officer of Amstar and Sutherland was an independent contractor that provided services for the Debtors on behalf of Alder. (Ebstein, Haarkoetter, Thelander, Wester, Kerzner and Sutherland are collectively referred to hereinafter as the "Third-Party Releasees.") The Third-Party Releasees are identified as "Debtor Releasees," "Exculpated Parties" and "Plan Released Parties" under the Plan and, when taken together, the Plan provides expansive releases for these individuals of any and all claims. (Plan at 4, 5 and 7.)

23.     No disclosure is made as to what roles the Third-Party Releasees may have played as agents, officers or members of related parties such as Alder, Amstar and Broadmoor. This Court previously barred discovery into this issue. (Docket No. 421.) On information and belief, the Third-Party Releasees all simultaneously held positions of authority for Amstar or are otherwise related to it – either by ownership, business relationship or blood. Amstar has not contributed any value towards the Plan.

24.     Neither have the Third-Party Releasees. The Plan states that the Debtors' and Holders of Claims and Interests' respective releases of causes of action against the Third-Party Releasees (generally, the "Releases") are "for the good and valuable consideration provided by the [Third-Party Releasees]". But there is no evidence of any value being provided by the Third-Party Releasees as consideration for the Releases. (Plan at 27-28.) Nor is there any indication of value being provided by such Third-Party Releasees in consideration for the benefits of the exculpation clause of the Plan. (*Id.* at 29.)

10

**B.  Reorganization and the Equity in the Reorganized Debtor**

25.     "The Plan contemplates the reorganization of the Debtors, with each emerging from bankruptcy and continuing to operate its business as a Reorganized Debtor with a restructured balance sheet."  (DS at 17.)  The Plan Proponents fail to disclose a planned liquidation of the Reorganized Debtors' assets in the Disclosure Statement or Plan.

26.     "In exchange for [Alder's] investment of equity necessary to make the payments required on the Effective Date of the Plan, [Alder] shall receive" all equity interests in the Reorganized Debtor. (Plan at 23.)  Alder receives 100% of the Reorganized Debtor on account of the new equity investment, as described and allocated in the Plan (*hereinafter*, the "New Equity Investment").  (*Id.*)  Nowhere in the Disclosure Statement or Plan do the Plan Proponents disclose that equity interests in the Reorganized Debtor are in exchange for anything than Alder's New Equity Investment.

27.     The Reorganized Debtor equity was never offered on the open market in these Bankruptcy Cases.[5]  The Plan Proponents also proposed this "new value" Plan during the time that the Debtors held exclusivity pursuant to 11 U.S.C. § 1121.

## IV. ARGUMENT

28.     A plan may be confirmed only if the proponent establishes that it: (A) satisfies *each* of the requirements set forth in 11 U.S.C. § 1129(a);[6] and (B) does not "discriminate unfairly" and

---

[5]     Prior to the Petition Date, the Disclosure Statement asserts that the "Debtors explored options with third parties" for an infusion of new capital, "but those discussions did not result in any proposals for further investment or acquisition of the Debtors' assets."  (DS at 9.)  There is no further detail or discussion of these efforts.  There are no disclosures that the Plan Proponents inquired into any possible sources of new capital after the Petition Date or otherwise solicited third parties (even including FishDish) to participate in the New Equity Investment.

[6]     This fact is true even if even if each class under the plan is unimpaired or has accepted.  *See, e.g., In re Central Med. Ctr., Inc.,* 122 B.R. 568, 571 (Bankr. E.D. Mo. 1990). ("[I]n voting to accept a plan, the **only** provision of section 1129(a) under which [a class of claimants] has waived its objection is subsection (a)(8) . . . .") (emphasis added).

4770331/1/18753.000

is "fair and equitable" with respect to each impaired class of claims or interests that has not voted in favor of the Plan. 11 U.S.C. § 1129(b); *see 203 N. LaSalle*, 526 U.S. at 441.

29.     **The Plan Proponents bear the burden of proof that the section 1129 requirements are satisfied.** *See, e.g., Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 (9th Cir. 1986) (plan proponent bears burden with respect to requirements of section 1129(a)); *Danny Thomas Props. II Ltd. P'ship v. Beal Bank, S.B.B. (In re Danny Thomas Props. II Ltd. P'ship)*, 241 F.3d 959, 963 (8th Cir. 2001) (if plan proponent requests that plan be crammed down, it bears burden with respect to requirements of section 1129(b)).

30.     Here, the Plan Proponents have not (and cannot) meet their burden. The Plan violates no less than four subsections of § 1129(a) and violates § 1126(b) – any one of which, standing alone, render the Plan unconfirmable.

**A. The Plan Does Not Comply with Section 1129(a)(1) of the Bankruptcy Code**

> **i.    The Plan violates Section 524(e) of the Bankruptcy Code by including impermissible Third-Party Releases.**

31.     Section 1129(a)(1) of the Bankruptcy Code requires, as a condition to confirmation, that the Plan complies with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). Some bankruptcy courts in the Eighth Circuit have indicated that third-party releases are absolutely prohibited as a violation of 11 U.S.C. §524(e). *See, e.g.*, *In re Bennett Paper Corp.*, 68 B.R. 518, 520 (E.D. Mo. 1986) (disapproving disclosure statement for failure to inform creditors that non-debtor release provision is impermissible pursuant to 11 U.S.C. § 524(e) where "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"); *and In re Craig*, 325 B.R. 804, 805 (Bankr. N.D. IA 2005) (where, "[t]he discharge in bankruptcy, along with the coextensive permanent injunction and fresh start, are exclusive to the debtor, and do not otherwise affect the enforcement of any

underlying debt, or any non-debtor liability thereon.")

32.     Other courts have held that third-party releases are very rarely permissible – and only under the most stringent conditions. "The Bankruptcy Codes does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan." *In re Continental Airlines*, 203 F.3d 203, 211 (3d. Cir. 2000). However, bankruptcy courts, 'as courts of equity, have broad authority to modify creditor-debtor relationships.' *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990)." *In re Archdiocese of Saint Paul & Minneapolis*, 578 B.R. 823, 832-33 (Bankr. D. Minn. 2017). "To confirm such a plan, the debtor must show (1) large or numerous liabilities against the debtor and the co-liable parties to be released, (2) a substantial contribution from the non-debtor co-liable parties, (3) the importance of the third-party releases to the reorganization process, and (4) significant acceptance of the plan by the group of creditors who are being asked to give up their claims against third parties."[7] *Archdiocese of Saint Paul*, 578 B.R. at 832.

33.     The causes of action against these Third-Party Releasees are extensively detailed in the Challenge Notice. These claims include breach of fiduciary and waste claims of significant value – indeed, the only value that remains for non-controlling shareholders such as FishDish.

34.     Alder asserts that the Releases are part of the consideration for the New Equity Investment. However, many of the Third-Party Releasees are also agents or officers of Amstar,

---

[7]     The *Archdiocese* court held that the term "substantial" "certainly means more than the half required by § 1126 for a class to accept a plan." *Id.* Here, Class 7 equity holders are receiving nothing under the Plan and are deemed to have rejected the Plan. (DS at 5.) *See also In re Master Mortgage Inv. Fund*, 168 B.R. 930, 936 (W.D. Mo. 1994) where factors to be considered in evaluating whether releases or injunctions are valid include: (1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization; (4) a substantial majority of the creditors agree to such injunction; and (5) the plan provides a mechanism for the payment of substantially all claims of the class affected by the injunction. *Id.* at 934-35; and *In re Fansteel Foundry Corp.*, No. 16-01825-als11, 2018 Bankr. LEXIS 3309, at *26-30 (Bankr. S.D. Iowa Oct. 26, 2018) (for same).

13

who has not provided *any* consideration towards the Plan, much less the "substantial contribution" required in *Archdiocese of Saint Paul*. There is nothing in the Disclosure Statement or Plan that identifies any necessity of the Releases to the Debtors, much less any critical importance. Minority shareholders (*i.e.* FishDish) are deemed to reject the Plan – and those shareholders are the constituents now required to waive claims against the Third-Party Releasees.

35.     Further still, the Third-Party Releases expansively include the:

> current and former officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, investment bankers, accountants, insurance providers, and other professionals and representatives, and each of their direct and indirect shareholders' and owners' respective officers, directors, members, employees, partners, managers, advisors, attorneys, financial advisors, investment bankers, accountants, and other professionals and representatives

(Plan at 4) of the Plan Proponents. This pool is a broad swath of persons utterly unknown in number or identity. These people (or entities) have not contributed any value to the Plan and the Plan Proponents cannot show that releases for these unknown individuals are essential to the Debtors' reorganization.

36.     It is clear that the Third-Party Releases in this Plan are not acceptable in the Eighth Circuit. On this ground alone, confirmation must be denied.

## ii.     The Plan violates Section 1123 of the Bankruptcy Code

37.     The Plan purports to extinguish all interests of Class 7 holders. (Plan at 14.) But Alder is granted an exclusive opportunity to make the New Equity Investment under the Plan and further receives 100% of the equity in the Reorganized Debtor, <u>plus</u> Releases for itself and certain "favored" third parties.

38.     Section 1123 of the Bankruptcy Code provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan *shall* . . . provide the same treatment for each claim or interest of a particular class, unless the holder agrees [to less favorable treatment]" 11

14

U.S.C. § 1123(a)(4). (emphasis added.)

39.     The U.S. Supreme Court previously instructed in *203 N. LaSalle* that an exclusive

right to receive equity in a reorganized debtor is "value" on account of a prior claim or interest in

the debtor. So, *some* Class 7 interest holders (Alder) do, in fact, receive value under the Plan on

account of the Alder Interests, while other Class 7 Interests holders (FishDish and other non-Alder

preferred shareholders) receive absolutely nothing. Accordingly, if this Court deems the Plan

violates Section 1123 of the Bankruptcy Code, by definition, it would violate Section 1129(a)(1)

of the Bankruptcy Code and cannot be confirmed as a matter of law.

**B.  The Plan Violates Section 1129(a)(3) of the Bankruptcy Code**

40.     Section 1129(a)(3) of the Bankruptcy Code requires the proponents of a plan to

establish, as a condition to confirmation, that the plan has been proposed in good faith and not by

any means forbidden by law. 11 U.S.C. § 1129(a)(3). The term "good faith" is not defined in the

Bankruptcy Code but is generally interpreted as meaning that there is "a reasonable likelihood that

the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."

*In re Madison Hotel Assocs.,* 749 F.2d 410, 424-25 (7th Cir. 1984). Section 1129(a)(3) "speaks

more to the *process* of plan development than to the content of the plan." *In re Bush Indus., Inc.*,

315 B.R. 292, 304 (Bankr. W.D.N.Y.2004) (emphasis added). To determine whether a plan has

been proposed in good faith a court must consider "the totality of the circumstances" surrounding

the plan's development and proposal. *Madison Hotel*, 749 F.2d at 425; *see also In re Apex Oil

Co.*, 118 B.R. 683, 703 (Bankr. E.D. Mo. 1990) (for same). "The court must focus on factors such

as whether the debtor has stated debts and expenses accurately; whether the debtor has made any

fraudulent misrepresentation to mislead the bankruptcy court; or whether the debtor has unfairly

manipulated the Bankruptcy Code." *In re Barger*, 233 B.R. 80, 83 (B.A.P. 8th Cir. 1999).

41.    The primary objective of the Bankruptcy Code is to maximize the value of a

debtor's estate and distribute that value to holders of claims and interests on account of those

claims and interests. *See 203 N. LaSalle*, 526 U.S. at 453 (1999) (citing *Toibb v. Radloff*, 501 U.S.

157, 163 (1991) (observing recognized policy of the Bankruptcy Code to be "maximizing property

available to satisfy creditors"); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores,

Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is]

to enhance the value of the estate at hand."). The Plan fails this primary objective, to satisfy the

"good faith" requirement of Section 1129(a)(3), for the reasons articulated below.

42.    <u>First</u>, the impermissible Third-Party Releases being provided to "favored"

individuals and wide swaths of unknown persons connected to the Plan Proponents constitutes

"bad faith" under federal bankruptcy law. Moreover, none of the Plan Proponents have identified

any value being provided by the Third-Party Releasees for the Releases under the Plan, except

maybe Alder, assuming Alder actually funds the New Equity Investment.

43.    <u>Second</u>, the highly contingent nature of Alder's New Equity Investment constitutes

"bad faith" under federal bankruptcy law. FishDish anticipates submitting evidence at the

Confirmation Hearing that certain contingencies to Alder's funding set forth in Exhibit C of the

Disclosure Statement simply can never be met. Moreover, as set discussed *supra*, Alder's

obligations to fund the New Equity Investment - at least the vast majority of it - are illusory.

44.    <u>Third</u>, the Debtors failure to conduct any inquiry into the Challenge Notice Claims

constitutes "bad faith" under federal bankruptcy law. The Debtors' willful ignorance – not even

attempting to obtain and review the Amstar / Broadmoor Note sale agreement or the Alder

Participation Agreement, is smoke indicating a fire of claims that would inure to the benefit of the estate and its creditors and interest holders.  Further still, FishDish anticipates submitting evidence at the Confirmation Hearing of certain waste claims related to the culling and disposal of fish inventory – ostensibly for the purpose of deflating the asset value and Liquidation Analysis, as no other rationale exists for this behavior, which incidentally violated applicable law and might even constitute a criminal act.[8]

45.     _Fourth_, the Debtors actions to suppress potential competing bids for the estate during these Bankruptcy Cases constitutes "bad faith" under federal bankruptcy law.  This reality is further discussed *infra*, in connection with the Plan's violation of the absolute priority rule.  That said, FishDish anticipates providing further evidence of even more egregious bid suppression by the Debtors at the Confirmation Hearing.  Maximizing value to the estate is antithetical to efforts to discourage potential third-party purchasers, and such behavior by the Plan Proponents constitutes "bad faith" as a matter of law.

46.     _Fifth_, equality of distribution among similarly situated creditors is central to the purposes and objectives of the Bankruptcy Code.  *See, e.g., Begier v. IRS*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a *central policy* of the Bankruptcy Code.  According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property.") (emphasis added); *see also Avon Park*, 311 U.S. at 147-48.  The U.S. Supreme Court has recognized the importance of this policy for at least the last 100 years.  *See Clarke v. Rogers*, 228

---

[8]     Upon information and belief, the Debtors used clove oil to kill its entire fish inventory during these Bankruptcy Cases, on December 6, 2019.  Such practice is illegal under applicable federal law for its risk to any human administering the clove oil.   *See e.g.,* US FDA, *Guidance for Industry # 150 – Concerns Related to the use of Clove Oil as Anesthetic for Fish* (April 24, 2007), https://www.fws.gov/fisheries/aadap/PDF/GFI-150-Clove-Oil-2.pdf ("FDA Guidance") ("This guidance is intended to remind producers that neither clove oil nor any of its components are the subject of an approved new animal drug application and, because of safety concerns, should not be used as an anesthetic in fish.")  A copy of the FDA Guidance is attached hereto as Exhibit C.

17

U.S. 534, 548 (1913) ("Equality between creditors is *necessarily the ultimate aim* of the Bankrupt[cy] Law.") (emphasis added).

47.     As also further discussed *infra*, the failure of the Debtors (under Alder's control) to engage in a marketing process resulted in Alder failing to pay "top dollar" for the equity shares in the Reorganized Debtor.  This failure resulted in Class 7 interest-holder Alder receiving more from the estate on account of its interests, than FishDish and other non-Alder Interests, under the Plan.  While the Plan asserts that the shares in the Reorganized Debtor were consideration for Alder's equity infusion, the Plan Proponents' failure to market test the Reorganized Debtor's shares through an open sale is fatal to this argument.  Again, the burden of proof rests with the Plan Proponents.[9]

**C.  The Plan Violates Section 1129(a)(7) of the Bankruptcy Code**

48.     To be confirmed, pursuant to 11 U.S.C. § 1129(a)(7), a plan must meet the "best interests of creditors test."  (To be clear, section 1129(a)(7) also applies to interest holders.  *Id.*) This test requires that non-accepting impaired classes must "receive or retain under the plan … property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 . …"  Application of this test entails a hypothetical chapter 7 liquidation analysis as of the effective date of the plan.

---

[9]     Finally, it is unknown as of this filing whether Class 5 General Unsecured Creditors (excluding Broadmoor) will vote against the Plan.  If the general unsecured creditor body (excluding Broadmoor) votes against the Plan, the Debtors classification of the $40 million-plus Broadmoor deficiency claim as a Class 5 Claim also constitutes bad faith and impermissible gerrymandering of the voting classifications under Section 1122 of the Bankruptcy Code. FishDish reserves the right to supplement this Objection after the balloting is completed.

The burden of proof is on the plan proponent to establish that its plan meets this test.  *In re Affiliated Foods, Inc.,* 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000).

49.     The Liquidation Analysis ignores any analysis of the Challenge Notice Claims and the result of the recharacterization and equitable subordination of the Broadmoor Secured Claim and/or equitable subordination of Alder's interests.  The bald statement: "the Debtors believe that the demands lack merit in their entirety" is all they offer.  (DS at 12.)  It would be well within the Debtors' rights to determine the Challenge Notice Claims have no value – but there is no basis or discussion for <u>how</u> the Debtors came to this determination.  Given that: (a) Alder controls the Board and the Debtors; (b) Alder has common ownership with Amstar; and (c) Alder has an unknown interest in or level of control over Broadmoor, it is clear why the Debtors have engaged in zero investigation into the Challenge Notice Claims.  The Debtors may "believe" that the demands lack merit – but when the Debtors have not even reviewed any of the underlying transaction documents central to those claims, the Debtors' conclusions ring hollow.

50.     Recall that, in connection with Plan confirmation, the Debtors carry the burden of proof.  *In re Affiliated Foods, Inc.*, 249 B.R. at 787.  Because the Debtors have not performed nor disclosed that they have conducted any due diligence or investigation into the Challenge Notice Claims, they cannot meet the burden of demonstrating that the Challenge Notice Claims do not have value and that shareholders would not be better off in a complete liquidation.

51.     Furthermore, the Liquidation Analysis (DS at Ex. D) has also been improperly deflated because of the Debtors' wasteful and improper culling of fish inventory, both pre- and

post-Petition Date.  FishDish anticipates providing evidence of this waste of the Debtors' assets that negatively impacted the assets of the estate and the Liquidation Analysis.

### D.  The Plan Violates Section 1129(a)(11) of the Bankruptcy Code

52.     Section 1129(a)(11) of the Bankruptcy Code states that a plan proponent must establish that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." "This statutory provision establishes what is commonly known as the 'feasibility' requirement, and as a practical matter it requires the court to find that the plan is 'workable' before it may be confirmed."  *In re Danny Thomas Properties II Ltd. Partnership*, 241 F.3d 959, 962 (8th Cir. 2001); *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir. 1985).  In determining whether a plan is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable. *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990).

53.     The test for feasibility is whether the things which are to be accomplished after confirmation can actually happen as a practical matter.  *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)  Pertinent factors to be considered include the business' earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company.  *Id.*  Bankruptcy courts in this district have previously expressly stated that the purpose of the feasibility test is "to protect against visionary or speculative plans."  *Gilbertson Restaurants LLC*, 2005 Bankr. LEXIS 554 at *15.  Here, as described below, the Plan is the exact type of speculative plan that fails to meet the feasibility standard.

54.     As noted above, the Debtors allegedly rely upon a $29 million equity infusion from

Alder (an illusory infusion, as discussed *supra*), which ostensibly provides capital for the partial repayment of the restructured Broadmoor loan, the payment of the distribution to Class 5 creditors, and for working capital and capital expenditure needs. But Alder's obligation to make this infusion, however, is tied to at least two impossible contingencies, as set forth below. Nevertheless, despite the highly contingent nature of this infusion, Alder is certain to receive 100% of the equity interests in the Reorganized Debtor on the Effective Date. (Plan at 18.)[10]

55.     In relevant part, Exhibit C to the Disclosure Statement sets forth two conditions to Alder's New Equity Investment:

- "The Receipt of the Jordan aquifer well permit and the ability to actually reach the aforementioned aquifer" (*hereinafter*, the "Aquifer Permit"); and

- "The Debtors shall have secured means of wastewater disposal consistent with applicable law and local ordinances (and acceptable to Alder), including receipt of permits from National Pollutant Discharge Elimination System for waste water from Urban Farm, Blairsburg, and Buckeye facilities" (*hereinafter*, the "Wastewater Permit").

(DS at Ex. C ¶¶ 9, 10.)

56.     The Disclosure Statement and Plan are devoid of any information relating to the status of their efforts to obtain the Aquifer Permit nor the Wastewater Permit. The Debtors have not disclosed their due diligence efforts, if any, to obtain these permits. This Court previously barred discovery into this issue. (Docket No. 421.)

57.     In fact, the Debtors cannot obtain the Aquifer Permit. Evidence to be presented at the Confirmation Hearing will establish that the Jordan aquifer is already at or beyond capacity.

---

[10]     The Effective Date is <u>not</u> contingent upon Alder's funding, but only upon the entry of the confirmation order. (Plan at 5, 30.) The Third-Party Releasees will also receive their Releases on the Effective Date, again, whether or not Alder actually funds the New Equity Investment. (Plan at 27.) The Plan's definition of "Effective Date" incorrectly cites to conditions of effectiveness at § 10.01 of the Plan, rather than, presumably, § 11.01 of the Plan. (Plan at 5, 30.)

4770331/1/18753.000

The Debtors' meetings with the Webster City municipal government ("Webster City") made clear that the Debtors' request to draw an additional 250,000 to 400,000 gallons of water from the aquifer *per day* will not be granted as there is simply not enough water for both the farm and Webster City's citizens.  FishDish anticipates providing this and additional evidence of the impossibility of obtaining the Aquifer Permit.  FishDish expects the evidence to show that, as the condition cannot be met, the obligation to make the New Equity Investment in the Reorganized Debtor is illusory – to be renegotiated or ignored at any time – rather than a contractual obligation.

58.     Further, at least with respect to the Wastewater Permit at Urban Farm, which is within the jurisdiction of Webster City, FishDish anticipates submitting evidence that the Debtors have not requested or inquired into a Wastewater Permit with the Department of Natural Resources or Webster City.  If they have not even inquired, how can the Debtors represent to this Court that the Wastewater Permit is obtainable?

59.     Additionally, section 1129(a)(11) provides that the Plan may only be confirmed if the Plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  Here, FishDish anticipates submitting evidence and admissions by a principal of the Debtors that the Plan Proponents have plans to liquidate the Debtors' assets after Plan confirmation.  This course of action is not listed anywhere in the Plan or Disclosure Statement.  Without such disclosure, the Plan violates the feasibility requirement of the chapter 11 plan confirmation process.

60.     The Plan Proponents have the burden of proof to demonstrate the Plan is feasible. Under these circumstances, they cannot possibly meet that burden under section 1129(a)(11).  The Plan cannot be confirmed.

**E. The Plan Violates Section 1129(b) of the Bankruptcy Code**

61.     Section 1129(b) of the Bankruptcy Code provides that a plan can only be confirmed if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b).

62.     As described above, the Plan treats Alder's and FishDish's preferred shares within a single classification – Class 7 Interests.  Class 7 Interests are extinguished under the Plan, with such class deemed to have rejected the Plan.  (Plan at 14.)

63.     Alder, however, receives 100% of the equity in the Reorganized Debtor on the Effective Date.  (Plan at 22.)  The ability to make this contribution alone is an exclusive right of Alder, the Debtors' controlling shareholder.  The Plan provides no opportunities or options for any other party-in-interest to either contribute to the New Equity Investment or provide better terms than Alder to receive shares in the Reorganized Debtor.  In essence, some interest-holders have been provided with an exclusive opportunity to bid for this equity (*i.e.* Alder), while others have not (*i.e.* FishDish).

64.     The U.S. Supreme Court held in *203 N. LaSalle* that exclusive opportunities to "purchase" equity in a reorganized debtor have independent value and – if those opportunities aren't exposed to the market – constitute an impermissible end-around to the absolute priority rule under Section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  *See* 506 U.S. at 441.

65.     In *203 N. LaSalle*, the partnership debtor proposed a plan under which certain current partners would contribute new capital in exchange for ownership in the reorganized entity. *Id*. Rejecting the lower court' confirmation order under section 1129(b) of the Bankruptcy Code, the U.S. Supreme Court held that an insider's exclusive opportunity to participate and obtain the reorganized debtor's equity was, by itself, a valuable property right.  *Id*. at 455.  "Given that the

23

opportunity is property of some value, the question arises why old equity alone should obtain it, not to mention at no cost whatever." *Id*. The Court went on to hold that the exclusiveness of the opportunity "with its protection against the market's scrutiny of the purchase price by means of competing bids renders the [opportunity] a property interest extended 'on account of' the old equity position." *Id*. Therefore, the Court concluded *203 N. LaSalle* plan violated the absolute priority rule.

66.     The facts are slightly different in this case – but the same law and logic applies. Here, the objector (FishDish) does not hold a claim or interest senior to Alder, but rather both Alder and FishDish have been classified together as Class 7 Interests. However, *203 N. LaSalle* instructs that an exclusive right to participate in funding and receive shares in the Reorganized Debtor constitutes value regardless.[11] While this reality dooms the Plan under section 1123(a)(4), it begs the question whether the Debtors could separately classify Alder and FishDish and effectively "end around" section 1123(a)(4).

67.     But even a modified Plan that separately classes Alder and FishDish could not be confirmed because it would then violate Section 1129(b)(2)(C), which provides that, for subsection (b), "the condition that a plan be fair and equitable with respect to a class" requires, in the case of interest holders:

> each holder of an interest of such class [must] receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is

---

[11]     After holding that the exclusive opportunity to purchase old equity constitutes "value" received on account of a prior interest in the debtor, the U.S. Supreme Court essentially mandated that opportunities to purchase equity in a reorganized debtor over the objection of a senior creditor be open to competing bids in order to ensure that the price was "top dollar" and truly acquired in exchange for new value. *Id*. Put bluntly: "plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." *Id*. at 458. *See also In re Castleton Plaza, LP*, 707 F.3d 821, 822 (7th Cir. 2013) ("The [203 N. LaSalle] Court devised the competition requirement to curtail evasion of the absolute-priority rule… Competition helps prevent the funneling of value from lenders to insiders, no matter who proposes the plan or when. An impaired lender who objects to any plan that leaves insiders holding equity is entitled to the benefit of competition.").

4770331/1/18753.000

entitled, any fixed redemption price to which such holder is entitled, or the value of such interest

11 U.S.C. § 1129(b)(2)(C). Thus, FishDish must share, *pro rata*, in any value that Alder receives under the Plan if separately classified. As such, any modified Plan where Alder retains 100% of the equity in the Reorganized Debtor without subjecting that interest to competitive bidding, would not be "fair and equitable" to FishDish and would "discriminate unfairly" against it. Any such Plan would be unconfirmable under Section 1129(b) of the Bankruptcy Code.[12] For these reasons, FishDish submits that Alder's failure to open bidding for the equity in the Reorganized Debtors dooms the Plan as a matter of law.

### F. The Disclosure Statement Does Not Contain "Adequate Information" As Required By 11 U.S.C. § 1125.

68.     As set forth above, section 1125 of the Bankruptcy Code requires a disclosure statement contain "adequate information" regarding a proposed plan to allow creditors to make informed decisions. "Adequate information" is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtors' books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

> Adequate information is not a static or rigid term. Instead, the concept is intended to be tailored to suit individual cases. Precisely what constitutes adequate information in any particular instance will develop on a case by case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the costs of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection . . . . In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.

*In re Fansteel Foundry Corp.*, No. 16-01825-als11, 2018 Bankr. LEXIS 3309, at *8 (Bankr. S.D.

---

[12]     As discussed *supra*, Alder simply could decide not fund the New Equity Investment (the conditions cannot be satisfied) on the Effective Date but still receive 100% of the equity in the Reorganized Debtor and those Releases for its "favored" Third-Party Releasees. A firm commitment of $1 has greater value than Alder's conditional commitment, where the conditions are an impossibility.

Iowa Oct. 26, 2018).

69.     Here, the Disclosure Statement omits highly relevant facts that are needed to make

an informed decision regarding whether to accept or reject the Plan.  Among others, the following

provisions of the Disclosure Statement lack adequate information or provide incorrect information:

a.  The Disclosure Statement incorrectly asserts that the shares in the Reorganized
Debtor are being provided to Alder in return for its New Equity Investment.  (DS
at 13, where "*[i]n exchange for its investments*, Alder will own 100% of the equity
interests in VBF USA." (emphasis added))[13]  Pursuant to the terms of the Plan,
however, the new equity is issued to Alder on the Effective Date of the Plan – and
the New Equity Investment is contingent upon the conditions set forth in Exhibit C
to the Disclosure Statement.  Yet, the triggering of the Effective Date does **not**
require that Alder fund the New Equity Investment.  (Plan at 5, 31 where the Plan
becomes effective so long as final orders on substantive consolidation and
confirmation have been entered.)  In short, Alder could refuse to fund the New
Equity Investment and still receive 100% of the equity in the Reorganized Debtor
(and the Releases for the Third Party Releasees) without having to pay another
penny after confirmation.  Alder could refuse to fund because the conditions of
funding cannot be met, as discussed in greater detail, *supra*, in relation to the Plan's
feasibility issues.

b.  The Disclosure Statement's Liquidation Analysis states that, with respect to a
technology patent: "[t]here was a reissue patent application filed on October 20,
2016 and many claims in that reissue application were rejected.  The Debtor has
until December 22, 2018 to respond."  (DS at 54.)  The Amended Disclosure
Statement was filed on March 13, 2019 – with no update to whether the response
was filed or where Debtors are in this process.

c.  The Disclosure Statement does not provide any information regarding the
investigation, or lack thereof, that the Debtors undertook in response to the
Challenge Notice Claims.

d.  The Disclosure Statement does not provide any information relating to the
Challenge Notice Claims.  No doubt that the Plan Proponents believed that, with
the new-found support of the Creditors' Committee and the barring of the Ad Hoc
Equity Committee from these cases, that they were free to omit any detail of those
claims.  Nonetheless, those claims still existed for creditors and equity shareholders
regardless of the standing and status of the two committees.  The Challenge Notice
Claims should have been disclosed and the Debtors should have provided the bases
to which they determined those claims had no value.

---

[13]     The Plan, in places, also asserts that the Reorganized Debtor's equity is in exchange for the New Equity
Investment.  (Plan at 23, where "[i]n exchange for [Alder's] investment of equity necessary to make the payments
required on the Effective Date of the Plan, the [Alder] shall receive the Plan Sponsor New Equity Interest.")

26

    e.    The Disclosure Statement is devoid of any information relating to the status of the Debtors' efforts and ability to obtain the Aquifer Permit and the Wastewater Permit. The Debtors have not disclosed their due diligence efforts, if any, to obtain these permits.

    f.    The Disclosure Statement does not provide any information relating to any entities that the Third Party Releasees were officers, agents or members of (with the exception of the disclosures relating to Kerzner and Sutherland).  This Court barred any discovery on this issue.  (Docket No. 421.)

4770331/1/18753.000

## CONCLUSION

WHEREFORE, for the reasons set forth herein, FishDish LLC respectfully requests that this Court deny confirmation of the Plan.


Dated:  April 12, 2019                    Respectfully submitted,


                                          **FISHDISH, LLC**

                                          By:   _/s/ Aaron L. Hammer_
                                                One of Its Attorneys

                                          John R. Walker
                                          Beecher, Field, Walker, Morris, Hoffman
                                          & Johnson, P.C.
                                          Court Square Building
                                          620 Lafayette St., Suite 300
                                          P.O. Box 178
                                          Waterloo, IA 50704
                                          Phone: (319) 234-1766

                                          **-** and -

                                          Aaron L. Hammer
                                          John W. Guzzardo
                                          Stavros S. Giannoulias
                                          Horwood Marcus & Berk Chartered
                                          500 W. Madison, Suite 3700
                                          Chicago, IL 60661
                                          Phone: (312) 606-3200
                                          ahammer@hmblaw.com
                                          jguzzardo@hmblaw.com

4770331/1/18753.000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel of record hereby certifies that he caused a copy of the foregoing

**FISHDISH LLC'S OBJECTION TO DISCLOSURE STATEMENT AND CONFIRMATION OF DEBTORS' REVISED CHAPTER 11 PLAN** to be filed with the U.S.

Bankruptcy Court for the Northern District of Iowa on the 12th day of April, 2019.  Notice and a

copy of this filing will be served upon all counsel of record by operation of the Court's CM/ECF

electronic filing system.

By: /s/ Aaron L. Hammer

4770331/1/18753.000